# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Case No. 24-[•] (    ) |
| **EDGIO, INC.**, *et al.*,[1] | Chapter 11 |
| Debtors. | (Joint Administration Requested) |

# MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THEM TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

---

[1] The Debtors operate under the trade name Edgio and have previously used the trade names Limelight, Edgecast and Layer0. The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the last four digits of each Debtor's federal tax identification number, are: Edgio, Inc. (7033); Edgecast Inc. (6704); Edgio International, Inc. (3022); Limelight AcquisitionCo, Inc. (6138); Limelight Midco, Inc. (1120); Limelight Networks VPS, Inc. (3438); Mojo Merger Sub, LLC (7033). The Debtors' service address for purposes of these Chapter 11 Cases is: 11811 N. Tatum Blvd., Ste. 3031, Phoenix, AZ 85028. Additional information about the Chapter 11 Cases is available at https://OmniManagementSolutions.com/Edgio/.

Edgio, Inc. and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "***Edgio***", the "***Debtors***", or the "***Company***"), respectfully state as follows.

## RELIEF REQUESTED

1.     By this motion (the "***Motion***"), the Debtors seek entry of an interim order (the "***Interim Order***") and a final order (the "***Final Order***" and together with the Interim Order, the "***DIP Orders***"):[2]

(i)     authorizing Edgio (the "***Borrower***") to obtain a senior secured superpriority debtor in possession financing facility (the "***DIP Facility***") subject to the terms and conditions set forth in that certain DIP Commitment Letter and DIP Term Sheet, by and among the Borrower, each of the Debtors other than the Borrower (collectively, the "***Guarantors***" and, together with the Borrower, the "***DIP Loan Parties***" and Lynrock Lake Master Fund LP ("***Lynrock***"), as lender (the "***DIP Lender***") attached hereto as **Exhibit B** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***DIP Term Sheet***"), consisting of:

(a)     a term loan facility in an aggregate principal amount not less than $45,955,067 consisting of: (1) a new money term loan in the aggregate principal amount not to exceed $11,718,750 (which, after accounting for the Original Issue Discount (as defined in the DIP Term Sheet), will provide $9,375,000 in net funding to the Debtors) (the "***Interim New Money DIP Loan***"), which shall be made available and funded in a single disbursement upon entry of the Interim Order and satisfaction or waiver (in writing) by the DIP Lender of the other applicable conditions to any Interim New Money DIP Loan set forth in the DIP Term Sheet (the "***Interim Closing Date***"); and (2) a "roll up" of (x) all outstanding Prepetition Priority Term Loan Obligations (as defined below) and (y) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement (as defined below) (the "***Interim Roll-Up Prepetition Obligations***") into new loans under the DIP Facility (the "***Interim Rolled DIP Loans***") in a corresponding, aggregate principal amount, which Interim Rolled DIP Loans shall be drawn upon and immediately deemed applied in repayment of all Interim Roll-Up Prepetition Obligations on a cashless dollar-for-dollar basis upon entry of the Interim Order and funding of the Interim New Money DIP Loan;

(b)     a term loan facility in an aggregate principal amount not less than $73,352,483 consisting of: (1) a new money term loan in the aggregate principal amount not to exceed $3,906,250 (which, after accounting for the

---

[2]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

Original Issue Discount, will provide $3,125,000 in net funding to the Debtors) (the "*Final New Money DIP Loan*" and, together with the Interim New Money DIP Loan, the "*New Money DIP Loans*"), which shall be made available and funded in a single disbursement upon entry of the Final Order (as defined below) and satisfaction or waiver (in writing) by the DIP Lender of the other applicable conditions to the Final DIP Loan set forth in the DIP Term Sheet (or, in the event the DIP Documents (as defined below) have been executed and delivered to the DIP Lender in advance of the Final DIP Loan draw, subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent to funding of the Final DIP Loan set forth in the applicable DIP Documents); and (2) a "roll up" of no less than $69,446,233 of outstanding principal amount and accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement (collectively, the "*Final Roll-Up Prepetition Obligations*" and, together with the Interim Roll-Up Prepetition Obligations, the "*Roll-Up Prepetition Obligations*"), into new loans under the DIP Facility (the "*Final Rolled DIP Loans*," together with the Interim Rolled DIP Loans, the "*Rolled DIP Loans*" and, the Rolled DIP Loans, together with the New Money DIP Loans, the "*DIP Loans*") in a corresponding, aggregate principal amount, which Final Rolled DIP Loans shall be drawn upon and immediately deemed applied in repayment of all Roll-Up Prepetition Obligations on a cashless dollar-for-dollar basis upon entry of the Final Order.

(ii)     providing for each of the Guarantors to unconditionally guaranty, on a joint and several basis, the Borrower's obligations under the DIP Facility, including the borrowings under the DIP Loans and all other DIP Obligations;

(iii)    authorizing the DIP Loan Parties to enter into any agreements, documents and instruments in connection with the DIP Facility, including the DIP Term Sheet and all notices, guarantees, security agreements, ancillary documents and agreements executed in connection therewith, (collectively, the "*DIP Documents*") on terms and conditions consistent with the Interim Order and otherwise in form and substance acceptable to the DIP Lender, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(iv)     subject to the Carve-Out[3], authorizing the Debtors to grant to the DIP Lender, and authorizing the Debtors to incur, the DIP Liens in all DIP Collateral, to secure the DIP Obligations (including in respect of the Interim Rolled DIP Loans), which liens and security interests shall be automatically perfected and be subject to the lien priorities set forth in the DIP Term Sheet, on the terms and conditions set forth herein and in the applicable DIP Documents;

(v)      authorizing the Debtors to grant to the DIP Lender allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations (including in respect of the Interim Rolled

---

[3]     Any terms or provisions in the that are made subject or subordinate to the "Carve-Out" shall, to the extent applicable, also, be subject or subordinate to the Sale Proceeds Carve-Out (as defined in the Interim Order).

DIP Loans), with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out and the Prepetition Permitted Liens, on the terms and conditions set forth in the applicable DIP Documents and the Interim Order;

(vi)    authorizing the Debtors to use the proceeds of the DIP Facility and the Prepetition Collateral (as defined below), including Cash Collateral, in accordance with the terms hereof, including pursuant to the Approved Budget as further described herein, to: (a) pay fees, interest and expenses under the DIP Facility; (b) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out; (c) pay for bankruptcy-related costs and expenses; and (d) pay Adequate Protection Payments;

(vii)    authorizing the Debtors to pay, on a final and irrevocable basis, the principal, interest, expenses, fees, premiums and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation: (a) the Exit Premium (as defined in the DIP Term Sheet); (b); the Original Issue Discount; and (c) the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with the Interim Order and the DIP Documents (collectively, the "***DIP Obligations***");

(viii)    granting adequate protection to the Prepetition Junior Secured Parties (as defined below), on the terms set forth in the DIP Documents and the Interim Order, on account of any Diminution in Value (as defined below) of the Prepetition Junior Secured Parties' respective interests in the Prepetition Collateral, including Cash Collateral;

(ix)    authorizing the Debtors and their estates to waive: (a) their rights to surcharge against the DIP Collateral, including Prepetition Collateral, pursuant to Bankruptcy Code section 506(c); (b) the "equities of the case" exception under Bankruptcy Code section 552(b); and (c) the equitable doctrine of marshalling and/or similar doctrines with respect to the DIP Collateral, including the Prepetition Collateral, in each case, on the terms and conditions set forth in the Interim Order;

(x)    authorizing the DIP Lender, the Prepetition Junior Term Loan Lender and Prepetition Junior Secured Notes Parties (each as defined below), as applicable, to exercise remedies under the DIP Documents, the Prepetition Junior Term Loan Documents (as defined below) and the Prepetition Junior Secured Notes Documents (as defined below), as applicable, on the terms described in the Interim Order upon the occurrence and during the continuance of a Termination Event (as defined below);

(xi)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the Interim Order and to deliver any notices of termination described below and as further set forth herein;

(xii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order; and

(xiii)    scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order (i) authorizing and approving, on a final basis, among other things, the

Debtors' entry into the DIP Facility, the borrowings under the DIP Facility, the continued use of Cash Collateral and the granting of adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents, and (ii) approving the form of notice with respect to the Final Hearing.

2.      A proposed form of order granting this relief on an interim basis (the "***Proposed Interim Order***") is attached to this Motion as **Exhibit A**.[4]

3.      The principal statutory bases for this Motion are sections 105(a), 363, 364 and 503(b) of title 11 of the U.S. Code (the "***Bankruptcy Code***"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedures (the "***Bankruptcy Rules***"), and Rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Delaware (the "***Court***") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This case has been referred to the Court pursuant to 28 U.S.C. § 157(a) by the Amended Standing Order of Reference, *In re Standing Order of Reference re: Title 11* (D. Del. Feb. 29, 2012) (Sleet, C.J.). This Motion is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to the Court's entry of a final order on this Motion if it is determined that the Court cannot otherwise enter a final order or judgment consistent with article III of the U.S. Constitution.

5.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.      GENERAL BACKGROUND

6.      Edgio provides technology services that support the delivery of video and other content through the Internet. Among a broad suite of services, Edgio runs global computer networks that support high-speed delivery of websites, recorded video, and live-streaming for a

---

[4]      The Debtors will file the proposed Final Order in connection with the hearing for approval thereof.

diverse and sophisticated base of blue-chip business and media customers. Through its software applications, Edgio helps many of those same customers enhance the security and performance of their websites and e-commerce platforms. Edgio employs hundreds of developers and engineers around the world to provide these services to its customers.

7.      On this date (the "***Petition Date***"), Edgio commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Edgio is authorized to continue operating its businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Edgio has requested that its cases be consolidated for procedural purposes only and administered jointly. No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.

8.      Edgio commenced these Chapter 11 Cases to implement an expeditious process to market and sell substantially all of its business's assets (the "***Sale Process***"). In this effort, Edgio is supported by its prepetition secured lender, which has agreed to act as a stalking horse bidder in connection with the Sale Process. Edgio believes that this Sale Process, together with an orderly wind-down of any remaining entities, will maximize value for the benefit of all stakeholders.

9.      For further information about Edgio, its business operations, and the circumstances that have led to the filing of these Chapter 11 Cases, Edgio refers to *Declaration of Todd Hinders in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed simultaneously herewith. [5]

## II.    THE PROPOSED FINANCING

10.     The Debtors require postpetition financing and access to Cash Collateral to fund the anticipated Sale Process and continue their operations during the course of these Chapter 11 Cases. To assess such financing requirements and options, Riveron Consulting, LLC ("***Riveron***"), the Debtors' proposed financial advisor, analyzed the cash needs of the Debtors in connection with the

---

[5]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day Declaration or the Interim Order attached hereto as **Exhibit A**, as applicable.

postpetition financing and TD Securities (USA) LLC (an affiliate of Cowen and Company, LLC) ("**TD Cowen**"), the Debtors' proposed investment banker, engaged with critical stakeholders and led a robust marketing process to identify parties that were interested in providing postpetition financing to the Debtors. In addition to engaging with Lynrock, the Debtors primary prepetition secured lender, this process also included reaching out to parties outside the existing capital structure. As part of this process, TD Cowen reached out to approximately 15 third-party financial institutions and other capital sources to assess interest in providing debtor-in-possession financing. As more fully set forth in the *Declaration of Ann M. Miller of TD Cowen in Support of the Motion* (the "**TD Cowen Declaration**"), through this process the Debtors did not receive any interest from a third-party source and, in consultation with their advisors, focused their efforts on engaging with Lynrock to seek postpetition financing on the best possible terms as well as ensuring that the financing was appropriately sized and timed to meet the Debtors' cash and liquidity needs as more fully set forth in the *Declaration of Jesse York of Riveron in Support of the Motion* (the "**Riveron Declaration**"). The Debtors and their advisors continued to engage in extensive, hard-fought, arm's-length, negotiations with the Lynrock, and were ultimately able to secure the proposed DIP Facility set forth in the DIP Term Sheet attached hereto. This represents the best and only possible debtor-in-possession financing facility that the Debtors were able to obtain.

11.     The DIP Facility includes: (i) the New Money DIP Loans which are senior secured superpriority debtor in possession loans to the Borrower in a total aggregate principal amount not to exceed $15,625,000 and (ii) a roll-up of not less than $ 103,682,550 of the Priority Term Loan Obligations and all principal and interest of the 2023 Term Loan Obligations, including accrued interest on a portion of the 2023 Term Loan Obligations through the date of entry of the Final Order (but not including the make-whole premium) (the "**Roll-Up Amount**") on a cashless, dollar-for-dollar basis, into DIP Loans.

12.     Through the DIP Facility, the Debtors will obtain access to (in addition to Cash Collateral) the New Money DIP Commitments over two draws as follows: (x) the Interim New Money DIP Loan in an amount not to exceed $11,718,750 (with net proceeds after the Original

Issue Discount of $9,375,000) and (y) the Final New Money DIP Loans, not to exceed $3,906,250 (with net proceeds after the Original Issue Discount of $3,125,000) on a final basis. The DIP Facility also contains milestones that provide for an efficient and value-maximizing Sale Process (as further described below and as set forth in the DIP Term Sheet, the "***Milestones***").

13.    With respect to the Rolled DIP Loans, the DIP Facility provides for a roll-up of (i) all of the $9,236,316.75 in Prepetition Priority Term Loan Obligations and (ii) not less than $94,446,233.40 in principal and interest in 2023 Term Loan Obligations outstanding as of the Petition Date, plus accrued interest on a portion of the 2023 Term Loan Obligations through the date of entry of the Final Order, on a cashless, dollar-for-dollar basis, into DIP Loans. The roll-up of the entire Prepetition Priority Term Loan Obligations and $25 million in principal amount of the 2023 Term Loan Obligations shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan, with a "roll up" of remaining outstanding principal amount and accrued and unpaid interest under the 2023 Term Loan Obligations deemed to occur upon entry of the Final Order. The Rolled DIP Loans constitute a key component of the DIP Facility and the DIP Lender has represented to the Debtors that it would not agree to provide the DIP Facility absent the Rolled DIP Loans. The terms of the roll-up will also benefit the Debtors, in that the DIP Facility (including the Rolled DIP Loans) bears an interest rate of 19.5% of which 2.5% is payable in cash, while the 2023 Term Loan bears an interest rate (including default interest) of 25.5% of which 3.5% is payable in cash. Thus, were it not for the roll-up, the Debtors might be forced to make adequate protection payments during these Chapter 11 Cases at a higher rate than the cash interest on the Rolled DIP Loans. Under the circumstances, given the lack of any actionable alternative financing offers and the fact that the DIP Lender, in its capacity as the Debtors' prepetition lender, is willing to provide the Debtors with continued access to its Cash Collateral, the Debtors believe that the Rolled DIP Loans is reasonable and appropriate.

14.    In addition to the New Money DIP Loans and the Rolled DIP Loans, the DIP Lender has consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order. As set forth in the Riveron Declaration, the Debtors would be unable to finance the Sale Process and

maintain their operations with Cash Collateral use alone. Accordingly, accessing the DIP Facility provided by the DIP Lenders is critical to maximize the value of these estates.

15.    Along with the DIP Facility, the Debtors will provide adequate protection to the Prepetition Junior Secured Parties consisting of (i) replacement liens on all DIP Collateral (subject to the priorities set forth the Interim Order), (ii) superpriority administrative expense claims, (iii) payment of professional fees and (iv) continued accrual of interest payments during the pendency of the Chapter 11 Cases (to the extent their Prepetition Secured Obligations are not rolled into the DIP Facility), (as further described below and in the Interim Order, the "***Adequate Protection***").

16.    The DIP Facility (including each of the terms thereunder, as also set forth in the Interim Order) and access to Cash Collateral is the culmination of hard-fought, arm's-length, good faith negotiations between the DIP Lender and the Debtors.

17.    As further described in the TD Cowen Declaration, the terms and provisions of the DIP Facility are fair and reasonable under the circumstances. The proposed DIP Facility, after TD Cowen's survey of the debtor-in-possession financing market, represents the Debtors' best (and only) available option to acquire postpetition funding. As further described in the First Day Declaration and the Riveron Declaration, the Debtors enter these cases in a compromised liquidity position and require access to Cash Collateral and the proceeds of the DIP Facility (including, in the immediate term, the Interim DIP Loan) to fund the Sale Process and these Chapter 11 Cases. Specifically, access to the Interim DIP Loan will permit the Debtors to meet near-term obligations and also allow the Debtors, with the assistance of their advisors, to conduct a thorough and efficient sale process that will maximize the value of the estates.

18.    The proposed DIP Facility is in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates, and should be approved.

### III.    Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2

19.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Summary of Material Terms[6] | |
|---|---|
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Edgio, Inc. in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code.<br><br>DIP Term Sheet at 1. |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each subsidiary of the Borrower that guaranteed, purported to guarantee, or was required to guarantee, any Prepetition Credit Facility.<br><br>DIP Term Sheet at 1. |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Lynrock Lake Master Fund LP, in its capacity as holder of the Interim New Money DIP Loans, the Rolled DIP Loans, and the Final New Money DIP Loans.<br><br>DIP Term Sheet at 1. |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(B), (a)(ii) | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "***Maturity Date***"):<br><br>(i)  the date that is 6 months after the Petition Date (the "***Interim Maturity Date***"); provided, that the Interim Maturity Date may be extended with the prior written consent of the DIP Lender, in its sole discretion, for up to two (2) additional 30-day periods as necessary to obtain receipt of all regulatory approvals required for consummation of a sale of assets;<br><br>(ii)  the date of consummation of any sale or disposition of (a) all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures) or (b) one or more Segments (as defined in the Bidding Procedures) to the extent that, as of the date such Segment(s) is/are sold, no other Qualified Bids (as defined in the Bidding Procedures) for a substantial portion of the Debtors' remaining Assets have been submitted to the Debtors (the "***Sale Maturity Date***"); provided, that the Sale Maturity Date may be extended by the DIP Lender, in its sole discretion;<br><br>(iii)  the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and<br><br>(iv)  the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an Event of Default.<br><br>DIP Term Sheet at 13-14. |

---

[6]  The summaries contained in this table are qualified in their entirety by the provisions of the DIP Commitment Letter, the DIP Term Sheet and the proposed Interim Order, as applicable. To the extent of any inconsistency, the terms of the DIP Commitment Letter, DIP Term Sheet or the Interim Order shall control, as applicable.

| Summary of Material Terms[6] |
|---|
| **Commitments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A), (a)(ii) | The DIP Facility shall be available from the Interim Closing Date to the Maturity Date, unless terminated earlier pursuant to the terms hereof or the DIP Orders.  The Borrower may request draws under the DIP Facility on the dates set forth below by delivering a notice of borrowing to the DIP Lender (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower:<br><br>(i)    <u>Interim DIP Loans</u>:  On the Interim Closing Date, the DIP Lender shall make available DIP Loans (as defined below) in an aggregate principal amount no less than $45,955,067 consisting of (a) a new money term loan in the aggregate principal amount not to exceed $11,718,750 (which, after accounting for the Original Issue Discount as defined and described below), will provide $9,375,000 in net funding to the Debtors) (the "**Interim New Money DIP Loan**"), which shall be funded as a single borrowing on the date upon which each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to the Interim DIP Loans" have been satisfied or waived (in writing) by the DIP Lender and (b) a roll up of (1) all outstanding Prepetition Priority Term Loan Obligations and (2) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement, in each case, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Interim Rolled DIP Loans**", and together with the Interim New Money DIP Loan, the "**Interim DIP Loans**"), which shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan; and<br><br>(ii)    <u>Final DIP Loan</u>: On the Final Closing Date (as defined below), the DIP Lender shall make available DIP Loans in an aggregate principal amount no less than $73,352,483 consisting of (a) a new money term loan in an aggregate principal amount not to exceed $3,906,250 (which, after accounting for the Original Issue Discount, will provide $3,125,000 in net funding to the Debtors) (the "**Final New Money DIP Loan**," together with the Interim New Money DIP Loans, the "**New Money DIP Loans**"), which shall be funded as a single borrowing strictly in accordance with the then-in-effect Approved DIP Budget (as defined below) (after giving effect to the Permitted Variances (as defined below)), subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to Final DIP Loan" (or, in the event the DIP Documents have been executed and delivered to the DIP Lender in advance of the Final DIP Loan draw, subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent to funding of the Final DIP Loan set forth in the applicable DIP Documents) and (b) a roll up of all remaining outstanding principal amounts and all accrued and unpaid interest (including interest attributable to principal under the Prepetition Junior Term Loan Credit Agreement that constituted the Interim Rolled DIP Loans) under the Prepetition Junior Term Loan Credit Agreement, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Final Rolled DIP Loans**", and together with the Final New Money DIP Loan, the "**Final DIP Loan**" and, together with the Interim DIP Loans, the "**DIP Loans**"), which shall be deemed to occur immediately upon entry of the Final DIP Order.<br><br>The DIP Lender shall fund the New Money DIP Loans by wire transfer of immediately available funds no later than 5:00 P.M. (Eastern Time), one (1) Business Day after receipt of a Notice of Borrowing to the account of the Borrower.  Upon the funding of the Interim New Money DIP Loan to the Borrower, all Prepetition Priority Term Loan Obligations and $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Interim Rolled DIP Loans. Upon the entry of the Final DIP Order, all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Final Rolled DIP Loans.<br><br>DIP Term Sheet at 1-3. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **<u>Interim DIP Loan</u>**:<br><br>The obligations of the DIP Lender to make the Interim DIP Loan on the Interim Closing Date will be subject to satisfaction or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with the related draw request: |

RLF1 31465571v.1

| **Summary of Material Terms[6]** | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(E) | (i) | the Debtors shall have timely delivered to the DIP Lender and its advisors the initial Approved DIP Budget or any update thereto then required to be delivered in accordance with this DIP Term Sheet; |
| | (ii) | the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) on the date of entry of the Interim DIP Order (or such later time as the DIP Lender may agree to). |
| | (iii) | the Borrower shall have delivered to the DIP Lender a closing certificate duly executed by the chief executive officer, president or chief financial officer (or other responsible officer with equivalent duties) of the Borrower, appropriately completed, by which such officer shall certify to the DIP Lender that the conditions precedent to the Interim DIP Loan set forth in clauses (vii) and (viii) hereof to be made on the Interim Closing Date have been satisfied; |
| | (iv) | the Interim DIP Order shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Interim DIP Order; |
| | (v) | all of the "first day" motions, orders and related pleadings filed by the Debtors in the Chapter 11 Cases shall have been delivered in advance to counsel to the DIP Lender and the relief granted thereunder shall be acceptable to the DIP Lender; |
| | (vi) | the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition Priority Term Loan Credit Agreement remains in place); |
| | (vii) | no default or Event of Default under the DIP Commitment Letter or this DIP Term Sheet (or under the DIP Documents, as the case may be) or a Termination Event under, and as defined in, the Interim DIP Order shall have occurred and be continuing on the Interim Closing Date or shall exist after giving effect to the Interim DIP Loan to be made on the Interim Closing Date; |
| | (viii) | all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects on the Interim Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date; |
| | (ix) | subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform could not reasonably be expected to cause a Material Adverse Change; |
| | (x) | receipt by the DIP Lender of a certificate, in form and substance reasonably satisfactory to the DIP Lender, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) of each Debtor on behalf of such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (1) the certificate of incorporation of such Debtor, certified as of a recent date by the applicable secretary of state and (2) the by-laws of such Debtor then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of |

| Summary of Material Terms[6] |
|---|

| | | |
|---|---|---|
| | | such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) thereof authorized to execute the DIP Commitment Letter and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof; |
| | (xi) | to the extent invoiced at least one (1) Business Day prior to the Interim Closing Date, substantially concurrently with the Interim Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Prepetition Secured Parties and the DIP Lender relating to the Chapter 11 Cases, the DIP Facility and the Prepetition Secured Debt Facilities (including, without limitation, reasonable fees and expenses of their counsel and external advisors allocated to the Chapter 11 Cases, including, without limitation, all reasonable and documented fees and out-of-pocket expenses of (a) Akin Gump Strauss Hauer & Feld, LLP), (b) Pashman Stein Walder Hayden P.C., (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the DIP Lender in lieu of the professionals set forth in clause (a) or (b) (collectively, the **"DIP Professionals"**) or the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order. Modifications of the Interim DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent (email being sufficient) of the DIP Lender; |
| | (xii) | the Debtors are in compliance in all respects with the section below entitled "Milestones"; and |
| | (xiii) | the DIP Lender shall have received, at least three (3) Business Days prior to the Interim Closing Date (or such shorter period as DIP Lender may agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001), as subsequently amended and reauthorized), in each case, requested at least seven (7) Business Days prior to the Interim Closing Date. |
| | | For the purposes of this DIP Term Sheet, "Material Adverse Change" shall mean: since the Petition Date, any event, circumstance or condition that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on (i) the business, assets, properties, liabilities (contingent or otherwise), financial condition or results of operations of the Debtors, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases, (ii) the ability of the Debtors to perform their obligations under this DIP Term Sheet or any other DIP Document to which they are a party, (iii) the validity or enforceability against any Debtor of this DIP Term Sheet or any other DIP Document to which it is a party or (iv) the rights and remedies of the DIP Lender hereunder or thereunder. |
| | | See DIP Term Sheet at 16-19. |
| | | **Final DIP Loan**: |
| | | The obligations of the DIP Lender to make the Final DIP Loan on the Final Closing Date shall be subject to satisfaction, or written waiver, by the DIP Lender, of each of the conditions precedent described above in the section of this DIP Term Sheet (or, to the extent the DIP Documents have been executed and delivered to the DIP Lender, the DIP Credit Agreement) titled "Conditions Precedent to the Interim DIP Loans" and each of the following conditions precedent in connection with the related draw request: |
| | (i) | the Debtors shall have timely delivered to the DIP Lender the Approved DIP Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet; |
| | (ii) | the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) three (3) Business |

| Summary of Material Terms[6] |
|---|

| | | |
|---|---|---|
| | | Days prior to the requested funding date for such Final DIP Loan (or such later time as the DIP Lender may agree to); |
| | (iii) | the Final DIP Order shall have been entered by the Bankruptcy Court (after notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Final DIP Order; |
| | (iv) | no default or Event of Default under the DIP Facility or a Termination Event under the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist after giving effect to the Final DIP Loan to be made on the Final Closing Date; |
| | (v) | all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects as of the Final Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects, and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date); |
| | (vi) | subject to Bankruptcy Court approval, (a) the Debtors shall have the corporate power and authority to make, deliver and perform their obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet, the DIP Documents (as applicable) and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change; |
| | (vii) | to the extent invoiced at least one (1) Business Day prior to the applicable Final Closing Date, substantially concurrently with such Final Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or postpetition) of the DIP Lender and the Prepetition Secured Parties relating to the Chapter 11 Cases, the DIP Facility (including, without limitation, reasonable fees and expenses of the DIP Professionals and any professionals retained by the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) in accordance with the terms of the Final DIP Order; |
| | (viii) | at least forty-one (41) days shall have passed since the Petition Date; |
| | (ix) | if required by the DIP Lender, and to the extent not previously executed, receipt by the DIP Lender of duly executed and delivered copies of the DIP Documents (including, without limitation, senior secured superpriority debtor in possession term loan credit agreement), in each case on the terms set forth in this DIP Term Sheet or otherwise on terms reasonably acceptable to the DIP Lender; and |
| | (x) | the Debtors are in compliance in all respects with the section below entitled "Milestones." |
| | | Modifications of the Final DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent of the DIP Lender, in its sole discretion (e-mail being sufficient (including as communicated by counsel in writing)). |
| | | See DIP Term Sheet at 19-21. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | | Interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate per annum equal to 19.5%.<br><br>Interest with respect to any DIP Loan shall be paid as follows (i)(a) 2.5% *per annum* shall be paid in cash and (b) 17.0% *per annum* shall be payable in kind and not in cash with such interest amount |

| Summary of Material Terms[6] | |
|---|---|
| Local Rule 4001-2(a)(i)(B), (a)(ii) | being automatically added to, and made part of, the outstanding principal amount of DIP Leans, in each case on the last Business Day of each month and (ii) all accrued and unpaid interest shall be paid in cash on the Maturity Date.<br><br>See DIP Term Sheet at 12-13. |
| **Use of DIP Facility**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | Subject to Bankruptcy Court approval, the Debtors shall use the proceeds of the DIP Facility and Cash Collateral strictly in accordance with this DIP Term Sheet, the DIP Documents, the DIP Orders and the Approved DIP Budget (after giving effect to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases, (c) costs and expenses related to the DIP Facility and (d) any other purposes specifically set forth in the Approved DIP Budget.<br><br>No Cash Collateral or proceeds of the DIP Facility may be used by the Debtors or any other entity to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with, the DIP Facility; _provided_ that any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**") may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action in respect of the Rolled DIP Loans (the "**Investigation Budget**").<br><br>No cash collateral or proceeds of the DIP Facility in excess of the amount in any Approved DIP Budget may be distributed to, or used for the benefit of, any non-Debtor Affiliates or subsidiaries of the Debtors, or applied toward (directly or indirectly) their administration without the prior written approval of the DIP Lender<br><br>See DIP Term Sheet at 4-5. |
| **"Roll-Up" Provisions**<br><br>Local Rule 4001-2(a)(i)(O) | The DIP Facility shall also include, as further set forth below, a "roll-up" of (i) all Prepetition Priority Term Loan Obligations and (ii) all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement, including accrued interest on a portion of the Prepetition Junior Term Loan Obligations through the date of entry of the Final Order.<br><br>In connection with the Interim DIP Loan, a roll up of (1) all outstanding Prepetition Priority Term Loan Obligations and (2) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement, in each case, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Interim Rolled DIP Loans**", and together with the Interim New Money DIP Loan, the "**Interim DIP Loans**"), which shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan; and<br><br>In connection with the Final DIP Loan, a roll up of all remaining outstanding principal amounts and all accrued and unpaid interest (including interest attributable to principal under the Prepetition Junior Term Loan Credit Agreement that constituted the Interim Rolled DIP Loans) under the Prepetition Junior Term Loan Credit Agreement, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Final Rolled DIP Loans**", and together with the Final New Money DIP Loan, the "**Final DIP Loan**" and, together with the Interim DIP Loans, the "**DIP Loans**"), which shall be deemed to occur immediately upon entry of the Final DIP Order.<br><br>DIP Term Sheet at 2-3. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for the diminution in value of their interests in the Prepetition Collateral resulting from (a) subordination of their respective interests in the Prepetition Collateral, (b) the use of cash collateral during the Chapter 11 Cases, (c) the use, sale, lease or other disposition of any Prepetition Collateral, (d) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code and/or (e) any other reason for which adequate protection may be granted under the Bankruptcy Code (the "**Diminution in Value**"), the Prepetition Junior Term Loan Lender and the Prepetition Junior Notes Parties shall, to the extent of any Diminution in Value, during the pendency of the Chapter 11 Cases:<br><br>(i)      be granted (a) additional and replacement liens on, except as set forth herein, all property of the Debtors' estates that constitutes DIP Collateral (the "**Adequate Protection Liens**"), which shall be junior and subordinate only to the Carve-Out, the |

| Summary of Material Terms[6] |
|---|

|  |  |  |
|---|---|---|
|  |  | Prepetition Permitted Liens and the DIP Liens, and (b) superpriority administrative expense claims against each of the Debtors pursuant to section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), which claims shall be junior and subordinate only to the Carve Out and the DIP Superpriority Claims; |
|  | (ii) | receive payments in cash on a current basis of all reasonable and documented fees, costs and expenses of professionals retained by the Prepetition Junior Term Loan Lender, the Prepetition Junior Noteholder and the Prepetition Junior Notes Agent, which professionals shall include, but may not be limited to, (a) Akin Gump Strauss Hauer & Feld LLP, as lead restructuring counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (b) Pashman Stein Walder Hayden P.C., as Delaware local counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the Prepetition Secured Parties in lieu of the professionals set forth in clauses (a) or (b) (the "**Adequate Protection Fees**"); and |
|  | (iii) | accrue interest on all outstanding Prepetition Junior Term Loan Obligations and Prepetition Junior Notes Obligations that have not been exchanged into Rolled DIP Loans. |
|  |  | See DIP Term Sheet at 10; Interim Order ¶ 9. |
| **Mandatory Prepayments**<br><br>Local Rule 4001-2(a)(i)(E) |  | Subject to the Carve-Out, the Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Premium) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows: |
|  | (i) | 100% of the net cash proceeds of any sale or disposition of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, subject to the prior deposit of proceeds into escrow solely to fund (i) the KEIP Payment, (ii) the Expense Reimbursement (as defined in the Bidding Procedures) and (iii) the payment of any applicable fees payable to TD Cowen pursuant to that certain engagement letter among them and the Borrower dated February 27, 2024, as amended on September 8, 2024 (the "**Cowen Engagement Letter**" and such payments described in clauses (i) through this clause (iii), the "**Mandatory Pre-Prepayments**"), in each case to be applied solely to such uses only when due and only in the amounts required to be paid; |
|  | (ii) | 100% of the net cash proceeds of any other sale or other disposition by the Borrower or the Guarantors or their subsidiaries of any assets, subject to exceptions consistent with the Prepetition Priority Term Loan Credit Agreement, and subject to the prior deposit of proceeds into escrow solely to fund the Mandatory Pre-Prepayments to be applied solely to the Mandatory Pre-Prepayments only when due and only in the amounts required to be paid; |
|  | (iii) | 100% of the net cash proceeds of extraordinary receipts by the Borrower or the Guarantors or their subsidiaries (including any Litigation Proceeds, tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions); |
|  | (iv) | 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by the Borrower or the Guarantors or their subsidiaries not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below; and |

| Summary of Material Terms[6] |
|---|

|  | (v)  100% of the net cash proceeds received from the sale or issuance of equity securities by the Borrower or the Guarantors or their subsidiaries.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.<br><br>See DIP Term Sheet at 15-16. |
|---|---|
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), (a)(ii) | The Debtors shall pay to the DIP Lender a fee equal to 5.0% of the funded amount of the Interim New Money DIP Loan (the "**Interim Exit Premium**"), earned upon the Interim Closing Date and 5.0% of the funded amount of the Final DIP Loan (the "***Final Exit Premium***" and together with the Interim Exit Premium, the "***Exit Premium***" and the Exit Premium, together with the Original Issue Discount, the "***DIP Fees***"), earned upon the Final Closing Date, and, in each case, payable in cash on the Maturity Date (or upon the date of any mandatory prepayment of the applicable New Money DIP Loans), to the extent earlier than the Maturity Date, whether as a result of acceleration or otherwise); *provided*, that payment of the Exit Premium shall be waived if the DIP Lender or an affiliate of the DIP Lender acquires substantially all equity or assets of the Debtors, whether through a sale process or a chapter 11 plan.<br><br>The New Money DIP Loans shall be made at a discount of 20% (the "***Original Issue Discount***") of the DIP Commitments.  Notwithstanding the foregoing, the Debtors shall repay to the DIP Lender the full principal amount of the New Money DIP Loans borrowed by the Borrower in accordance with the terms of this DIP Term Sheet and the DIP Documents, without setoff, deduction, offset or counterclaim, it being understood and agreed that the Original Issue Discount with respect to each New Money DIP Loan shall be deemed fully-earned on the Closing Date in respect of such New Money DIP Loan, shall be due and payable upon the funding of such New Money DIP Loan and shall be non-refundable when paid.  The parties agree that the Original Issue Discount shall be treated for U.S. tax purposes as adjustments to purchase price and as original issue discount and all parties agree to report such amounts accordingly.<br><br>The Original Issue Discount shall be net-funded from the proceeds of any DIP Loans borrowed concurrently with the payment thereof.<br><br>See DIP Term Sheet at 12. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E), (a)(ii) | The Debtors shall prepare and deliver to the DIP Lender and its advisors (a) a weekly updated 13-week rolling operating budget and cash flow forecast, in form consistent with the forecast delivered under the Prepetition Priority Term Loan Credit Agreement, of the Debtors for the period covered thereby (the "**Cash Flow Forecast**"), (b) a cash balance report as of the immediately preceding Friday, (c) accounts payable and accounts receivable balance reports as of the immediately preceding Friday, (d) accounts payable and accounts receivable aging reports as of the immediately preceding Friday, and (e) a revenue and Consolidated EBITDA forecast for the remainder of Fiscal Year 2024 (collectively, the "**Approved DIP Budget**"), which shall be approved by the DIP Lender in its sole discretion.<br><br>Commencing at 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week that is four weeks following the week in which the Petition Date occurs, and continuing at 5:30 P.M. (Eastern Time) on the Tuesday of every fourth week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), or at any other interim time as reasonably requested by the Borrower, the Debtors shall deliver to the DIP Lender and its advisors an updated and supplemented forecast (in the case of the Cash Flow Forecast, for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered) and reports of the information contained in the previous Approved DIP Budget (a "**Proposed Budget**"), and, if such Proposed Budget is in form and substance acceptable to the DIP Lender, in its sole discretion, it shall become the "Approved DIP Budget" for purposes of this DIP Term Sheet, the DIP Documents and the DIP Orders.   Until any Proposed Budget, amendment, supplement or modification has been approved |

| Summary of Material Terms[6] | |
|---|---|
| | by the DIP Lender, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect. |
| | DIP Term Sheet at 5. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(E), (a)(ii) | By no later than 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week following the week in which the Petition Date occurs, and no later than 5:30 P.M. (Eastern Time) on each Tuesday of each calendar week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), the Debtors shall deliver to the DIP Lender and its advisors a variance report (each, a "**Weekly Variance Report**"), setting forth, in reasonable detail, (a) in the case of the Cash Flow Forecast, the "receipts" and "disbursements" of the Debtors on a weekly, rolling four-week basis and cumulative basis (relative to the initial Approved DIP Budget) and any variances between the actual amounts and those set forth in the initial Approved DIP Budget and the then-in-effect Approved DIP Budget, and including detail by line-item as to whether a given material (greater than 5% or $20,000) variance is permanent or timing-based and commentary in respect thereof and (b) in the case of other reports, variances comparing such reports with (i) the applicable reports in the most recently delivered Approved DIP Budget and (ii) the initial Approved DIP Budget. Each Tuesday (or, if any Tuesday is not a Business Day, the next Business Day thereafter) of each calendar week, beginning with the calendar week that is one week following the week in which the Petition Date occurs, shall be referred to as a "**Cash Flow Variance Testing Date.**" |
| | The Debtors shall comply with the following (collectively, the "**Permitted Variances**"): |
| | As of any Cash Flow Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 90% (on a cumulative basis taking into account the variance for any prior Testing Period during the then-in-effect Approved DIP Budget period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget, and (ii) the aggregate disbursements (excluding professional fees and expenses incurred by the DIP Professionals (as defined in the Interim DIP Order) and/or professionals retained by the Debtors, but including professional fees and expenses incurred by professionals retained by the Creditors' Committee) to exceed 110% (on a cumulative basis taking into account the variance for any prior Testing Period during the then-in-effect Approved DIP Budget period) of the estimated disbursements provided in the then-in-effect Approved DIP Budget. The two-week period ending on the Friday prior to each Cash Flow Variance Testing Date shall be referred to as a "**Testing Period**". |
| | Additional variances, if any, from the Approved DIP Budget, and any proposed amendment, supplement or modification to the Approved DIP Budget, shall be subject to the written approval of the DIP Lender, in its sole discretion. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Lender in writing). |
| | See DIP Term Sheet at 5-6. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(M), (a)(ii) | Each of the following shall constitute an "**Event of Default**": |
| | (i)    the entry of an interim or final order with respect the DIP Facility, granting approval of the DIP Commitment Letter and the DIP Term Sheet or the DIP Documents (as applicable) in form or substance that is not acceptable to the DIP Lender in its sole discretion; |
| | (ii)   except as set forth in clause (xxiii) below, failure by the Debtors to be in compliance with provisions of this DIP Term Sheet or any DIP Document (subject to applicable grace periods as set forth in any DIP Document or any DIP Order, including a one (1) Business Day grace period for delivery of the Approved DIP Budgets, cash flow forecasts and Weekly Variance Reports); |
| | (iii)  any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order; |

| **Summary of Material Terms**[6] |
|---|

| | | |
|---|---|---|
| | (iv) | any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for entry of a final order of the Bankruptcy Court charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender; |
| | (v) | failure of any Milestone set forth in this DIP Term Sheet to be satisfied by the specified deadline therefor (in each case, as then in effect after giving effect to any extensions, waivers or amendments thereto made in accordance with the requirements of this DIP Term Sheet); |
| | (vi) | failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (vii) | the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens or DIP Superpriority Claims, excluding (a) the Carve-Out, (b) liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender or (c) as provided in the "first day" motions with the prior written consent of the DIP Lender; |
| | (viii) | the Debtors (or any of their direct or indirect non-Debtor affiliates) commence (or fail to contest the commencement by a third party) of any action (other than an action permitted by the DIP Orders) against the DIP Lender, the Prepetition Secured Parties or any of its agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Document or under any DIP Order in favor of the DIP Lender or the Prepetition Secured Parties; |
| | (ix) | the entry of an order by the Bankruptcy Court in favor of the Creditors' Committee (if any), any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against the DIP Lender or the Prepetition Secured Parties, (b) sustaining an objection to claims of the DIP Lender or the Prepetition Secured Parties or (c) avoiding any liens held by the DIP Lender or the Prepetition Secured Parties; *provided*, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Rolled DIP Loans or the Prepetition Secured Obligations in accordance with the terms of the applicable DIP Orders; |
| | (x) | (a) the Debtors file any pleading in any court (or fail to contest any pleading filed by a third party in any court)  seeking entry of an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Document or any DIP Order, or the disallowance of any DIP Obligations, in whole or in part, or (b) any provision of this DIP Term Sheet, any other DIP Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding; |
| | (xi) | without the prior written consent of the DIP Lender, the failure by the Debtors to be in compliance with provisions of the Bidding Procedures Order (subject to any applicable grace periods as set forth in the Bidding Procedures Order); |
| | (xii) | without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations; |
| | (xiii) | to the extent that any DIP Obligations remain outstanding, the filing of a chapter 11 plan that is not reasonably acceptable to the DIP Lender; |
| | (xiv) | the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner or responsible officer with enlarged powers (beyond those set forth in sections 1106(a)(3) |

| Summary of Material Terms[6] | |
|---|---|
| | and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor; |
| | (xv) the granting of (or the Debtors' failure to contest) any motion filed by a creditor or other party in interest seeking relief from the automatic stay in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value in excess of $100,000; |
| | (xvi) termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of the satisfaction in full of the DIP Obligations; |
| | (xvii) the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code; |
| | (xviii) the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code; |
| | (xix) a dismissal of any of the Chapter 11 Cases; |
| | (xx) without the prior written consent of the DIP Lender, a request by the Debtors to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; |
| | (xxi) [reserved]; |
| | (xxii) the filing of any motion seeking approval of a sale of any DIP Collateral (other than any sale permitted under "Negative Covenants"); |
| | (xxiii) failure to pay (A) principal in full when due, including without limitation, on the Maturity Date, or (B) interest or other DIP Obligations in full within three (3) Business Days after the same becomes due; or |
| | (xxiv) the entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking the appointment or election of a trustee, responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business. |
| | See DIP Term Sheet at 27-30. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower shall indemnify the DIP Lender in accordance with indemnity provisions customary for transactions of this type and otherwise generally consistent with those set forth in the Prepetition Priority Term Loan Credit Agreement. Section 10.5 of the Prepetition Priority Term Loan Credit Agreement is hereby incorporated by reference herein, *mutatis mutandis*.<br><br>See DIP Term Sheet at 31. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(H), (a)(ii) | Milestones in respect of the Chapter 11 Cases under the DIP Facility are listed below (as any such time and date may be extended with the written consent of the DIP Lender (which consent may be confirmed via e-mail by counsel on behalf of the DIP Lender)), in each case, subject to Bankruptcy Court availability:<br><br>(i) no later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of the Interim DIP Order;<br><br>(ii) no later than one (1) calendar day after the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of an order, in form and substance acceptable to the DIP Lender, among other things, (a) approving procedures (the "**Bidding Procedures**") to be used and bid protections to be provided in connection with the sale (or sales) of all, substantially all of the Debtors' assets (the "**Sale Transaction**"), (b) establishing certain dates and deadlines related thereto and scheduling an auction (if any) (the "**Auction**") and the hearing on approval of the Sale Transaction and (c) approving the utilization of a form of asset purchase agreement to be used in connection with the Sale Transaction (the "**Bidding Procedures Order**");<br><br>(iii) no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order; |

| Summary of Material Terms[6] | |
|---|---|
| | (iv)    no later than twenty-four (24) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order; |
| | (v)    no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; |
| | (vi)    no later than October 15, 2024, the Bid Deadline (as defined in the Bidding Procedures) shall have occurred, unless such date has been extended in accordance with the terms of the Bidding Procedures; |
| | (vii)    no later than November 13, 2024, the Auction (if necessary) shall have occurred; |
| | (viii)    no later than November 25, 2024, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "**Sale Approval Order**"), in form and substance acceptable to the DIP Lender; and |
| | (ix)    no later than December 6, 2024, the Sale Transaction shall be consummated (the "**Sale Closing Milestone**") (or the Outside Date shall have been extended as provided in the Stalking Horse Agreement (each as defined in the Bidding Procedures)). |
| | See DIP Term Sheet at 26-27. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | Each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Junior Term Loan Liens, the Prepetition Junior Term Loan Claims, the Prepetition Junior Secured Notes Liens and Prepetition Junior Secured Notes Claims shall be subject to payment of the Carve-Out (defined below).<br><br>(a)    "Carve-Out" means the following expenses: (i) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time (whether by interim order, final order, procedural order or otherwise), (A) all unpaid fees and expenses (collectively, the "Debtor Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (collectively, the "Debtor Professionals") and (B) all unpaid fees and expenses (collectively, the "Committee Professional Fees" and, together with the Debtor Professional Fees, the "Professional Fees" (in each case, other than any restructuring, sale, process, or other transaction fee of any investment bankers or financial advisors; *provided, however*, that any monthly fees of any investment bankers or financial advisors shall be included) incurred by persons or firms retained by the Creditors' Committee (if any) (such professionals to the Creditors' Committee, the "Committee Professionals" and, together with the Debtor Professionals, the "Estate Retained Professionals") pursuant to Bankruptcy Code sections 327, 328 or 1103, as applicable, at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice and, with respect to the Professional Fees incurred by the Committee Professionals, solely in the amounts set forth in the then-in-effect Approved Budget, in each case, without regard to whether such fees and expenses were invoiced after the Carve-Out Trigger Date and whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice (the "Pre-Carve-Out Trigger Notice Fees," and such amounts, the "Pre-Carve-Out Trigger Notice Cap"); and (iv) after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, and, solely with respect to the Professional Fees incurred by the Committee Professionals, subject to the then-in-effect Approved Budget, all unpaid fees, disbursements, costs and expenses incurred by Estate Retained Professionals in an aggregate amount not to exceed $250,000 (the cap set forth in this clause (iv), the "Post-Carve-Out Trigger Notice Cap" and, together with the Pre-Carve-Out Trigger Notice Cap, the "Carve-Out Amount") incurred after the first business day following delivery of a Carve-Out Trigger Notice.  Any payment or reimbursement made to any Estate Retained Professional on or after the delivery of the Carve-Out Trigger Notice shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.<br><br>A.    *Carve-Out Trigger Notice.*  For purposes of the foregoing, a "Carve-Out Trigger Notice" shall mean a written notice delivered by e-mail by the DIP Lender to: (i) the Debtors' lead restructuring counsel; (ii) the U.S. Trustee; and |

| Summary of Material Terms[6] |
|---|

|  | (iii) counsel to the Creditors' Committee appointed in the Chapter 11 Cases (if any) (collectively, the "Carve-Out Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a Termination Event and acceleration of the DIP Obligations, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |
|  | **B.**   *Carve-Out Reserves.* |
| (1) | On or before the Friday of each week, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtors to fund a reserve in an amount equal to the aggregate amount of the Estate Retained Professionals' Professional Fees projected for such week in the then-in-effect Approved Budget. The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Lender, which shall constitute the corpus of a trust governed by New York law, for the benefit of the Estate Retained Professionals entitled to receive payment thereunder to pay such Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims, and all payments of Professional Fees, to the extent allowed at any time, incurred prior to the Carve-Out Trigger Date shall be paid first from such Pre-Carve-Out Trigger Notice Reserve Account. |
| (2) | On the date on which a Carve-Out Trigger Notice is delivered (the "Carve-Out Trigger Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to fund, to the extent not already funded, the Pre-Carve-Out Trigger Notice Reserve in an amount equal to the then unpaid amounts of (i) the Professional Fees of Estate Retained Professionals and (ii) the obligations accrued as of the Carve-Out Trigger Date with respect to clauses (i) and (ii) of the definition of Carve-Out set forth in paragraph 8(a) (the "Additional Carve-Out Obligations"). On the Carve-Out Trigger Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap and deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Lender, which shall constitute the corpus of a trust governed by New York law, for the benefit of the Estate Retained Professionals entitled to receive payment thereunder to pay, to the extent allowed at any time, such Estate Retained Professionals' Professional Fees (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to the use of such reserve to pay any other claims. |
| **C.** | Notwithstanding anything to the contrary in the DIP Documents (including the failure to satisfy or receive a waiver of any of the conditions precedent to any DIP Loans set forth in the DIP Term Sheet or the DIP Documents) or the Interim Order, following delivery of the Carve-Out Trigger Notice, in the event that the Carve-Out Reserves have not been fully funded as provided herein, the DIP Lender shall promptly fund any additional draw request for any shortfall amounts; *provided*, that the DIP Lender shall not be required to fund any amounts that, in the aggregate, exceed the amount of the New Money Term Loans to be funded by the DIP Lender to the Debtors under the DIP Facility; *provided*, *further*, that the DIP Lender shall not be required to fund any amounts in respect of Professional Fees incurred by the Committee Professionals that exceed the amounts set forth for such Committee Professionals in the then-in-effect Approved Budget. |
| **D.** | The Debtors shall use funds held in the Pre-Carve-Out Trigger Notice Reserve exclusively to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in paragraph 8(a) (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Amounts, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of the Interim Order, to pay any other amounts (if owing) benefitted by the Carve-Out and then to the DIP Lender, in accordance with the terms of the Interim Order, the DIP Term Sheet and the DIP Documents, unless the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) |

RLF1 31465571v.1

| Summary of Material Terms[6] |
|---|

| | have been Paid in Full,[7] in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents and the Interim Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts") up to the Post-Carve-Out Trigger Notice Cap, and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of the Interim Order, to pay the DIP Lender, in accordance with the terms of the Interim Order, the DIP Term Sheet and the DIP Documents, unless the DIP Obligations have been Paid in Full, in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents and the Interim Order.  Notwithstanding anything to the contrary in the DIP Documents or the Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in paragraph 8(d) of the Interim Order, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts or Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in paragraph 8(d) of the Interim Order, prior to making any payments to the DIP Lender or the Prepetition Junior Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Term Sheet, the DIP Documents or the Interim Order, following delivery of a Carve-Out Trigger Notice, neither the DIP Lender (in accordance with the terms of the DIP Term Sheet, the DIP Documents or the Interim Order) nor the Prepetition Junior Secured Parties (in accordance with the terms of the Interim Order and the Prepetition Junior Secured Credit Documents) shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Lender, in accordance with the terms of the DIP Term Sheet, the DIP Documents and the Interim Order, unless the DIP Obligations have been Paid in Full, in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents.   Further, notwithstanding anything to the contrary in the Interim Order, (x) disbursements by the Debtors from the Carve-Out Reserves shall not increase or reduce the DIP Obligations or constitute additional loans under the DIP Facility and (y) the failure of the Carve-Out Reserves to satisfy in full the Professional Fees of Estate Retained Professionals shall not affect the priority of the Carve-Out in respect of DIP Collateral or any recoveries thereon.

*Limitation on Responsibility of Secured Parties*.  Neither the DIP Lender nor any of the Prepetition Junior Secured Parties shall be responsible for the payment or reimbursement of any fees or expenses of any Estate Retained Professional incurred in connection with these Chapter 11 Cases or any Successor Cases.  Nothing in the Interim Order shall be construed to obligate the DIP Lender or any of the Prepetition Junior Secured Parties to pay compensation to, or to reimburse the expenses of, any Estate Retained Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Creditors' Committee (if any), any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses. |

---

[7]  As used in the Interim Order, the term "Paid in Full" or "Payment in Full" means, with respect to the DIP Obligations or any Prepetition Junior Secured Notes Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all DIP Obligations or such Prepetition Junior Secured Notes Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| Summary of Material Terms[6] |
| --- |

|  | See Interim Order ¶ 8. |
| --- | --- |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i)<br><br>Local Rule<br>4001-2(a)(i)(D), (G),<br>(U), 4001-2(a)(ii) | All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with this DIP Term Sheet, the DIP Documents and/or the DIP Orders (collectively, the "**DIP Obligations**"), in all cases subject to (a) the "Carve Out" and (b) the Prepetition Permitted Liens, shall be pursuant to:<br><br>(i)    section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status against each of the Debtors (the "**DIP Superpriority Claims**") which DIP Superpriority Claims shall have priority over any and all administrative expenses and claims of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code;<br><br>(ii)    section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens;<br><br>(iii)   section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected junior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is subject to a Prepetition Permitted Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any such Prepetition Permitted Lien; and<br><br>(iv)    section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority priming security interest in and lien upon all DIP Collateral that is subject to a Prepetition Secured Debt Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any Prepetition Permitted Liens (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**"); *provided*, that the DIP Liens shall not attach to any claims or causes of avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (collectively, "**Avoidance Actions**"); *provided, further*, that, subject to entry of the Final Order, the DIP Liens shall attach to all proceeds of Avoidance Actions ("**Avoidance Action Proceeds**").<br><br>The DIP Liens shall not be made *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject, in each case, only to the Carve Out and Prepetition Permitted Liens.<br><br>As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Priority Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Priority Term Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).<br><br>See DIP Term Sheet at 6-8. |
| **506(c) Waiver; Section 552(b)**<br>Bankruptcy Rule<br>4001(c)(l)(B)(x);<br>4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(V), (W),<br>(X) | <u>**Limitation on Charging Expenses**</u>.  Subject to entry of the Final Order and except to the extent of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection or enhancement of realization by the DIP Lender upon the DIP Collateral or, subject to entry of the Final Order, the Prepetition Junior Secured Parties upon the Prepetition Junior Collateral, shall be charged against or recovered from the DIP Collateral or the Prepetition Junior Collateral, whether pursuant to Bankruptcy Code section 506(c), any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the DIP Lender or the Prepetition Junior Secured Parties, as applicable, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the DIP Lender or any of the Prepetition Junior Secured Parties. |

| Summary of Material Terms[6] |
|---|

|  | **No Marshaling; Section 552(b) Waiver**.  Subject to entry of the Final Order, in no event shall the DIP Lender or, the Prepetition Junior Secured Parties, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Obligations, the DIP Collateral, Adequate Protection Obligations, Prepetition Junior Collateral or the Prepetition Junior Secured Obligations, and all proceeds shall be received and applied in accordance with the DIP Term Sheet, the DIP Documents and the Prepetition Junior Secured Credit Documents, as applicable.  Subject to entry of the Final Order, the DIP Lender and each of the Prepetition Junior Secured Parties, shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and in no event shall the "equities of the case" exception in Bankruptcy Code section 552(b) apply to the DIP Lender or the DIP Collateral or, subject to entry of the Final Order, the Prepetition Junior Secured Parties or the Prepetition Junior Collateral. <br><br> See Interim Order ¶ 24-25. |
| **Stipulations to Prepetition Liens and Claims** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br><br> Local Rule 4001-2(a)(i)(Q) | Without prejudice to the rights of any other party, but subject to the limitations contained in paragraphs 19 and 20 of the Interim Order, the Debtors, on their own behalf and on behalf of their estates, shall be deemed to admit, stipulate, acknowledge and agree as follows: <br><br> 1.  Prepetition Priority Term Loan Facility <br><br>    a.  *Prepetition Priority Term Loan Credit Agreement*.  Pursuant to that certain Priority Credit Agreement, dated as of August 23, 2024, by and among Edgio, as borrower, and Lynrock, as lender (the "Prepetition Priority Term Loan Lender") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Priority Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition Priority Term Loan Documents"), Edgio was provided secured term loans in an initial aggregate principal amount of $9,146,000 (the "Prepetition Priority Term Loan Facility").  Edgio's obligations under the Prepetition Priority Term Loan Facility are guaranteed by each of Edgio International, Inc. ("Edgio International"), Edgecast Inc. ("Edgecast"), Limelight Acquisitionco, Inc. ("Limelight Acquisitionco"), Limelight Midco, Inc. ("Limelight Midco"), Limelight Networks VPS, Inc. ("Limelight Networks VPS"), and Mojo Merger Sub, LLC ("Mojo" and, collectively, the "Prepetition Priority Term Loan Guarantors" and, the Prepetition Priority Term Loan Guarantors, together with Edgio, the "Prepetition Priority Term Loan Obligors") pursuant to the Prepetition Priority Term Loan Documents. <br><br>    b.  *Prepetition Priority Term Loan Obligations*.  As of the Petition Date, the Prepetition Priority Term Loan Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Priority Term Loan Lender under the Prepetition Priority Term Loan Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $9,236,316.75 plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition Priority Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Priority Term Loan Documents (collectively, the "Prepetition Priority Term Loan Obligations").  The Prepetition Priority Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Priority Term Loan Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Priority Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. |

| Summary of Material Terms[6] |
|---|

|  |  |
|---|---|
|  | c. *Prepetition Priority Term Loan Liens.* Pursuant to the Prepetition Priority Term Loan Documents, the Prepetition Priority Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "<u>Prepetition Priority Term Loan Liens</u>") the "Collateral" (as defined in the Prepetition Priority Term Loan Documents) (the "<u>Prepetition Priority Term Loan Collateral</u>"). The Prepetition Priority Term Loan Liens are senior in priority to any and all other liens on the Prepetition Collateral pursuant to the Priority Lien Intercreditor Agreement, except for the Prepetition Permitted Liens. Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Priority Term Loan Liens are (i) valid, binding, perfected and enforceable liens and security interests in the Prepetition Priority Term Loan Collateral, with the priority set forth in the Prepetition Priority Term Loan Documents and the Priority Lien Intercreditor Agreement and (ii) not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind. As used in the Interim Order the term "<u>Prepetition Permitted Liens</u>" shall mean, in relation to any Prepetition Credit Facility, liens that are senior by operation of law to the liens securing the Prepetition Priority Term Loan Credit Facility or otherwise permitted by the applicable Prepetition Priority Term Loan Documents, but solely to the extent any such permitted liens were (1) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (2) valid, non-avoidable and in existence immediately prior to the Petition Date, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. |
|  | 2.   <u>Prepetition Junior Term Loan Facility.</u> |
|  | a. *Prepetition Junior Term Loan Credit Agreement.* Pursuant to that certain Credit Agreement, dated as of November 14, 2023, by and among Edgio, as borrower, and Lynrock, as lender (the "<u>Prepetition Junior Term Loan Lender</u>") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Junior Term Loan Credit Agreement</u>" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "<u>Prepetition Junior Term Loan Documents</u>"), Edgio was provided secured term loans in an initial aggregate principal amount of $79,472,175.22 (the "<u>Prepetition Junior Term Loan Facility</u>"). Edgio's obligations under the Prepetition Junior Term Loan Facility are guaranteed by each of Edgio International, Edgecast, Limelight Acquisitionco, Limelight Midco, Limelight Networks VPS, and Mojo (collectively, the "<u>Prepetition Junior Term Loan Guarantors</u>" and, together with Edgio, the "<u>Prepetition Junior Term Loan Obligors</u>") pursuant to the Prepetition Junior Term Loan Documents. |
|  | b. *Prepetition Junior Term Loan Obligations.* As of the Petition Date, the Prepetition Junior Term Loan Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Term Loan Lender under the Prepetition Junior Term Loan Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $94,446,233.40, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, including, but not limited to, the Prepayment Premium/Make-Whole Amount (as defined in the Prepetition Junior Term Loan Credit Agreement) in the amount of $65,952,657[8], additional interest, any other "Obligations" (as defined in the Prepetition Junior Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Term Loan Documents (collectively, the "<u>Prepetition Junior Term Loan Obligations</u>"). The Prepetition Junior Term Loan Obligations constitute legal, valid, binding and non-avoidable |

---

[8] Prepayment Premium/Make-Whole Amount represents an agreed upon reduction from the total Prepayment Premium/Make-Whole Amount provided for under Prepetition Junior Term Loan Credit Agreement.

| Summary of Material Terms[6] |
| --- |

obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Term Loan Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

c. *Prepetition* Junior Term Loan Liens. Pursuant to the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "Prepetition Junior Term Loan Liens") the "Collateral" (as defined in the Prepetition Junior Term Loan Documents) (the "Prepetition Junior Term Loan Collateral"), subject to certain Prepetition Permitted Liens. The Prepetition Junior Term Loan Liens are: (i) junior and subordinate in priority to (A) the Prepetition Priority Term Loan Liens on any Prepetition Junior Term Loan Collateral pursuant to the Priority Lien Intercreditor Agreement and (B) any Prepetition Permitted Liens; (ii) pari passu in priority to the Prepetition Junior Secured Notes Liens on any Prepetition Junior Term Loan Collateral pursuant to the Junior Lien Intercreditor Agreement; and (iii) senior in priority to any and all other liens on the Prepetition Junior Term Loan Collateral. Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Junior Term Loan Liens (x) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Junior Term Loan Documents and the Prepetition Intercreditor Agreements and (y) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind.

3. Prepetition Junior Secured Notes.

a. Prepetition Junior Secured Notes Indenture. Pursuant to that certain Indenture, dated as of November 14, 2023, by and among Edgio, as issuer, and U.S. Bank Trust Company, National Association, as trustee and collateral agent (the "Prepetition Junior Secured Notes Agent") (as amended, restated, amended and restated, supplemented, restructured or otherwise modified, renewed or replaced from time to time, the "Prepetition Junior Secured Notes Indenture" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition Junior Secured Notes Documents," the Prepetition Junior Secured Notes Documents, together with the Prepetition Junior Term Loan Documents, the "Prepetition Junior Secured Credit Documents"), and, the Prepetition Junior Secured Credit Documents, together with the Prepetition Priority Term Loan Documents, the "Prepetition Credit Documents"), Edgio issued certain notes in the aggregate principal amount of $118,870,000 (the "Prepetition Junior Secured Notes" and, together with the Prepetition Priority Term Loan Facility and the Prepetition Junior Term Loan Facility, the "Prepetition Credit Facilities"), to Lynrock, as secured noteholder (the "Prepetition Junior Secured Noteholder," together with the Prepetition Junior Secured Notes Agent, the "Prepetition Junior Secured Notes Parties," the Prepetition Junior Secured Notes Parties, together with the Prepetition Junior Term Loan Lender, the "Prepetition Junior Secured Parties," and the Prepetition Junior Secured Parties, together with the Prepetition Priority Term Loan Lender, the "Prepetition Secured Parties"). Edgio's obligations under the Prepetition Junior Secured Notes Indenture are guaranteed by each of Edgio International, Edgecast, Limelight Acquisitionco, Limelight Midco, Limelight Networks VPS, and Mojo (the "Prepetition Junior Secured Notes Guarantors" and, together with Edgio, the "Prepetition Junior Secured Notes Obligors") pursuant to the Prepetition Junior Secured Notes Documents.

b. Prepetition Junior Secured Notes Obligations. As of the Petition Date, the Prepetition

| Summary of Material Terms[6] |
|---|

|  | Junior Secured Notes Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Secured Noteholder under the Prepetition Junior Secured Notes Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $140,971,311.36, plus accrued and unpaid interest thereon as of the Petition Date, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, including, but not limited to, the Applicable Premium (as defined in the Prepetition Junior Secured Notes Indenture) in the amount of $96,751,937[9] additional interest, any other "Obligations" (as defined in the Prepetition Junior Secured Notes Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Secured Notes Documents (collectively, the "Prepetition Junior Secured Notes Obligations," together with the Prepetition Junior Secured Term Loan Obligations, the "Prepetition Junior Secured Obligations," and the Prepetition Junior Secured Obligations, together with the Prepetition Priority Term Loan Obligations, the "Prepetition Secured Obligations"). The Prepetition Junior Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Secured Notes Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Secured Notes Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.<br><br>c.   Prepetition Junior Secured Notes Liens. Pursuant to the Prepetition Junior Secured Notes Documents, the Prepetition Junior Secured Notes Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in the "Prepetition Junior Secured Notes Liens," together with the Prepetition Junior Term Loan Liens, the "Prepetition Junior Secured Liens") and, the Prepetition Junior Secured Liens together with the Prepetition Priority Term Loan Liens, the "Prepetition Liens") the "Collateral" (as defined in the Prepetition Junior Secured Notes Documents) (the "Prepetition Junior Secured Notes Collateral" together with the Prepetition Junior Term Loan Collateral, the "Prepetition Junior Collateral" and, the Prepetition Junior Collateral, together with the Prepetition Priority Term Loan Collateral, the "Prepetition Collateral"), subject to certain permitted liens as permitted under the Prepetition Junior Secured Notes Documents. The Prepetition Junior Secured Notes Liens are: (i) junior and subordinate in priority to (A) the Prepetition Priority Term Loan Liens on any Prepetition Junior Secured Notes Collateral pursuant to the Priority Lien Intercreditor Agreement and (B) any Prepetition Permitted Liens; (ii) pari passu in priority to the Prepetition Junior Term Loan Liens on any Prepetition Junior Secured Notes Collateral pursuant to the Junior Lien Intercreditor Agreement; and (iii) senior in priority to any and all other liens on the Prepetition Junior Secured Notes Collateral. Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Junior Secured Notes Liens (x) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Junior Secured Notes Collateral, with the priority set forth in the Prepetition Junior Secured Notes Documents and the Prepetition Intercreditor Agreements and (y) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or |

[9]   Applicable Premium amount represents an agreed upon reduction from the total Applicable Premium amount provided for under Prepetition Junior Secured Notes Indenture.

| Summary of Material Terms[6] |
|---|

"claim" (as defined in the Bankruptcy Code) of any kind.

4.  Prepetition Intercreditor Agreements.

    a.  *Priority Lien Intercreditor Agreement*.  Edgio, the Prepetition Priority Term Loan Lender, the Prepetition Junior Term Loan Lender, the Prepetition Junior Secured Notes Agent, and certain of Edgio's subsidiaries are parties to that certain Priority Lien Intercreditor Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Priority Lien Intercreditor Agreement"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Priority Term Loan Lender, the Prepetition Junior Term Loan Lender and the Prepetition Junior Secured Notes Parties.

    b.  *Junior Lien Intercreditor Agreement*.  The Prepetition Junior Term Loan Lender, the Prepetition Junior Secured Notes Agent, Edgio and certain of Edgio's subsidiaries are parties to that certain Junior Lien Intercreditor Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Junior Lien Intercreditor Agreement" and, together with the Priority Lien Intercreditor Agreement, the "Prepetition Intercreditor Agreements"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Junior Secured Parties.

5.  Cash Collateral.  Any and all of the Debtors' cash, wherever located or held, including any amounts generated by the collection of accounts receivable, all cash proceeds of the Prepetition Collateral, and the cash in the Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date (excluding cash deposits that secure any outstanding letters of credit) or deposited into the Debtors' banking, checking or other deposit accounts with financial institutions after the Petition Date constitutes cash collateral within the meaning of Bankruptcy Code section 363(a) ("Cash Collateral") of the DIP Lender and the Prepetition Junior Secured Parties, as applicable. The Debtors' use of Cash Collateral shall be subject to the terms of the Interim Order and the Debtors' authority to use Cash Collateral of the DIP Lender and the Prepetition Junior Secured Parties, as applicable, may be terminated in accordance with paragraphs 16 and 17 hereof.

6.  Entitlement to Adequate Protection.

    a.  The Prepetition Junior Secured Parties are entitled, pursuant to Bankruptcy Code sections 105, 361, 362, and 363(e), to adequate protection of their respective interests in the Prepetition Junior Collateral, including Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Junior Collateral resulting from, among other things: (i) subordination of the Prepetition Junior Secured Parties' interests in the Prepetition Junior Collateral; (ii) the use of Cash Collateral during the Chapter 11 Cases; (iii) the use, sale or lease of any of the Prepetition Junior Collateral; (iv) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a); and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("Diminution in Value"). Based on the Motion, the DIP Declaration and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Junior Collateral, including Cash Collateral, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Junior Collateral (including the use of Cash Collateral); provided, that nothing in the Interim Order or the DIP Documents shall: (x) be construed as the affirmative consent by any of the Prepetition Junior Secured Parties for the use of Prepetition Junior Collateral (including Cash Collateral) other than on the terms set forth in the Interim Order (including the Approved Budget) and in the context of the DIP Facility authorized by the Interim Order to the extent such consent has been or will be given; (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Junior Collateral; or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Junior Secured Parties to seek new, different

| Summary of Material Terms[6] |  |
|---|---|
| | or additional adequate protection or assert the interests of any of the Prepetition Junior Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved. |
| | b.    The Prepetition Junior Secured Parties would not otherwise consent to the use of their Prepetition Junior Collateral (including Cash Collateral), subordination of their liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the agreement of the Debtors to consent to the jurisdiction of this Court in all matters arising out of or relating to the DIP Loans, the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Prepetition Credit Facilities, the Prepetition Credit Documents, the Prepetition Liens and the Prepetition Secured Obligations. |
| | 7.    <u>No Control</u>. None of the DIP Lender or the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Interim Order, the DIP Facility or the Prepetition Credit Facilities. |
| | See Interim Order ¶ F. |
| **Challenge Period**<br>**Bankruptcy Rule**<br>**4001(c)(l)(B)**<br><br>Local Rule<br>4001-2(a)(i)(Q) | The acknowledgments, stipulations, admissions, agreements, waivers and releases contained in the Interim Order shall also be binding upon all other parties in interest, including, but not limited to, the Creditors' Committee (if any), any non-statutory committees appointed or formed in these Chapter 11 Cases and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7, chapter 11 trustee or examiner appointed or elected for any of the Debtors in these Chapter 11 Cases or any Successor Cases (a "<u>Trustee</u>"), and each of their respective successors and assigns, in all circumstances and for all purposes, unless: (i) any such party, having obtained requisite standing, timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (A) objecting to or challenging the validity, perfection, priority, scope, extent or enforceability of the Rolled DIP Liens, Rolled DIP Obligations, Prepetition Junior Secured Liens, or the Prepetition Junior Secured Obligations, (B) objecting to or alleging any basis to impair, restrict, deny or otherwise challenge the right of the DIP Lender or the Prepetition Junior Secured Parties to credit bid, in whole or in part, the Rolled DIP Liens, the Rolled DIP Obligations, Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations, as applicable, under Bankruptcy Code section 363(k) or otherwise or (C) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Challenges</u>") against the DIP Lender or the Prepetition Junior Secured Parties in connection with any matter related to the Rolled DIP Liens, the Rolled DIP Obligations, the Prepetition Junior Secured Credit Documents, the Prepetition Junior Secured Collateral, the Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations by the date that is no later than seventy-five (75) calendar days after entry of the Interim Order, subject to further written extension (which writing may be in the form of e-mail by counsel) by the DIP Lender and/or the Prepetition Junior Secured Parties, as applicable (the "<u>Challenge Period</u>"); *provided* that in the event that, prior to the expiration of the Challenge Period, (1) any of the Chapter 11 Cases is converted to a Successor Case or (2) a Trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of ten (10) days solely with respect to such Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (1) and (2); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the party asserting any Challenge sustaining any such Challenge in such duly filed adversary proceeding or contested matter.<br><br>See Interim Order ¶ 20(b). |
| **Waiver/Modification of**<br>**the Automatic Stay**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors to take all actions as are necessary or appropriate to implement the terms of the Interim Order. The automatic stay shall be modified to the extent necessary to permit the DIP Lender and the Prepetition Junior Secured Parties to take any action authorized by the Interim Order.<br><br>See Interim Order ¶ 15. |

I.   **THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND NEED FOR THE DIP FACILITY**

   A.   **Prepetition Capital Structure**

   20.   Edgio's current capital structure was established in late 2023 through the borrowing of capital as a term loan under a new credit agreement, the issuance of new notes due 2027 in exchange for old notes due 2025, and the termination of certain revolving credit lines that had been extended by First-Citizens Bank and Trust Company as successor to Silicon Valley Bank.

   21.   A summary of Edgio's funded debt is set forth below:

| Debt Facility | Security and Priority | Principal and Interest Outstanding (mm)[10] |
|---|---|---|
| Priority Term Loan due 2025 | Priority lien on substantially all assets | $9.2 |
| Secured Notes due 2027 | Junior lien on substantially all assets | $140.9 |
| 2023 Term Loan due 2027 | | $94.4 |
| **Total** | | **$244.5** |

   B.   **Secured Debt**

   22.   On November 14, 2023, Edgio, Inc. entered into the 2023 Credit Agreement, which provided for a senior secured term loan credit facility with Lynrock as the sole lender, in the aggregate principal amount of approximately $79,472,000 (including approximately $13,248,000 in original issue discount) and maturing November 14, 2027. The 2023 Credit Agreement is secured by substantially all of the assets of Edgio, Inc. and its wholly owned domestic subsidiaries (collectively, the "***Collateral***") and guaranteed by each of the wholly owned domestic subsidiaries of Edgio, Inc. The 2023 Credit Agreement bears interest at a rate of 3.5% in cash and 16.0% payable in kind. Pursuant to the 2023 Credit Agreement, Edgio agreed to pay an upfront fee to Lynrock in an amount equal to approximately $13,248,000 or 16.67% multiplied by the aggregate principal amount of Lynrock's term loan under the 2023 Credit Agreement.

---

[10]   For illustrative purposes, interest has been calculated at the default rate through September 8, 2024.

23.     On November 14, 2023, in connection with its entry into the 2023 Credit Agreement, Edgio completed a private exchange with Lynrock, which had previously held an aggregate of $118,870,000 in principal amount of Edgio's Unsecured Notes. In exchange for the Unsecured Notes held by Lynrock, Edgio issued Lynrock $118,870,000 in aggregate principal amount of the Secured Notes having a stated maturity roughly four years longer than the date for repurchase of the Unsecured Notes following the Fundamental Changes, governed by an indenture (the "***Secured Indenture***"). The Secured Notes are secured by the Collateral, pari passu with the 2023 Credit Agreement, and are likewise guaranteed by the wholly owned domestic subsidiaries of Edgio, Inc. The Secured Notes have a stated maturity of November 14, 2027, unless earlier converted, redeemed or repurchased in accordance with their terms. U.S. Bank Trust Company, N.A., is the trustee and collateral agent under the Secured Indenture.

24.     On August 23, 2024, in order to obtain the liquidity necessary to commence these Chapter 11 Cases and conduct an orderly Sale Process, the Company entered into an additional senior secured term loan credit facility with Lynrock as lender, in the aggregate principal amount of $9,146,000 (including $1,646,280 in original issue discount), governed by a credit agreement (the "***Priority Credit Agreement***") and maturing February 23, 2025. The Priority Credit Agreement is secured by the Collateral, effectively senior to the Secured Notes and the 2023 Credit Agreement, and is likewise guaranteed by the wholly owned domestic subsidiaries of Edgio, Inc. The Priority Credit Agreement required an up-front fee to the lender of 18% (so that it provided net cash proceeds of $7,500,000), and bears interest at a rate of 19.5%, payable in cash.

25.     As of the Petition Date, no less than: (i) $140,971,311 in principal and accrued interest under the Secured Indenture, approximately; (ii) $94,446,233 under the 2023 Credit Agreement; and (iii) approximately $9,236,317 under the Priority Credit Agreement (in each case including accrued and unpaid interest at the default rate) remained outstanding. Additionally, the filing of these Chapter 11 Cases will trigger make-whole premiums under the terms of both the 2023 Credit Agreement and the Secured Indenture. In connection with negotiations over the proposed debtor-in-possession financing offered by Lynrock and as part of the comprehensive

compromises and settlements contained herein and in exchange for the terms of the DIP Financing provided herein, the Debtors and Lynrock have agreed to reduce those make-whole premiums by 13%, resulting in the allowed claims set forth in the proposed order approving the debtor-in-possession financing: $65,952,657 with respect to the Prepayment Premium/Make-Whole Amount (as defined in the 2023 Credit Agreement) and $96,751,937 with respect to the Applicable Premium (as defined in the Secured Indenture).

### C.    Intercreditor Agreements

26.    Two intercreditor agreements define the relative rights of creditors under the Secured Indenture, the 2023 Credit Agreement and the Priority Credit Agreement. Under the First Lien Pari Passu Intercreditor Agreement dated as of November 14, 2023, the collateral agent under the Secured Indenture and Lynrock as lender under the 2023 Credit Agreement have *pari passu* rights to the Collateral. In connection with the Priority Credit Agreement, Edgio entered into a Priority Lien Intercreditor Agreement, dated as of August 23, 2024, which subordinated the existing security interests securing the 2023 Credit Agreement and the Secured Notes to the security interests securing the Priority Credit Agreement.

## II.    ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE

27.    As further described in the TD Cowen Declaration, other than the proposed DIP Facility offered by the DIP Lender, no other actionable financing alternative exists. The Debtors and their advisors engaged with numerous parties regarding funding for these Chapter 11 Cases. TD Cowen contacted approximately fifteen parties outside the existing capital structure in regards to providing debtor-in-possession financing to determine whether any of these parties would be willing to provide postpetition financing to the Debtors. Despite this outreach by TD Cowen, no third parties submitted a proposal. *See* TD Cowen Decl. ¶ 14. Ultimately, the offer from the Prepetition Lender was the only actionable financing proposal that the Debtors received.

28.    Accordingly, Edgio engaged in hard-fought negotiations with Lynrock with respect to the terms of the proposed DIP Facility. These efforts proved fruitful, as Edgio was able to negotiate material improvements to the terms of thereof, including, among others, (i) material

reductions with respect to the fees payable under the DIP Facility and (ii) the PIK-ing of a substantial portion of the interest due under the DIP Facility, both of which will help to preserve the Debtors' limited cash during the Chapter 11 Cases. Having secured these concessions and given their inability to raise any form of alternative financing to support their operations or the administration of the Chapter 11 Cases, the Debtors elected to pursue the DIP Facility offered by Lynrock.

29.     The DIP Facility is the product of good-faith, robust, competitive, hard-fought, arm's-length negotiations between the DIP Lenders and the Debtors, and the terms of the DIP Facility are fair and reasonable. The DIP Term Loan will provide vital liquidity for the Debtors to smoothly transition into chapter 11 and execute the Sale Process in a manner designed to maximize value. *See id.* ¶ 22. Accordingly, approval of the Debtors' entry into the DIP Facility is in the best interests of the estates and constitutes a sound exercise of the Debtors' business judgment. Further, access to both the proceeds of the DIP Facility and the use of Cash Collateral is integral because neither is sufficient to fund the estate on its own.

## BASIS FOR RELIEF

### I.   THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP DOCUMENTS.

#### A.   Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.

30.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to enter into the DIP Facility. Section 364 of the Bankruptcy Code authorizes the Debtors to obtain secured or superpriority postpetition financing. Courts grant a debtor's business judgment considerable deference in obtaining postpetition secured credit, so long as the arrangements for such credit do not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection

of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.     To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP [l]ender. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

32.     The Debtors and the DIP Lender negotiated the DIP Documents in good faith, at arm's-length, and with the assistance of their respective advisors. The postpetition financing made available by the DIP Facility will provide the Debtors with adequate liquidity to smoothly transition into chapter 11 and execute a sale process. The interest rates, premiums, and the Roll-Up Amount are integral components of the overall package demanded by the DIP Lenders as consideration for the extension of the DIP Commitments. The Debtors, in consultation with TD Cowen, Riveron and their other advisors, have determined that the proposed DIP Facility presents

the best financing proposal currently available to the Debtors. See TD Cowen Decl. ¶ 15. Simply put, the Debtors' do not have other viable alternatives to the DIP Facility. Absent access to the DIP Facility, the Debtors would be forced to liquidate imminently pursuant to chapter 7 of the Bankruptcy Code, which would have a detrimental impact on the value of the Debtors' assets and preclude the Debtors from conducting an orderly Sale Process that will benefit stakeholders. Thus, the terms of the DIP Facility reflect a sound exercise of the Debtors' business judgment, and the Debtors should be authorized to enter into the DIP Commitment Letter, obtain the DIP Loans, and continue using Cash Collateral, all on the terms set forth herein and the proposed DIP Orders.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

33.     The Debtors propose to grant superpriority claims and liens described herein and in the proposed Interim Order pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve-Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens upon, all tangible and intangible prepetition and postpetition property of the Debtors. The prepetition liens with respect to the Prepetition Secured Obligations shall be primed by and made subject and subordinate to the DIP Liens.

34.     In the event a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C § 364(c). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> A. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;
> B. the credit transaction is necessary to preserve the assets of the estate; and

- 36 -

C. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

35.     As described above and in the TD Cowen Declaration, the Debtors are unable to obtain junior, let alone unsecured, credit. Indeed, the Debtors did not receive ***any*** actionable DIP financing proposals other than that from the DIP Lender, which was offered on a secured basis. *See* TD Cowen Decl. ¶ 14.

36.     Absent the DIP Facility, which will provide sufficient liquidity to administer these Chapter 11 Cases and execute the Debtors' Sale Process, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' dire circumstances, the Debtors believe that the terms of the DIP Facility, including the Roll-Up Amount and other economic provisions of the DIP Facility, as set forth in the DIP Term Sheet and the Proposed Interim Order, are fair and reasonable. For these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

37.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Court may authorize the "priming" liens proposed in the Motion if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in their respective collateral are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

38.     Here, each of the Prepetition Secured Parties whose liens will be primed has consented or is deemed to have consented to the priming of their respective liens on the terms described herein and set forth in the proposed Interim Order. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.     Alternatives to the DIP Facility Do Not Exist

39.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987). If only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

40.     The Debtors' prepetition marketing process demonstrated that actionable alternative sources of financing are not available. *See* TD Cowen Decl. ¶ 13-14. The Debtors and TD Cowen have canvassed the distressed financing market for alternative postpetition financing proposals. Yet, no party other than the DIP Lender came forward with a potentially actionable financing proposal to fund these Chapter 11 Cases. Besides the proposed DIP Facility, the Debtors did not receive any additional proposals for financing in these Chapter 11 Cases. Accordingly, the DIP Facility offered by the DIP Lender represents the Debtors' best and only available option to meet the Debtors' urgent liquidity needs and to successfully finance these cases. *See id*. The DIP Facility

- 38 -

will allow the Debtors to smoothly transition into chapter 11, wherein they and their advisors will conduct an orderly Sale Process for the Debtors' assets that will maximize the value of the Debtors' estates. *See* TD Cowen Decl. ¶ 8. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.      The Roll-Up Amount is Appropriate.**

41.      The DIP Term Sheet provides that on the entry of the Interim Order, the roll-up of (i) all of Prepetition Priority Term Loan Obligations and (ii) $25 million in principal amount of the 2023 Term Loan Obligations shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan. Upon entry of the Final Order, the remaining outstanding principal amount and accrued and unpaid interest of the 2023 Term Loan Obligations shall roll-up into the DIP Facility on a cashless dollar-for-dollar basis.

42.      The proposed Roll-Up Amount is an exercise of the Debtors' sound business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

43.      DIP facilities commonly include provisions repaying prepetition debt (often referred to as a "roll-up"). The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to that requested herein. *See, e.g., In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jul. 31, 2023) (authorizing an approximately $63 million DIP Facility, including an approximately $43

million roll-up); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jul. 20, 2020) (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19 11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18 12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order).

44.    As demonstrated in the First Day Declaration and the Riveron Declaration, the Debtors cannot fund these cases and the sale of their assets without the liquidity provided by the DIP Facility. The Debtors received no actionable alternative financing proposals. Accordingly, the Debtors believe that obtaining credit under the DIP Facility, and incurrence of the Roll-Up Amount, constitutes a sound exercise of their business judgment and is in the best interest of their estates and creditors.

45.    Further, the Roll-Up Amount is a material component of the consideration required by the DIP Lender as part of its commitment to provide postpetition financing. *See* TD Cowen Decl. ¶ 23. The Roll-Up Amount was the subject of hard-fought, arm's-length and good-faith negotiations between the Debtors and the DIP Lender, is an integral component of the overall terms of the DIP Facility and was required by the DIP Lender as consideration for the extension of postpetition financing. *See id*. Furthermore, the Debtors obtained a material concession from Lynrock that the cash interest on the Rolled DIP Loans (like all of the DIP Loans) will be significantly less than the cash payments that the Debtors would have otherwise expected to pay on the 2023 Term Loan Obligations. The Roll-Up Amount is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interest of all stakeholders given the alternatives. *See id*.

### E.   The Debtors Should Be Authorized to Use the Cash Collateral and Provide Adequate Protection.

46.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, including the forms of adequate protection provided thereunder.

47.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

48.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Junior Secured Parties with certain forms of adequate protection to protect against the postpetition diminution in value of their Prepetition Collateral (collectively, the "***Adequate Protection***"). These protections are set forth in the Interim Order, which provides that Junior Secured Parties are granted: (i) Adequate Protection Liens on all DIP Collateral; (ii) Adequate Protection Claims (subject and subordinate only to the Carve-Out and the DIP Superpriority Claims); (iii) payment of the fees and expenses of certain professionals of the Prepetition Junior Secured Parties and (iv) the continued accrual of interest during these Chapter 11 Cases (solely to the extent the obligations owed to such Prepetition Junior Secured Parties have not been rolled into the DIP Facility) in accordance with the terms and conditions of the Prepetition Junior Term Loan Credit Documents and the Prepetition Junior Secured Notes Documents, respectively (calculated at the default contract rate).

49.     The Debtors submit that the proposed Adequate Protection is sufficient to protect the Prepetition Secured Parties from any potential diminution in value to their respective Prepetition Collateral (including Cash Collateral). In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' provision of the Adequate Protection is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able to continue using Prepetition Collateral, including Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and the Debtors' estates.

## II.     THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES REQUIRED BY THE DIP LENDER UNDER THE DIP DOCUMENTS.

50.     Under the DIP Documents, the Debtors will, subject to Court approval, pay certain fees (the "***Fees***") to the DIP Lender, including an original issue discount and exit premiums at the interim and final funding dates. The Fees are reasonable under the circumstances and for the same reasons as set forth above with respect to the Roll-Up Amount. The DIP Lender, representing the Debtors' best, and only, available source of postpetition financing, would not have extended the

DIP Facility but for the economics (including the Fees) contained therein. These economics and Fees were the subject of hard-fought negotiations between the Debtors and the DIP Lender. Thus, the Fees should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility.

51.     The proposed Fees are as follows:

(a)     Original Issue Discount: The New Money DIP Loans shall be made at a discount of 20% (the "***Original Issue Discount***"). The Original Issue Discount shall be net-funded from the proceeds of any DIP Loans borrowed concurrently with the payment thereof.

(b)     Interest: Interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate *per annum* equal to 19.5%, with 2.5% per annum payable in cash and 17.0% per annum payable in kind.

(c)     Exit fee: Exit fee will be equal to 5.0% of the funded amount of the Interim New Money DIP Loan (the "***Interim Exit Premium***"), earned upon the Interim Closing Date and 5.0% of the funded amount of the Final DIP Loan (the "***Final Exit Premium***" and together with the Interim Exit Premium, the "***Exit Premium***" and the Exit Premium, together with the Original Issue Discount, the "***DIP Fees***"), earned upon the Final Closing Date, and, in each case, payable in cash on the Maturity Date (or upon the date of any mandatory prepayment of the applicable New Money DIP Loans), to the extent earlier than the Maturity Date, whether as a result of acceleration or otherwise); *provided*, that payment of the Exit Premium shall be waived if the DIP Lender or an affiliate of the DIP Lender acquires substantially all equity or assets of the Debtors, whether through a sale process or a chapter 11 plan.

## III.    THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS.

52.     The proposed Interim Order provides that the automatic stay in effect under section 362 of the Bankruptcy Code will be modified to (i) implement the terms of the Interim Order and (ii) allow the DIP Lender and Prepetition Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to perfect the respective liens granted to them under the DIP Documents. In addition, the proposed Interim Order provides that the automatic stay will be modified to the extent necessary to permit the DIP Lender to exercise certain remedies upon the occurrence of an event of default under the DIP Documents—subject to the procedures set forth in the Interim Order. The Debtors believe that these provisions were

required for the Debtors to obtain the DIP Facilities and use Cash Collateral as provided in the Interim Order.

53.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g., In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Town Sports Int'l., LLC*, No. 12 12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20 11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).

## IV.   FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO THE DIP FACILITY WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM.

54.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

55.     For the reasons noted above, in the First Day Declaration, and in the Riveron Declaration, the Debtors have a critical and immediate need for the liquidity provided by the DIP Facility and access to Cash Collateral. *See* Riveron Decl. ¶ 9-10. The DIP Facility and Cash Collateral are necessary to fund the Debtors' operations during these Chapter 11 Cases and to execute the value maximizing marketing and sale process. *See id.* ¶ 11. Cash Collateral will supplement the cash infused by the DIP Facility to ensure that these Chapter 11 Cases are sufficiently funded. The Debtors will continue their operations in tandem with the marketing and sale process in compliance with the Approved Budget and for the singular purpose of maximizing estate value. Id.

56. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to ensure that the Debtors can receive the Interim New DIP Loan and continue operating their business and initiate the Sale Process (subject to Court approval) during the initial phase of the Chapter 11 Cases. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## EXPEDITED CONSIDERATION

57. Bankruptcy Rule 6003 allows a bankruptcy court to grant relief within the first 21 days of a case "to the extent that relief is necessary to avoid immediate and irreparable harm." Pursuant to that Bankruptcy Rule and Local Rule 9013-1(m), the Debtors request emergency consideration of this Motion to avoid immediate and irreparable harm to the Debtors' operations, going concern value, and their efforts to pursue a resolution of these Chapter 11 Cases. For these reasons, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Motion should be granted immediately on an interim basis to the extent set forth in the Proposed Interim Order.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

58. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and their efforts to pursue a resolution to these Chapter 11 Cases.

## NOTICE

59. Notice of this Motion will be provided to (a) the U.S. Trustee; (b) the creditors holding the 30 largest unsecured claims, according to the list filed by the Debtors with their petitions; (c) counsel to Lynrock Lake Master Fund LP (the "***DIP Lender***"); (d) U.S. Bank Trust

Co., N.A., as trustee and collateral agent for the Debtors' outstanding senior secured convertible notes due 2027; (e) each of the Debtors' depositories and their respective counsel; (f) all Utility Providers in the Utility Services List; (g) the Disbursement Banks, (h) the Internal Revenue Service, (i) the Securities and Exchange Commission, (j) the United States Attorney's Office for the District of Delaware and all other states in which the Debtors operate; and (k) any other person entitled to notice pursuant to Local Rule 9013-1(m). In the case of secured creditors, depositories, and the holders of the 30 largest unsecured claims, service will be effectuated pursuant to Bankruptcy Rules 4001. The Debtors submit that that the applicable notice requirements have been satisfied, and that no further notice is required under the circumstances.

Upon the foregoing Motion, the Debtors respectfully request that the Court (a) enter the Proposed Interim Order, granting this Motion on an interim basis and scheduling a hearing to consider the Motion on a final basis, (b) at that hearing, enter the Proposed Final Order granting this Motion on a final basis, and (c) grant such other relief as is just and proper.

*[Remainder of page intentionally blank]*

Dated: September 9, 2024
Wilmington, Delaware

Respectfully submitted,

*/s/ Mark D. Collins*

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Brendan J. Schlauch (No. 6115)
Huiqi Liu (No. 6850)
Emily R. Mathews (No. 6866)
Gabrielle A. Colson (No. 7179)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King St.
Wilmington, DE  19801
Telephone: 1 (302) 651-7700
Fax:       1 (302) 651-7701
Email:     Collins@RLF.com
           Silberglied@RLF.com
           Schlauch@RLF.com
           Liu@rlf.com
           Mathews@rlf.com
           Colson@rlf.com

- and -

Dennis F. Dunne (*pro hac vice* pending)
Tyson Lomazow (*pro hac vice* pending)
Lauren C. Doyle (*pro hac vice* pending)
Benjamin M. Schak (*pro hac vice* pending)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Telephone: 1 (212) 530-5000
Email:     DDunne@Milbank.com
           TLomazow@Milbank.com
           LDoyle@Milbank.com
           BSchak@Milbank.com

*Proposed Co-Counsel to the*
*Debtors and Debtors in Possession*

RLF1 31465571v.1

**EXHIBIT A TO DIP MOTION**

**PROPOSED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Edgio, Inc., *et al*., | Case No. 24-_____ (____) |
| Debtors.[1] | (Joint Administration Requested) |
| | Re: D.I. __ |

**INTERIM ORDER (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, AND (B)
USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) MODIFYING THE AUTOMATIC
STAY; (IV) GRANTING ADEQUATE PROTECTION; (V) SCHEDULING A FINAL
HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Edgio, Inc. ("Edgio"), and certain of its affiliates, as

debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (the "Chapter 11 Cases"), and pursuant to sections 105, 361, 362, 363, 364(c)(1)-(3),

364(d)(1), 364(e) 503, 506(c), 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101,

*et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2 and 9013 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District

of Delaware (the "Local Rules"), seeking entry of this interim order (the "Interim Order"), *inter*

*alia*:

---

[1] The Debtors operate under the trade name Edgio and have previously used the trade names Limelight, Edgecast and Layer0. The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the last four digits of each Debtor's federal tax identification number, are: Edgio, Inc. (7033); Edgecast Inc. (6704); Edgio International, Inc. (3022); Limelight AcquisitionCo, Inc. (6138); Limelight Midco, Inc. (1120); Limelight Networks VPS, Inc. (3438); and Mojo Merger Sub, LLC (7033). The Debtors' service address for purposes of these Chapter 11 Cases is: 11811 N. Tatum Blvd., Ste. 3031, Phoenix, AZ 85028. Additional information about the Chapter 11 Cases is available at https://OmniManagementSolutions.com/Edgio/.

(i)    authorizing Edgio (the "<u>Borrower</u>") to obtain a senior secured superpriority debtor in possession financing facility (the "<u>DIP Facility</u>") subject to the terms and conditions set forth in that certain DIP Term Sheet, by and among the Borrower, each of the Debtors other than the Borrower (collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>DIP Loan Parties</u>") and Lynrock Lake Master Fund LP ("<u>Lynrock</u>"), as lender (the "<u>DIP Lender</u>") attached hereto as **Exhibit B** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Term Sheet</u>"), consisting of:

(a)    a term loan facility in an aggregate principal amount no less than $45,955,067 consisting of: (1) a new money term loan in the aggregate principal amount not to exceed $11,718,750 (which, after accounting for the Original Issue Discount (as defined in the DIP Term Sheet), will provide $9,375,000 in net funding to the Debtors) (the "<u>Interim New Money DIP Loan</u>"), which shall be made available and funded in a single disbursement upon entry of the Interim Order and satisfaction or waiver (in writing) by the DIP Lender of the other applicable conditions to any Interim New Money DIP Loan set forth in the DIP Term Sheet (the "<u>Interim Closing Date</u>"); and (2) a "roll up" of (x) all outstanding Prepetition Priority Term Loan Obligations (as defined below) and (y) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement (as defined below) (the "<u>Interim Roll-Up Prepetition Obligations</u>") into new loans under the DIP Facility (the "<u>Interim Rolled DIP Loans</u>") in a corresponding, aggregate principal amount, which Interim Rolled DIP Loans shall be drawn upon and immediately deemed applied in repayment of all Interim Roll-Up Prepetition Obligations on a cashless dollar-for-dollar basis upon entry of this Interim Order and funding of the Interim New Money DIP Loan;

(b)    a delayed draw term loan in an aggregate principal amount no less than $73,352,483 consisting of: (1) a new money term loan in the aggregate principal amount not to exceed $3,906,250 (which, after accounting for the Original Issue Discount, will provide $3,125,000 in net funding to the Debtors) (the "<u>Final New Money DIP Loan</u>" and, together with the Interim New Money DIP Loan, the "<u>New Money DIP Loans</u>"), which shall be made available and funded in a single disbursement upon entry of the Final Order (as defined below) and satisfaction or waiver (in writing) by the DIP Lender of the other applicable conditions to the Final DIP Loan set forth in the DIP Term Sheet (or, in the event the DIP Documents (as defined below) have been executed and delivered to the DIP Lender in advance of the Final DIP Loan draw, subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent to funding of the Final DIP Loan set forth in the applicable DIP Documents); and (2) a "roll up" of no less than $69,446,233 of outstanding principal amount and accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement (collectively, the "<u>Final Roll-Up Prepetition Obligations</u>" and, together with

the Interim Roll-Up Prepetition Obligations, the "<u>Roll-Up Prepetition Obligations</u>"), into new loans under the DIP Facility (the "<u>Final Rolled DIP Loans</u>," together with the Interim Rolled DIP Loans, the "<u>Rolled DIP Loans</u>" and, the Rolled DIP Loans, together with the New Money DIP Loans, the "<u>DIP Loans</u>") in a corresponding, aggregate principal amount, which Final Rolled DIP Loans shall be drawn upon and immediately deemed applied in repayment of all Roll-Up Prepetition Obligations on a cashless dollar-for-dollar basis upon entry of the Final Order.

(ii)     providing for each of the Guarantors to unconditionally guaranty, on a joint and several basis, the Borrower's obligations under the DIP Facility, including the borrowings under the DIP Loans and all other DIP Obligations (as defined below);

(iii)    authorizing the DIP Loan Parties to enter into any agreements, documents and instruments in connection with the DIP Facility, including the DIP Term Sheet and all notices, guarantees, security agreements, ancillary documents and agreements executed in connection therewith, (collectively, the "<u>DIP Documents</u>") on terms and conditions consistent with this Interim Order and otherwise in form and substance acceptable to the DIP Lender, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Documents;

(iv)    authorizing the Debtors to grant to the DIP Lender, and authorizing the Debtors to incur, the DIP Liens (as defined below) in all DIP Collateral (as defined below), to secure the DIP Obligations (including in respect of the Interim Rolled DIP Loans), which liens and security interests shall be automatically perfected and be subject to the lien priorities set forth in the DIP Term Sheet, on the terms and conditions set forth herein and in the applicable DIP Documents;

(v)     authorizing the Debtors to grant to the DIP Lender allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations (including in respect of the Interim Rolled DIP Loans), with priority over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve-Out[2] (as defined below) and the Prepetition Permitted Liens (as defined below), on the terms and conditions set forth in the applicable DIP Documents and this Interim Order;

(vi)    authorizing the Debtors to use the proceeds of the DIP Facility and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), in accordance with the terms hereof, including pursuant to the Approved Budget (as defined below) as further described herein, to: (a) pay fees, interest and expenses under the DIP Facility; (b) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve-Out; (c) pay

---

[2] Any terms or provisions in this Interim Order that are made subject or subordinate to the "Carve-Out" shall, to the extent applicable, also, be subject or subordinate to the Sale Proceeds Carve-Out (as defined herein).

for bankruptcy-related costs and expenses; and (d) pay Adequate Protection Payments (as defined below);

(vii)    authorizing the Debtors to pay, on a final and irrevocable basis, the principal, interest, expenses, fees, premiums and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation: (a) the Exit Premium (as defined in the DIP Term Sheet); (b); the Original Issue Discount; and (c) the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with this Interim Order and the DIP Documents (collectively, the "DIP Obligations");

(viii)   granting adequate protection to the Prepetition Junior Secured Parties (as defined below), on the terms set forth in the DIP Documents and this Interim Order, on account of any Diminution in Value (as defined below) of the Prepetition Junior Secured Parties' respective interests in the Prepetition Collateral, including Cash Collateral;

(ix)     authorizing the Debtors and their estates to waive: (a) their rights to surcharge against the DIP Collateral, including Prepetition Collateral, pursuant to Bankruptcy Code section 506(c); (b) the "equities of the case" exception under Bankruptcy Code section 552(b); and (c) the equitable doctrine of marshalling and/or similar doctrines with respect to the DIP Collateral, including the Prepetition Collateral, in each case, on the terms and conditions set forth in this Interim Order;

(x)      authorizing the DIP Lender, the Prepetition Junior Term Loan Lender and Prepetition Junior Secured Notes Parties (each as defined below), as applicable, to exercise remedies under the DIP Documents, the Prepetition Junior Term Loan Documents (as defined below) and the Prepetition Junior Secured Notes Documents (as defined below), as applicable, on the terms described in this Interim Order upon the occurrence and during the continuance of a Termination Event (as defined below);

(xi)     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order and to deliver any notices of termination described below and as further set forth herein;

(xii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xiii)   scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") (i) authorizing and approving, on a final basis, among other things, the Debtors' entry into the DIP Facility, the borrowings under the DIP Facility, the continued use of Cash Collateral and the granting of adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents, and (ii) approving the form of notice with respect to the Final Hearing.

4

The Court having held a hearing to consider entry of this Interim Order (the "Interim Hearing"); and the Court having considered the Motion, the exhibits attached thereto, the *Declaration of Todd Hinders in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. [__]] (the "First Day Declaration"), the *Declaration of Ann Miller of TD Cowen in support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. [__]) (the "TD Cowen Declaration") [Docket No. [__]] and the *Declaration of Jesse York of Riveron Consulting, LLC in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. [__]] (the "Riveron Declaration" and, together with the TD Cowen Declaration, the "DIP Declarations") the evidence submitted and arguments made at the Interim Hearing; and appropriate notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and all applicable Local Rules; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the relief granted by this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair

5

and reasonable and in the best interests of the Debtors and their estates and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor, **THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.    **Petition Date**.  On September 9, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their business and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

C.    **Jurisdiction and Venue**.  The Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to Bankruptcy Code section 1102 (a "Creditors' Committee").

E.    **Notice**.  Under the circumstances, the notice given by the Debtors, and described in the Motion, of the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

F.    **Debtors' Stipulations**.  Without prejudice to the rights of any other party, but subject to the limitations contained in paragraphs 19 and 20 of this Interim Order, the Debtors, on their own behalf and on behalf of their estates, shall be deemed to admit, stipulate, acknowledge and agree as follows:

1.    Prepetition Priority Term Loan Facility

(a)    *Prepetition Priority Term Loan Credit Agreement*.  Pursuant to that certain Priority Credit Agreement, dated as of August 23, 2024, by and among Edgio, as borrower, and Lynrock, as lender (the "Prepetition Priority Term Loan Lender") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Priority Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition Priority Term Loan Documents"), Edgio was provided secured term loans in an initial aggregate principal amount of $9,146,000 (the "Prepetition Priority Term Loan Facility"). Edgio's obligations under the Prepetition Priority Term Loan Facility are guaranteed by each of

7

Edgio International, Inc. ("Edgio International"), Edgecast Inc. ("Edgecast"), Limelight Acquisitionco, Inc. ("Limelight Acquisitionco"), Limelight Midco, Inc. ("Limelight Midco"), Limelight Networks VPS, Inc. ("Limelight Networks VPS"), and Mojo Merger Sub, LLC ("Mojo" and, collectively, the "Prepetition Priority Term Loan Guarantors" and, the Prepetition Priority Term Loan Guarantors, together with Edgio, the "Prepetition Priority Term Loan Obligors") pursuant to the Prepetition Priority Term Loan Documents.

(b)     *Prepetition Priority Term Loan Obligations*.   As of the Petition Date, the Prepetition Priority Term Loan Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Priority Term Loan Lender under the Prepetition Priority Term Loan Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $9,236,316.75, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition Priority Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Priority Term Loan Documents (collectively, the "Prepetition Priority Term Loan Obligations").   The Prepetition Priority Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.   No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Priority Term Loan Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the

8

Prepetition Priority Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

        (c)    *Prepetition Priority Term Loan Liens*.  Pursuant to the Prepetition Priority Term Loan Documents, the Prepetition Priority Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "<u>Prepetition Priority Term Loan Liens</u>") the "Collateral" (as defined in the Prepetition Priority Term Loan Documents) (the "<u>Prepetition Priority Term Loan Collateral</u>").  The Prepetition Priority Term Loan Liens are senior in priority to any and all other liens on the Prepetition Collateral pursuant to the Priority Lien Intercreditor Agreement (as defined below), except for the Prepetition Permitted Liens.  Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Priority Term Loan Liens are (i) valid, binding, perfected and enforceable liens and security interests in the Prepetition Priority Term Loan Collateral, with the priority set forth in the Prepetition Priority Term Loan Documents and the Priority Lien Intercreditor Agreement and (ii) not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind.  As used in this Interim Order the term  "<u>Prepetition Permitted Liens</u>" shall mean, in relation to any Prepetition Credit Facility (as defined below), liens that are senior by operation of law to the liens securing the Prepetition Priority Term Loan Credit Facility or otherwise permitted by the applicable Prepetition Priority Term Loan Documents, but solely to the extent any such permitted liens were (1) valid, enforceable, perfected, non-avoidable and in existence immediately prior to the Petition Date or (2) valid, enforceable, non-avoidable and in existence immediately

RLF1 31465572v.1

prior to the Petition Date, that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

2. Prepetition Junior Term Loan Facility.

(a) *Prepetition Junior Term Loan Credit Agreement.* Pursuant to that certain Credit Agreement, dated as of November 14, 2023, by and among Edgio, as borrower, and Lynrock, as lender (the "Prepetition Junior Term Loan Lender") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Junior Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition Junior Term Loan Documents"), Edgio was provided secured term loans in an initial aggregate principal amount of $79,472,175.22 (the "Prepetition Junior Term Loan Facility"). Edgio's obligations under the Prepetition Junior Term Loan Facility are guaranteed by each of Edgio International, Edgecast, Limelight Acquisitionco, Limelight Midco, Limelight Networks VPS, and Mojo (collectively, the "Prepetition Junior Term Loan Guarantors" and, together with Edgio, the "Prepetition Junior Term Loan Obligors") pursuant to the Prepetition Junior Term Loan Documents.

(b) *Prepetition Junior Term Loan Obligations.* As of the Petition Date, the Prepetition Junior Term Loan Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Term Loan Lender under the Prepetition Junior Term Loan Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $94,446,233.40, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, including, but not limited to, the Prepayment

10

Premium/Make-Whole Amount (as defined in the Prepetition Junior Term Loan Credit Agreement) in the amount of $65,952,657[4], additional interest, any other "Obligations" (as defined in the Prepetition Junior Term Loan Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Term Loan Documents (collectively, the "<u>Prepetition Junior Term Loan Obligations</u>").  The Prepetition Junior Term Loan Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Term Loan Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Term Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)    *Prepetition Junior Term Loan Liens*.  Pursuant to the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "<u>Prepetition Junior Term Loan Liens</u>") the "Collateral" (as defined in the Prepetition Junior Term Loan Documents) (the "<u>Prepetition Junior Term Loan Collateral</u>"), subject to certain Prepetition Permitted Liens.  The Prepetition Junior Term Loan Liens are: (i) junior and subordinate in priority to (A) the Prepetition

---

[4] Prepayment Premium/Make-Whole Amount represents an agreed upon reduction from the total Prepayment Premium/Make-Whole amount provided for under Prepetition Junior Term Loan Credit Agreement.

11

Priority Term Loan Liens on any Prepetition Junior Term Loan Collateral pursuant to the Priority Lien Intercreditor Agreement and (B) any Prepetition Permitted Liens; (ii) *pari passu* in priority to the Prepetition Junior Secured Notes Liens (as defined below) on any Prepetition Junior Term Loan Collateral pursuant to the Junior Lien Intercreditor Agreement (as defined below); and (iii) senior in priority to any and all other liens on the Prepetition Junior Term Loan Collateral.  Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Junior Term Loan Liens (x) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Junior Term Loan Documents and the Prepetition Intercreditor Agreements and (y) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind.

3.    Prepetition Junior Secured Notes.

(a)    *Prepetition Junior Secured Notes Indenture.*  Pursuant to that certain Indenture, dated as of November 14, 2023, by and among Edgio, as issuer, and U.S. Bank Trust Company, National Association, as trustee and collateral agent (the "Prepetition Junior Secured Notes Agent") (as amended, restated, amended and restated, supplemented, restructured or otherwise modified, renewed or replaced from time to time, the "Prepetition Junior Secured Notes Indenture" and together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "Prepetition Junior Secured Notes Documents," the Prepetition Junior Secured Notes Documents, together with the Prepetition Junior Term Loan Documents, the "Prepetition Junior Secured Credit Documents"), and, the Prepetition Junior Secured Credit Documents, together with the Prepetition Priority Term Loan Documents, the "Prepetition Credit Documents"), Edgio issued certain notes in the aggregate

12

principal amount of $118,870,000 (the "Prepetition Junior Secured Notes" and, together with the Prepetition Priority Term Loan Facility and the Prepetition Junior Term Loan Facility, the "Prepetition Credit Facilities"), to Lynrock, as secured noteholder (the "Prepetition Junior Secured Noteholder," together with the Prepetition Junior Secured Notes Agent, the "Prepetition Junior Secured Notes Parties," the Prepetition Junior Secured Notes Parties, together with the Prepetition Junior Term Loan Lender, the "Prepetition Junior Secured Parties," and the Prepetition Junior Secured Parties, together with the Prepetition Priority Term Loan Lender, the "Prepetition Secured Parties"). Edgio's obligations under the Prepetition Junior Secured Notes Indenture are guaranteed by each of Edgio International, Edgecast, Limelight Acquisitionco, Limelight Midco, Limelight Networks VPS, and Mojo (the "Prepetition Junior Secured Notes Guarantors" and, together with Edgio, the "Prepetition Junior Secured Notes Obligors") pursuant to the Prepetition Junior Secured Notes Documents.

(b) *Prepetition Junior Secured Notes Obligations.* As of the Petition Date, the Prepetition Junior Secured Notes Obligors (including each of the Debtors), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Junior Secured Noteholder under the Prepetition Junior Secured Notes Documents in the aggregate principal amount, including accrued and unpaid interest thereon as of the Petition Date, of not less than $140,971,311.36, plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, including, but not limited to, the Applicable Premium (as defined in the Prepetition Junior Secured Notes Indenture) in the amount of $96,751,937[5], additional interest, any other "Obligations" (as defined in the Prepetition Junior

---

[5] Applicable Premium amount represents an agreed upon reduction from the total Applicable Premium amount provided for under Prepetition Junior Secured Notes Indenture.

Secured Notes Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Junior Secured Notes Documents (collectively, the "Prepetition Junior Secured Notes Obligations," together with the Prepetition Junior Term Loan Obligations, the "Prepetition Junior Secured Obligations," and the Prepetition Junior Secured Obligations, together with the Prepetition Priority Term Loan Obligations, the "Prepetition Secured Obligations").  The Prepetition Junior Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claims, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfer made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Junior Secured Notes Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Junior Secured Notes Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)     *Prepetition Junior Secured Notes Liens*.  Pursuant to the Prepetition Junior Secured Notes Documents, the Prepetition Junior Secured Notes Obligations are secured by valid, binding, perfected and enforceable liens on and security interests in (the "Prepetition Junior Secured Notes Liens," together with the Prepetition Junior Term Loan Liens, the "Prepetition Junior Secured Liens") and, the Prepetition Junior Secured Liens together with the Prepetition Priority Term Loan Liens, the "Prepetition Liens") the "Collateral" (as defined in the Prepetition Junior Secured Notes Documents) (the "Prepetition Junior Secured Notes Collateral,"

14

together with the Prepetition Junior Term Loan Collateral, the "<u>Prepetition Junior Collateral</u>" and, the Prepetition Junior Collateral, together with the Prepetition Priority Term Loan Collateral, the "<u>Prepetition Collateral</u>"), subject to certain permitted liens as permitted under the Prepetition Junior Secured Notes Documents.  The Prepetition Junior Secured Notes Liens are: (i) junior and subordinate in priority to (A) the Prepetition Priority Term Loan Liens on any Prepetition Junior Secured Notes Collateral pursuant to the Priority Lien Intercreditor Agreement and (B) any Prepetition Permitted Liens; (ii) *pari passu* in priority to the Prepetition Junior Term Loan Liens on any Prepetition Junior Secured Notes Collateral pursuant to the Junior Lien Intercreditor Agreement; and (iii) senior in priority to any and all other liens on the Prepetition Junior Secured Notes Collateral.  Each of the Debtors acknowledges and agrees that, as of the Petition Date, the Prepetition Junior Secured Notes Liens (x) are valid, binding, perfected and enforceable liens and security interests in the Prepetition Junior Secured Notes Collateral, with the priority set forth in the Prepetition Junior Secured Notes Documents and the Prepetition Intercreditor Agreements and (y) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind.

4. <u>Prepetition Intercreditor Agreements</u>.

  (a) *Priority Lien Intercreditor Agreement*.  Edgio, the Prepetition Priority Term Loan Lender, the Prepetition Junior Term Loan Lender, the Prepetition Junior Secured Notes Agent, and certain of Edgio's subsidiaries are parties to that certain Priority Lien Intercreditor Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Priority Lien Intercreditor Agreement</u>"), which governs, among other things, the rights, interests, obligations, priority and

15

positions of the Prepetition Priority Term Loan Lender, the Prepetition Junior Term Loan Lender and the Prepetition Junior Secured Notes Parties.

(b)    *Junior Lien Intercreditor Agreement.*  The Prepetition Junior Term Loan Lender, the Prepetition Junior Secured Notes Agent, Edgio and certain of Edgio's subsidiaries are parties to that certain Junior Lien Intercreditor Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Junior Lien Intercreditor Agreement" and, together with the Priority Lien Intercreditor Agreement, the "Prepetition Intercreditor Agreements"), which governs, among other things, the rights, interests, obligations, priority and positions of the Prepetition Junior Secured Parties.

5.    Cash Collateral.  Any and all of the Debtors' cash, wherever located or held, including any amounts generated by the collection of accounts receivable, all cash proceeds of the Prepetition Collateral, and the cash in the Debtors' banking, checking or other deposit accounts with financial institutions as of the Petition Date (excluding cash deposits that secure any outstanding letters of credit) or deposited into the Debtors' banking, checking or other deposit accounts with financial institutions after the Petition Date constitutes cash collateral within the meaning of Bankruptcy Code section 363(a) ("Cash Collateral") of the DIP Lender and the Prepetition Junior Secured Parties, as applicable.  The Debtors' use of Cash Collateral shall be subject to the terms of this Interim Order and the Debtors' authority to use Cash Collateral of the DIP Lender and the Prepetition Junior Secured Parties, as applicable, may be terminated in accordance with paragraphs 16 and 17 hereof.

6.      Entitlement to Adequate Protection.

(a)      The Prepetition Junior Secured Parties are entitled, pursuant to Bankruptcy Code sections 105, 361, 362, and 363(e), to adequate protection of their respective interests in the Prepetition Junior Collateral, including Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Junior Collateral resulting from, among other things: (i) subordination of the Prepetition Junior Secured Parties' interests in the Prepetition Junior Collateral; (ii) the use of Cash Collateral during the Chapter 11 Cases; (iii) the use, sale or lease of any of the Prepetition Junior Collateral; (iv) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a); and/or (v) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("Diminution in Value").  Based on the Motion, the DIP Declaration and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Junior Collateral, including Cash Collateral, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Junior Collateral (including the use of Cash Collateral); *provided*, that nothing in this Interim Order or the DIP Documents shall: (x) be construed as the affirmative consent by any of the Prepetition Junior Secured Parties for the use of Prepetition Junior Collateral (including Cash Collateral) other than on the terms set forth in this Interim Order (including the Approved Budget) and in the context of the DIP Facility authorized by this Interim Order to the extent such consent has been or will be given; (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Junior Collateral; or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Junior Secured Parties to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Junior

17

Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(b)     The Prepetition Junior Secured Parties would not otherwise consent to the use of their Prepetition Junior Collateral (including Cash Collateral), subordination of their liens to the DIP Liens (as defined below), and the DIP Lender would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the agreement of the Debtors to consent to the jurisdiction of this Court in all matters arising out of or relating to the DIP Loans, the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Prepetition Credit Facilities, the Prepetition Credit Documents, the Prepetition Liens and the Prepetition Secured Obligations.

7.     <u>No Control</u>.  None of the DIP Lender or the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order, the DIP Facility or the Prepetition Credit Facilities.

G.     **<u>Findings Regarding the DIP Facility and Use of Cash Collateral</u>**.  Based on the record established at the Interim Hearing, including the DIP Declaration, and the representations of the parties, the Court makes the following findings:

1.     <u>Good Cause</u>.  Good and sufficient cause has been shown for: (a) the entry of this Interim Order; (b) the Debtors to obtain postpetition financing on the terms and conditions set forth in the DIP Documents and this Interim Order; (c) authorizing the Debtors to continue to use Cash Collateral of the Prepetition Junior Secured Parties; and (d) granting adequate protection to the Prepetition Junior Secured Parties.

2.      <u>Need for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors

have an ongoing, immediate and critical need to use Cash Collateral on an interim basis and obtain

credit in the form of the Interim DIP Loans pursuant to the DIP Facility in order to, among other

things: (a) permit the orderly continuation of their business; (b) maintain business relationships

with their vendors, customers and other parties; (c) make payroll; (d) pay the costs of administering

the Chapter 11 Cases; (e) pay Adequate Protection Payments; and (f) repay in full (on a cashless,

dollar-for-dollar basis) the Roll-Up Prepetition Obligations, in each case, in compliance with, and

subject in all respects to, the Approved Budget and the terms and conditions set forth in the DIP

Documents and this Interim Order.  The incurrence of the Interim DIP Loans under the DIP Term

Sheet and use of Cash Collateral is necessary and vital to the preservation and maintenance of the

going concern value of the Debtors.  Immediate and irreparable harm will be caused to the Debtors

and their estates if immediate financing is not obtained and permission to use Cash Collateral is

not granted.  The terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of

prudent business judgment, are supported by reasonably equivalent value and fair consideration

and are in the best interests of the Debtors and their stakeholders.  The adequate protection

provided in this Interim Order and other benefits and privileges contained herein are consistent

with and authorized by the Bankruptcy Code.

3.      <u>Priming of Certain Prepetition Liens</u>.  The priming of the Prepetition Junior

Term Loan Liens on the Prepetition Junior Term Loan Collateral and the Prepetition Junior

Secured Notes Liens on the Prepetition Junior Secured Notes Collateral, to the extent set forth

herein, under Bankruptcy Code section 364(d)(1), as contemplated by this Interim Order and the

DIP Facility, and as further described below, have enabled the Debtors to obtain the DIP Facility

19

and, among other benefits, to continue to operate their businesses for the benefit of their estates and stakeholders.

4.      No Credit Available on More Favorable Terms.  As set forth in the DIP Declarations, given their current financial condition, financing arrangements, capital structure and the circumstances of the Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than those provided under the DIP Facility.  Further, the Prepetition Junior Secured Parties are adequately protected and have consented to the Debtors incurring the DIP Facility, the priming of their Prepetition Junior Secured Liens, and the use of their Cash Collateral, on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors have been unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors also have been unable to obtain sufficient credit: (a) on an unsecured basis having priority over all other administrative expenses; (b) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Postpetition financing is not otherwise available without granting the DIP Lender: (w) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein; (x) superpriority claims and priming liens to the extent set forth in the DIP Documents and this Interim Order; (y) the inclusion of the Rolled DIP Loans within the DIP Facility; and (z) the other protections set forth in this Interim Order.

5.      Use of Cash Collateral and Proceeds of the DIP Facility.  As a condition to the Debtors' entry into the DIP Term Sheet and the other DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash

20

Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of the DIP Documents and this Interim Order and in accordance with the Approved Budget, subject to the Permitted Variances (as defined below).

6.     Good Faith.

(a)     The DIP Facility has been negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents, and all other DIP Obligations shall be deemed to have been extended by the DIP Lender in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations and the DIP Liens shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(b)     The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and the Debtors' continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations (as defined below) and the granting of the Adequate Protection Liens (as defined below), in

21

accordance with the terms hereof), and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of Bankruptcy Code section 363(m) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

7.    <u>Sections 506(c) and 552(b)</u>.  As a material inducement to the DIP Lender to agree to provide the DIP Facility and the Prepetition Junior Secured Parties to agree to the use of Prepetition Junior Collateral (including Cash Collateral), and in exchange for (a) the DIP Lender's agreement to subordinate their DIP Liens and DIP Superpriority Claims (each as defined below) to the Carve-Out to the extent set forth herein and (b) the Prepetition Junior Secured Parties' agreement to (1) subordinate their Prepetition Junior Secured Liens and the Adequate Protection Liens to the Carve-Out and the DIP Liens, and (2) consent to the use of Prepetition Junior Collateral (including Cash Collateral) in accordance with and subject to the Approved Budget (subject to the Permitted Variances), the DIP Documents and the terms of this Interim Order, each of the DIP Lender and the Prepetition Junior Secured Parties are entitled to receive: (x) a waiver of any "equities of the case" exceptions or claims under Bankruptcy Code section 552(b); (y) a waiver of the provisions of Bankruptcy Code section 506(c); and (z) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Junior Collateral (as applicable), in each case effective upon entry of a Final Order providing such relief.

H.    <u>Continuation of Prepetition Liens; Prepetition Permitted Liens</u>.  The DIP Liens granted to secure the DIP Obligations and, subject to paragraphs 19 and 20 of this Interim Order, the Prepetition Junior Term Loan Liens granted to secure the Prepetition Junior Term Loan Obligations and the Prepetition Junior Secured Notes Liens granted to secure the Prepetition Junior

22

Secured Notes Obligations are continuing liens and the DIP Collateral, the Prepetition Junior Term Loan Collateral and the Prepetition Junior Secured Notes Collateral, as applicable, is and will continue to be encumbered by the applicable liens.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Lien is valid, senior, enforceable, prior, perfected or non-avoidable.  Moreover, nothing herein shall prejudice the right of any party in interest, including, but not limited to, any of the Debtors, the DIP Lender, the Prepetition Junior Secured Parties or the Creditors' Committee (if any) to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Prepetition Permitted Lien.

I.        **Immediate Entry**.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  The use of Cash Collateral (and the other Prepetition Collateral), in accordance with this Interim Order, is necessary to avoid immediate and irreparable harm to the Debtors' estates.

Based upon the foregoing findings and conclusions, the Motion and the record before this Court, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.        **Motion Granted**.  The relief sought by the Motion is granted on an interim basis, and the DIP Facility and the use of Cash Collateral are hereby authorized and approved, in each case, upon the terms and conditions of the DIP Documents and this Interim Order.

2.        **Objections Overruled**. Any objections to the Motion that have not been withdrawn, waived or settled, and all reservations of rights or other statements inconsistent with

23

this Interim Order, are hereby denied and overruled.  This Interim Order shall become effective and enforceable immediately upon its entry.

3.   **Approval and Authorization of DIP Facility and DIP Documents**.

(a)   *Approval of DIP Facility and DIP Documents*.  The DIP Facility is hereby approved on an interim basis on the terms and conditions set forth herein. The DIP Loan Parties are expressly and immediately authorized and empowered to: (i) enter into and perform all of their obligations under the DIP Term Sheet; (ii) as required by the DIP Lender, execute, deliver and perform all of their obligations under applicable DIP Documents; (iii) pay all fees, costs, expenses, indemnities and other amounts contemplated under the DIP Documents and this Interim Order; and (iv) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates and other documents (including, without limitation, the execution and/or recordation of any collateral, pledge and security documents, mortgages, deeds of trust, control agreements, financing statements or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Lender to perform its obligations under the DIP Term Sheet, the DIP Documents and this Interim Order and to implement the transactions contemplated thereunder and hereunder.  For the avoidance of doubt, upon execution and delivery, the DIP Term Sheet and the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents and such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

24

(b)      *Authorization to Borrow.*  Upon entry of this Interim Order, the Debtors are immediately authorized, subject to the terms and conditions of the DIP Term Sheet, the DIP Documents and this Interim Order, to: (i) borrow the Interim New Money DIP Loan in an aggregate principal amount of up to $11,718,750; and (ii) incur and pay all principal, interest, premiums, fees (including the DIP Fees (as defined below)), indemnities, expenses and other amounts provided for in the DIP Term Sheet, the DIP Documents and this Interim Order, pursuant to the terms and provisions thereof, subject to any limitations on availability or borrowing under the DIP Term Sheet, the DIP Documents and this Interim Order.  The Interim New Money DIP Loan shall be used for all purposes as permitted under the DIP Term Sheet, the DIP Documents and this Interim Order (including pursuant to the Approved Budget).

(c)      *Roll-Up of Certain Prepetition Secured Obligations.*  Upon entry of this Interim Order and the borrowing of the Interim New Money DIP Loan, all Interim Roll-Up Prepetition Obligations will be immediately, automatically and irrevocably deemed to have been converted into Interim Rolled DIP Loans on a cashless dollar-for-dollar basis and, except as otherwise provided in the DIP Term Sheet or the DIP Documents, shall be entitled to all the priorities, privileges, rights and other benefits afforded to the other DIP Obligations under the DIP Term Sheet and DIP Documents, subject to paragraph 20 of this Interim Order.  The conversion of Interim Roll-Up Prepetition Obligations into Interim Rolled DIP Loans as described in this paragraph 3(c) shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of, the DIP Lender to provide the New Money DIP Loans and not as payments under, adequate protection for or otherwise on account of, any Interim Roll-Up Prepetition Obligations.

25

(d)      *No Obligation to Extend Credit.*  The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet or the DIP Documents unless all of the conditions precedent under the DIP Term Sheet or such DIP Documents, as applicable, and this Interim Order have been satisfied in full or waived by the DIP Lender, in each case, in accordance with the terms of the DIP Term Sheet and DIP Documents.

(e)      *Use of DIP Proceeds and Cash Collateral.*  The Debtors are hereby authorized to use the proceeds of the DIP Facility and all Cash Collateral solely for the purposes set forth in this Interim Order, only in compliance with the Approved Budget (subject to the Permitted Variances) and subject to the terms and conditions set forth in the DIP Term Sheet, the DIP Documents and this Interim Order.  From and after the Petition Date, the Debtors shall use Cash Collateral only for the purposes specifically set forth in this Interim Order and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions set forth in the DIP Term Sheet, the DIP Documents and this Interim Order.

(f)      *DIP Interest, Fees and Expenses.*  The Debtors are authorized and directed to pay any and all: (i) interest, fees, premiums or other amounts payable under the DIP Term Sheet or DIP Documents, including, without limitation, and to the extent applicable, the Interim Exit Premium[6] and the Original Issue Discount (each as defined in the DIP Term Sheet); (ii) amounts due (or that may become due) to any Indemnified Person (as defined below) in respect of the indemnification obligations under this Interim Order, the DIP Term Sheet and the DIP Documents; and (iii) any other amounts payable in connection with the DIP Facility, including all reasonable and documented pre- and postpetition fees, expenses and disbursements in connection with the

---

[6] For the avoidance of doubt, the Interim Exit Premium will be earned on the Interim Closing Date but will not be payable until the Maturity Date of the DIP Facility.

26

DIP Facility and these Chapter 11 Cases of (A) Akin Gump Strauss Hauer & Feld LLP ("Akin"), as lead restructuring counsel to the DIP Lender, (B) Pashman Stein Walder Hayden P.C. ("Pashman"), as Delaware local counsel to the DIP Lender, (C) KPMG LLP ("KPMG"), as tax and auditing consultant, and (D) any other attorneys retained by the DIP Lender in lieu of the professionals set forth in clauses (A) or (B) (the professionals set forth in clauses (A) through (D), collectively, the "DIP Professionals"), in each case, whether or not such payments, premiums, fees, costs, expenses and disbursements arose before or after the Interim Closing Date (as defined in the DIP Term Sheet).   The payment of the fees, costs, expenses and disbursements of the DIP Professionals (the "DIP Professional Fees") shall be subject to the notice and review procedures set forth in paragraph 18 of this Interim Order.   For the avoidance of doubt, the Debtors shall be jointly and severally liable for the obligations to pay the DIP Professional Fees in accordance with this Interim Order.

(g)     *Indemnification*.   As set forth in the DIP Term Sheet and in any DIP Documents, the Debtors will jointly and severally indemnify the DIP Lender, the DIP Professionals and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including, but not limited to, reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Documents; *provided*, that no such Indemnified Person will be indemnified for costs, expenses or liabilities (i) to the extent determined by a final, non-appealable judgment of a court of competent

27

jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence or willful misconduct of such person (or their related persons); or (ii) in connection with any action brought in accordance with paragraph 20 of this Interim Order.

(h) *Modification of DIP Documents*. The DIP Lender is hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in accordance with the provisions of the DIP Term Sheet and any applicable DIP Documents governing amendments thereto, each without further application to or order of the Court; *provided*, however, that notice of any non-material modification or amendment to the DIP Term Sheet and applicable DIP Documents shall be provided to counsel to any Creditors' Committee, to the U.S. Trustee and to the Prepetition Junior Notes Agent, each of whom shall have three (3) days from the date of such notice within which to object in writing to such modification or amendment. If no objections are received, the Debtors may submit a proposed form of order reflecting any such modification or amendment to the Court under certification of counsel. If any Committee or the U.S. Trustee timely objects to any non-material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court. Any material modification of the DIP Documents shall only be permitted upon appropriate notice. For the avoidance of doubt, any amendments, waivers, consents or other modifications to and under the DIP Term Sheet or the DIP Documents that: (i) modify the original stated maturity of the DIP Facility; (ii) increase the aggregate commitments thereunder; or (iii) increase the rate of interest or fees payable with respect thereto shall require further Court approval.

28

4.      **DIP Obligations**

(a)      Upon entry of this Interim Order, the obligations under the DIP Term Sheet and any applicable DIP Documents shall constitute valid, binding, enforceable and non-avoidable obligations of each Debtor, and shall be fully enforceable against each of the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of these Chapter 11 Cases or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), in each case, in accordance with the terms of the DIP Documents and this Interim Order.

(b)      Upon entry of this Interim Order, the Debtors shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments or similar amounts, fees, costs, expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whether or not such obligations arose before or after the Petition Date, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, optional prepayment, declaration, acceleration, demand or otherwise, to the DIP Lender under the DIP Documents or this Interim Order.

(c)      All obligations incurred, payments made and transfers or grants of liens and security interests set forth in the DIP Term Sheet, the DIP Documents or this Interim Order by the Debtors are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby.  No obligation, payment,

29

transfer or grant of liens or security interests under the DIP Term Sheet, the DIP Documents or this Interim Order to the DIP Lender shall be limited, stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees, only to the procedures set forth in paragraph 18 of this Interim Order).

5.    **DIP Superpriority Claims**.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Lender, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of

30

Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and 507(b), and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to Bankruptcy Code section 549, and subject to the entry of the Final Order, the proceeds of, and property that is recovered from or becomes unencumbered as a result of (whether by judgment, settlement or otherwise), all claims and causes of action arising under chapter 5 of the Bankruptcy Code or under any applicable state law of a similar nature (such claims and causes of action, "Avoidance Actions" and the proceeds thereof, "Avoidance Action Proceeds"), subordinate only to the Carve-Out and, only with respect to any cash proceeds of the sale or disposition of DIP Collateral which results in a mandatory prepayment obligation pursuant to the DIP Term Sheet, the Sale Proceeds Carve-Out (as defined below); *provided*, that the DIP Superpriority Claims shall have recourse to the Carve-Out Reserves solely to the extent of available funds after satisfaction of the Carve-Out in full as provided in paragraph 8(f) of this Interim Order.  Except as set forth in, or permitted by, this Interim Order, or otherwise permitted pursuant to an order of this Court, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

6. **DIP Liens**.

(a)      As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral (as defined below), the DIP Lender is hereby granted by the Debtors continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected

31

security interests in and liens upon (collectively, the "DIP Liens") all DIP Collateral as security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all of the DIP Obligations.

(b)    The term "DIP Collateral" means all assets and properties of each of the Debtors and any of their non-Debtor subsidiaries (and, in the case of the Debtors, their bankruptcy estates), of any kind or nature whatsoever, wherever located, whether tangible or intangible, real, personal or mixed, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of, each of the Debtors (including under any trade names, styles or derivations thereof), whether prior to or after the Petition Date, including, without limitation: (i) all Prepetition Collateral (including Cash Collateral); (ii) all intercompany claims; (iii) all money, cash and cash equivalents; (iv) all funds in any deposit accounts (excluding cash deposits that secure any outstanding letters of credit), securities accounts, commodities accounts, or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (v) all accounts and other receivables (including those generated by intercompany transactions); (vi) all contracts and contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, furniture, machinery, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds; (xii) all franchise rights; (xiii) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (xiv) all general intangibles, tax or other refunds or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights; (xix) all commercial tort claims; (xx) subject to the entry of the Final Order, all Avoidance Action Proceeds (but not

32

avoidance actions themselves); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials, and records); (xxii) all proceeds, whether by settlement, judgment or otherwise, arising from or relating to any litigation, arbitration, administrative proceeding or other legal action (other than Avoidance Actions) in which the Borrower or any of the Guarantors is or may become a party, including, but not limited to, all monetary awards, settlements, compensation, damages, penalties or any other form of payment or relief that the Borrower or any Guarantor receives or is entitled to receive as a result of such legal actions, including, but not limited to, any proceeds or other payments related to claims asserted against any legal professionals (collectively, "Litigation Proceeds"); (xxiii) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiv) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to the Debtors from time to time with respect to any of the foregoing; *provided* that the DIP Collateral shall not include any "Excluded Assets" described in the definition thereof in the Prepetition Priority Term Loan Documents.

(c)     Subject in each case to the terms of this Interim Order, the DIP Term Sheet and the DIP Documents, the DIP Lender shall be granted the following DIP Liens in respect of the DIP Facility:

(i)     *First Priority Lien on Unencumbered Property*. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable and fully and automatically perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens (including, subject to entry of the Final Order, Avoidance Action Proceeds), which security interest and lien shall be junior and subordinate only to the Carve-Out;

33

(ii)     *Junior Lien on Encumbered Property*. Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable and fully and automatically perfected junior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is subject to a Prepetition Permitted Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any such Prepetition Permitted Lien; and

(iii)    *First Priority Priming Lien on Encumbered Property*. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable and fully and automatically perfected first priority priming security interest in and lien upon all DIP Collateral that is subject to a Prepetition Junior Secured Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any Prepetition Permitted Liens.

(d)     To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity for the Debtors to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens or the Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender or the Prepetition Junior Secured Parties in accordance with the terms of the DIP Term Sheet, the DIP Documents and this Interim Order.

7.     **Approved Budget; Compliance and Reporting**.

(a)     *Initial Budget*.  The Debtors have prepared and delivered to the DIP Lender and the DIP Professionals: (1) an itemized thirteen-week operating budget and cash flow forecast of the Debtors for the period covered thereby, in a form consistent with the forecast delivered to the Prepetition Priority Term Loan Lender under the Prepetition Priority Term Loan Credit Agreement (the "Cash Flow Forecast"); (2) a cash balance report as of the Friday immediately preceding the Petition Date; (3) accounts payable and accounts receivable balance reports as of the

34

Friday immediately preceding the Petition Date; (4) accounts payable and accounts receivable aging reports as of the Friday immediately preceding the Petition Date; and (5) a revenue and consolidated EBITDA forecast for the remainder of Fiscal Year 2024, which are attached hereto as **Exhibit A** (collectively, the "Initial Budget" and, as amended, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Documents, an "Approved Budget"). Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility to fund payments benefitted by the Carve-Out and otherwise in accordance with the Approved Budget (subject to the Permitted Variances).

(b)     *Proposed Budget; Budget Transition.* By no later than 5:30 p.m. (prevailing Eastern Time) on the Tuesday of the calendar week that is four weeks following the week in which the Petition Date occurs, and continuing at 5:30 p.m. (prevailing Eastern Time) on the Tuesday of every fourth week thereafter (or, in each case, if any Tuesday is not a business day, the next business day thereafter), the Debtors shall deliver to the DIP Lender and the DIP Professionals an updated and supplemented Cash Flow Forecast for the thirteen-week period commencing with the calendar week in which such Cash Flow Forecast is delivered and reports of the information contained in the previous Approved Budget (each, a "Proposed Budget"), and, if such Proposed Budget is in form and substance acceptable to the DIP Lender, in its sole discretion, it shall become the Approved Budget. Until any Proposed Budget, or any amendment, supplement or modification to an Approved Budget, has been approved by the DIP Lender, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect. The consent of the DIP Lender to any Proposed Budget or any amendment, supplement or modification to an Approved Budget or Approved Variance Report shall not be construed as consent to the use of any Cash

35

Collateral or proceeds of the DIP Facility after the occurrence of a Termination Event (as defined below), regardless of whether the aggregate funds shown in the Approved Budget have been expended.

(c)     *Budget Reporting*.  By no later than 5:30 p.m. (prevailing Eastern Time) on the Tuesday of the calendar week following the week in which the Petition Date occurs (the "First Reporting Date"), and no later than 5:30 p.m. (prevailing Eastern Time) on each Tuesday of each calendar week thereafter (or, in each case, if any Tuesday is not a business day, the next business day thereafter) (together with the First Reporting Date, each a "Weekly Reporting Date"), the Debtors shall provide to the DIP Lender and the DIP Professionals a report, in form and substance reasonably acceptable to the DIP Lender (the "Weekly Variance Report"), setting forth in reasonable detail: (i) in the case of the Cash Flow Forecast, (A) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "Actual Receipts") and the actual disbursements of the Debtors on a line-by-line and aggregate basis (the "Actual Disbursements"), in each case, (1) during the applicable week ending on the Friday immediately preceding each such Weekly Reporting Date, (2) during the rolling four-week period ending on the Friday immediately preceding each such Weekly Reporting Date and (3) during the period commencing on the Petition Date and ending on the Friday immediately preceding such Weekly Reporting Date (each such period, a "Reporting Period"), (B) a comparison (whether positive or negative, expressed as a percentage) for each Reporting Period between (1) the Actual Receipts (and each line item thereof) for such Reporting Period and the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Period and (2) the Actual Disbursements (and each line item thereof) for such Reporting Period and the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget

36

for such Reporting Period and (C) detail on a line-item basis as to whether any given material variance[7] from the projected receipts and disbursements set forth in the Approved Budget for each Reporting Period is permanent or timing-based, along with commentary in respect thereof; and (ii) in the case of all other reports required to be provided to the DIP Lender and the DIP Professionals under paragraph 7(a) of this Interim Order, variances comparing such reports with (A) the applicable reports in the most recently delivered Approved Budget and (B) the applicable reports delivered in connection with the Initial Budget.

(d)        *Budget Testing; Permitted Variances*.  The Tuesday of the calendar week following the week in which the Petition Date occurs (or, if such Tuesday is not a business day, the next business day thereafter), and each Tuesday thereafter (or, if any Tuesday is not a business day, the next business day thereafter) shall be referred to as a "Cash Flow Variance Testing Date." As of any Cash Flow Variance Testing Date, the Debtors shall not permit: (i) the aggregate Actual Receipts to be less than 90% (on a cumulative basis taking into account the variance for any prior Testing Period (as defined below)) of the amount of the projected receipts set forth in the then-in-effect Approved Budget for the two week period ending on the Friday immediately preceding such Cash Flow Variance Testing Date (each such period, a "Cash Flow Variance Testing Period"); or (ii) the aggregate Actual Disbursements (excluding disbursements in respect of fees and expenses of the Debtor Professionals (as defined below), the DIP Professionals, and any professionals retained by the Prepetition Secured Parties in accordance with paragraph 9(d) hereof, but including disbursements in respect of fees and expenses of Committee Professionals) (the "Total Tested Disbursements") to be more than 110% (on a cumulative basis taking into account the variance for any prior Cash Flow Variance Testing Period during the then-in-effect Approved Budget period)

---

[7]      As used herein, "material variance" means a variance in excess of: (i) 5% or (ii) $20,000.

of the projected Total Tested Disbursements set forth in the then-in-effect Approved Budget for the applicable Cash Flow Variance Testing Period (the variances described in clauses (i) and (ii) above, the "Permitted Variances").  Additional variances, if any, from an Approved Budget shall be subject to the prior written approval of the DIP Lender (with e-mail from counsel to the DIP Lender to the Debtors' counsel being sufficient), in its sole discretion.

(e)     *Reporting Requirements; Access to Records*.  Without limiting any rights to access the DIP Lender has under the DIP Term Sheet or the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the DIP Lender to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

8.     **Carve-Out**.  Each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens (as defined below), the Adequate Protection Claims (as defined below), the Prepetition Junior Term Loan Liens, the Prepetition Junior Term Loan Claims, the Prepetition Junior Secured Notes Liens and Prepetition Junior Secured Notes Claims shall be subject to payment of the Carve-Out (defined below).

(a)     "Carve-Out" means the following expenses: (i) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time (whether by interim order, final order, procedural order or otherwise), (A) all unpaid fees and expenses (collectively, the "Debtor Professional Fees")

38

incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (collectively,  the "Debtor Professionals") and (B) all unpaid fees and expenses (collectively, the "Committee Professional Fees" and, together with the Debtor Professional Fees, the "Professional Fees" (in each case, other than any restructuring, sale, process, or other transaction fee of any investment bankers or financial advisors; *provided, however*, that any monthly fees of any investment bankers or financial advisors shall be included)) incurred by persons or firms retained by the Creditors' Committee (if any) (such professionals to the Creditors' Committee, the "Committee Professionals" and, together with the Debtor Professionals, the "Estate Retained Professionals") pursuant to Bankruptcy Code sections 327, 328 or 1103, as applicable, at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) and, with respect to the Professional Fees incurred by the Committee Professionals, solely in the amounts set forth in the then-in-effect Approved Budget, in each case, without regard to whether such fees and expenses were invoiced after the Carve-Out Trigger Date and whether allowed by the Court prior to or after delivery of the Carve-Out Trigger Notice (the "Pre-Carve-Out Trigger Notice Fees," and such amounts, the "Pre-Carve-Out Trigger Notice Cap"); and (iv) after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, and, solely with respect to the Professional Fees incurred by the Committee Professionals, subject to the then-in-effect Approved Budget, all unpaid fees, disbursements, costs and expenses incurred by Estate Retained Professionals in an aggregate amount not to exceed $250,000 (the cap set forth in this clause (iv), the "Post-Carve-Out Trigger Notice Cap" and, together with the Pre-Carve-Out Trigger Notice Cap, the "Carve-Out Amount") incurred after the first business day following delivery of a Carve-Out Trigger Notice.  Any payment or reimbursement made to any Estate Retained Professional on

or after the delivery of the Carve-Out Trigger Notice shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis.

(b)     *Carve-Out Trigger Notice.*  For purposes of the foregoing, a "Carve-Out Trigger Notice" shall mean a written notice delivered by e-mail by the DIP Lender to: (i) the Debtors' lead restructuring counsel; (ii) the U.S. Trustee; and (iii) counsel to the Creditors' Committee appointed in the Chapter 11 Cases (if any) (collectively, the "Carve-Out Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a Termination Event (as defined below) and acceleration of the DIP Obligations, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(c)     *Carve-Out Reserves.*

(1)     On or before the Friday of each week, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtors to fund a reserve in an amount equal to the aggregate amount of the Estate Retained Professionals' Professional Fees projected for such week in the then-in-effect Approved Budget. The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Lender, which shall constitute the corpus of a trust governed by New York law, for the benefit of the Estate Retained Professionals entitled to receive payment thereunder to pay such Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims, and all payments of Professional Fees, to the extent allowed at any time, incurred prior to the Carve-Out Trigger Date shall be paid first from such Pre-Carve-Out Trigger Notice Reserve Account.

(2)     On the date on which a Carve-Out Trigger Notice is delivered (the "Carve-Out Trigger Date), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to fund, to the extent not already funded, the Pre-Carve-

40

Out Trigger Notice Reserve in an amount equal to the then unpaid amounts of (i) the Professional Fees of Estate Retained Professionals and (ii) the obligations accrued as of the Carve-Out Trigger Date with respect to clauses (i) and (ii) of the definition of Carve-Out set forth in paragraph 8(a) (the "Additional Carve-Out Obligations").  On the Carve-Out Trigger Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap and deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the DIP Lender, which shall constitute the corpus of a trust governed by New York law, for the benefit of the Estate Retained Professionals entitled to receive payment thereunder to pay, to the extent allowed at any time, such Estate Retained Professionals' Professional Fees (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to the use of such reserve to pay any other claims.

(d)    Notwithstanding anything to the contrary in the DIP Documents (including the failure to satisfy or receive a waiver of any of the conditions precedent to any DIP Loans set forth in the DIP Term Sheet or the DIP Documents) or this Interim Order, following delivery of the Carve-Out Trigger Notice, in the event that the Carve-Out Reserves have not been fully funded as provided herein, the DIP Lender shall promptly fund any additional draw request for any shortfall amounts; *provided*, that the DIP Lender shall not be required to fund any amounts that, in the aggregate, exceed the amount of the New Money Term Loans to be funded by the DIP Lender to the Debtors under the DIP Facility; *provided*, *further*, that the DIP Lender shall not be required to fund any amounts in respect of Professional Fees incurred by the Committee Professionals that exceed the amounts set forth for such Committee Professionals in the then-in-effect Approved Budget.

41

(e)       The Debtors shall use funds held in the Pre-Carve-Out Trigger Notice Reserve exclusively to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in paragraph 8(a) (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Amounts (as defined below), until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay any other amounts (if owing) benefitted by the Carve-Out and then to the DIP Lender, in accordance with the terms of this Interim Order, the DIP Term Sheet and the DIP Documents, unless the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been Paid in Full,[8] in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents and this Interim Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts") up to the Post-Carve-Out Trigger Notice Cap, and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order, to pay the DIP Lender, in accordance with the terms of this Interim Order, the DIP Term Sheet and the DIP Documents, unless the DIP Obligations have been Paid in Full, in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents and this Interim Order. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of

---

[8]    As used in this Interim Order, the term "Paid in Full" or "Payment in Full" means, with respect to the DIP Obligations or any Prepetition Junior Secured Notes Obligations (as the case may be), the irrevocable and indefeasible payment in full in cash of all DIP Obligations or such Prepetition Junior Secured Notes Obligations (as the case may be), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph 8(d), then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts or Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 8(d), prior to making any payments to the DIP Lender or the Prepetition Junior Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Term Sheet, the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, neither the DIP Lender (in accordance with the terms of the DIP Term Sheet, the DIP Documents or this Interim Order) nor the Prepetition Junior Secured Parties (in accordance with the terms of this Interim Order and the Prepetition Junior Secured Credit Documents) shall sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Lender, in accordance with the terms of the DIP Term Sheet, the DIP Documents and this Interim Order, unless the DIP Obligations have been Paid in Full, in which case any such excess shall be paid to the Prepetition Junior Secured Parties in accordance with the Prepetition Junior Secured Credit Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (x) disbursements by the Debtors from the Carve-Out Reserves shall not increase or reduce the DIP Obligations or constitute additional loans under the DIP Facility and (y) the failure of the Carve-Out Reserves to satisfy in full the Professional Fees of Estate Retained Professionals shall not affect the priority of the Carve-Out in respect of DIP Collateral or any recoveries thereon.

(f)     *Limitation on Responsibility of Secured Parties*.  Neither the DIP Lender nor any of the Prepetition Junior Secured Parties shall be responsible for the payment or

43

reimbursement of any fees or expenses of any Estate Retained Professional incurred in connection with these Chapter 11 Cases or any Successor Cases (as defined below). Nothing in this Interim Order shall be construed to obligate the DIP Lender or any of the Prepetition Junior Secured Parties to pay compensation to, or to reimburse the expenses of, any Estate Retained Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Creditors' Committee (if any), any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

9.     **Adequate Protection for Prepetition Junior Secured Parties**. The Prepetition Junior Secured Parties are entitled, pursuant to Bankruptcy Code sections 105, 361, 362 and 363(e), and in consideration of the stipulations and consents set forth herein, to adequate protection of their interests in the Prepetition Junior Collateral (including Cash Collateral), to the extent of any Diminution in Value of their interests therein. As adequate protection, the Prepetition Junior Term Loan Lender and the Prepetition Junior Secured Notes Agent (for the benefit of itself and the Prepetition Junior Secured Noteholder), are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)     *Adequate Protection Liens*. To the extent of any Diminution in Value of the Prepetition Junior Secured Parties' interests in the Prepetition Junior Collateral, the Prepetition Junior Term Loan Lender and the Prepetition Junior Secured Notes Agent (for the benefit of itself and the Prepetition Junior Secured Noteholder) are hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements),

44

additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected liens on, and security interests in (the "Adequate Protection Liens") all DIP Collateral.

(b)     *Ranking of Liens*.  The order of priority with respect to security interests in and liens upon DIP Collateral shall be as follows: (i) with respect to DIP Collateral that does not constitute Prepetition Junior Collateral, (A) the Carve-Out, (B) any Prepetition Permitted Liens, (C) the DIP Liens and (D) the Adequate Protection Liens; and (ii) with respect to DIP Collateral that constitutes Prepetition Junior Collateral, (A) the Carve-Out, (B) any Prepetition Permitted Liens, (C) the DIP Liens, (D) the Adequate Protections Liens and (E) the Prepetition Junior Secured Liens.

(c)     *Adequate Protection Claims*. To the extent of any Diminution in Value of their respective interests in the Prepetition Junior Collateral, the Prepetition Junior Term Loan Lender and the Prepetition Junior Secured Notes Agent (for the benefit of itself and the Prepetition Junior Secured Noteholder), are hereby granted allowed administrative expense claims against each of the Debtors with the priority set forth in Bankruptcy Code section 507 (the "Adequate Protection Claims"); *provided*, that the Adequate Protection Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral, including, subject only to entry of the Final Order, any Avoidance Action Proceeds (but not Avoidance Actions themselves).

(d)     *Interest, Fees and Expenses*.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Junior Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (i) counsel to Lynrock, in its capacity as the Prepetition Junior

45

Term Loan Lender and the Prepetition Junior Secured Noteholder, (A) Akin, (B) Pashman, (C) KPMG and (D) any other attorneys retained by the Prepetition Junior Term Loan Lender or the Prepetition Junior Secured Noteholder in lieu of the professionals set forth in clauses (A) or (B) and (ii) counsel to the Prepetition Junior Secured Notes Agent, [__], in each case, in accordance with the notice and review procedures set forth in paragraph 18 of this Interim Order.  In addition, the Prepetition Junior Term Loan Obligations and the Prepetition Junior Secured Notes Obligations shall continue to accrue interest during the pendency of these Chapter 11 Cases in accordance with the terms and conditions of the Prepetition Junior Term Loan Credit Documents and the  Prepetition Junior Secured Notes Documents, respectively (calculated at the default contract rate) (all payments referenced in clauses (i) and (ii) of this paragraph 9(d), the "Adequate Protection Payments").  For the avoidance of doubt, interest under the Prepetition Junior Term Loan Credit Documents following the entry of this Interim Order shall accrue solely in respect of the Prepetition Junior Term Loan Obligations that are not exchanged into Interim Rolled DIP Loans.

10.    **Right to Seek Additional Adequate Protection**.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Junior Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Subject to the Carve-Out, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Junior Secured Parties is insufficient to compensate them for any Diminution in Value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Junior Secured Parties that

46

the adequate protection granted herein does in fact adequately protect any of the Prepetition Junior Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral). For the avoidance of doubt, the payment of Adequate Protection Payments pursuant to paragraph 9(d) of this Interim Order shall be without prejudice to the rights of any of the Prepetition Junior Secured Parties to assert claims for payment of any premiums or similar amount set forth in the Prepetition Junior Secured Credit Documents, as applicable.

11.     **Perfection of DIP Liens and Adequate Protection Liens**. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Junior Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender and the Prepetition Junior Secured Parties are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or

the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lender and/or the Prepetition Junior Secured Parties all such financing statements, mortgages, notices and other documents as each may reasonably request. The DIP Lender and the Prepetition Junior Secured Parties may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.  To the extent that the Prepetition Junior Secured Parties are, with respect to any Prepetition Junior Term Loan Collateral or Prepetition Junior Secured Notes Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Junior Secured Credit Documents, or are listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Prepetition Junior Term Loan Lender and Prepetition Junior Secured Notes Agent shall act as agents for the DIP Lender solely for purposes of perfecting the DIP Lender's liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Junior Secured Parties' respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Lender until the DIP Obligations have been Paid in Full, subject to the lien priorities listed in paragraph 9(b) of this Interim Order; *provided*, that the DIP Lender may, in its sole discretion, require the Debtors and the Prepetition

48

Junior Secured Parties to (and the Debtors and the Prepetition Junior Secured Parties shall) use commercially reasonable efforts to provide the DIP Lender with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the Payment in Full of all DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for ten (10) calendar days to permit the DIP Lender and the Prepetition Junior Secured Parties, as applicable, to enter into any agreements or file any documents (including credit agreements, financing statements, mortgages or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Adequate Protection Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Lender and the Prepetition Junior Secured Parties to ensure the perfection of the DIP Liens and the Adequate Protection Liens, as applicable.  Notwithstanding anything in the DIP Documents to the contrary, the DIP Lender shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

12. **Cash Management**.  The Debtors shall maintain their cash management system consistent with the terms and conditions of any interim and/or final order granting the Debtors authorization to continue their cash management system and certain related relief, the DIP Term Sheet, the DIP Documents and this Interim Order.

13. **Maintenance of DIP Collateral**.  The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Term Sheet and the DIP Documents (which shall be deemed satisfied if such insurance as required under the Prepetition Priority Term Loan Documents remains in place).  The Debtors shall provide the DIP

49

Lender and the DIP Professionals with commercially reasonable evidence of such insurance upon a request to the Debtors' counsel.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender is, and is deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral (including all property damage and business interruption insurance policies of the Debtors, whether expired, currently in place or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

14.    **Disposition of DIP Collateral**.  Without the prior written consent of the DIP Lender and/or the Prepetition Junior Secured Parties, as applicable, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral (or enter into any binding agreement to do so) other than: (i) in the ordinary course of business (subject to any limitations on such ordinary course dispositions set forth in the DIP Term Sheet or the DIP Documents); (ii) pursuant to bid procedures in form and substance acceptable to the DIP Lender and Prepetition Junior Secured Parties and approved by the Court in the Chapter 11 Cases; and (iii) as otherwise permitted by this Interim Order, the Final Order, the DIP Term Sheet, or the DIP Documents.  All proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation or otherwise, will be deposited and applied as required by the DIP Term Sheet, the DIP Documents and this Interim Order, including, for the avoidance of doubt, that any cash proceeds of the sale or disposition of DIP Collateral which results in a mandatory prepayment obligation pursuant to the DIP Term Sheet shall: (i) be used first to fund the Carve-Out, (ii) be deposited into escrow solely to fund the KEIP Payment, (iii) be deposited into escrow solely to fund the payment of the Expense

50

Reimbursement (as defined in the Bidding Procedures), and (iv) be deposited into escrow solely to fund the payment of any applicable fees payable to TD Cowen pursuant to that certain engagement letter among them and the Borrower dated February 27, 2024, as amended on September 8, 2024, in each case to be applied solely to such uses only when due and only in the amounts required to be paid (such payments described in clauses (ii), (iii) and (iv) the "Sale Proceeds Carve-Out"), prior to being used to satisfy any DIP Obligations in accordance with the waterfall set forth in the DIP Term Sheet. The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any affiliate of the Debtors that is not a Debtor in these Chapter 11 Cases without the prior written consent of the DIP Lender, in its sole discretion or otherwise in accordance with the Approved Budget.

15.    **Modification of Automatic Stay**.  The automatic stay imposed by Bankruptcy Code section 362(a) is hereby modified, without application to or further order of this Court, to permit: (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens; (ii) the Debtors to incur all liabilities and obligations to the DIP Lender as contemplated under this Interim Order, the DIP Term Sheet and the DIP Documents; (iii) the Debtors to grant the Adequate Protection Liens and Adequate Protection Claims and to perform such acts as the Prepetition Junior Secured Parties may request to assure the perfection and priority of the Adequate Protection Liens; (iv) the Debtors to incur all liabilities and obligations to the Prepetition Junior Secured Parties, including all Adequate Protection Claims and other Adequate Protection Obligations, as contemplated under this Interim Order, the DIP Term Sheet and the DIP Documents; (v) the Debtors to pay all amounts required under this Interim Order, the DIP Term Sheet and the DIP Documents; (vi) the DIP Lender and the Prepetition Junior Secured Parties to retain and apply

payments made in accordance with the terms of this Interim Order, the DIP Term Sheet and the DIP Documents; (vii) subject in all respects to paragraph 17 of this Interim Order, the DIP Lender and the Prepetition Junior Secured Parties to exercise, upon the occurrence of any Termination Event (as defined below), all rights and remedies provided for in this Interim Order, the DIP Term Sheet, the DIP Documents or applicable law; (viii) the establishment and funding of the Carve-Out Reserves as set forth in this Interim Order; (ix) the Debtors to perform under this Interim Order, the DIP Term Sheet and the DIP Documents and to take any and all other actions that may be necessary, required or desirable for the performance by the Debtors under this Interim Order, the DIP Term Sheet and the DIP Documents and the implementation of the transactions contemplated hereunder and thereunder; and (ix) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, the DIP Term Sheet and the DIP Documents

16.     **Termination Events**.  Subject to any applicable notice and cure periods and other terms set forth in paragraph 17 of this Interim Order or in the DIP Term Sheet and the DIP Documents, until the DIP Obligations are Paid in Full and all commitments thereunder are terminated, the occurrence of any of the following events, unless waived by the DIP Lender (or as otherwise provided in the DIP Documents) in writing (which may be by e-mail from counsel to the DIP Lender to the Debtors' counsel) and in accordance with the terms of the DIP Term Sheet and the DIP Documents, shall constitute a termination event (collectively, the "Termination Events"): (i) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or, solely as to the DIP Lender, comply with any of the milestones set forth on **Exhibit C** hereto; (ii) the occurrence and

52

continuation of any Events of Default under, and as defined in, the DIP Term Sheet or the DIP Documents; or (iii) the occurrence of the Maturity Date (as defined in the DIP Term Sheet and the DIP Documents).

17.    **Rights and Remedies Upon a Termination Event**.

(a)    *Termination Declaration*. The Debtors shall immediately provide notice (which may be given by e-mail from the Debtors' counsel) to: (i) lead restructuring counsel to the DIP Lender; (ii) counsel to the Prepetition Junior Secured Notes Agent; (iv) counsel to the Creditors' Committee (if any); and (v) the U.S. Trustee upon knowledge of the occurrence of any Termination Event.  Upon the occurrence and during the continuation of a Termination Event, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of this Interim Order: (A) the DIP Lender may send a written notice to the Debtors, counsel to the Creditors' Committee (if any) and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all DIP Obligations owing under the DIP Term Sheet and the DIP Documents to be immediately due and payable, (2) the commitments of the DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility, the DIP Term Sheet and the DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice in accordance with this Interim Order; (B) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Term Sheet and the DIP Documents; and (C) the DIP Lender may declare a termination, reduction or restriction on the

53

ability of the Debtors to use proceeds of the DIP Facility and any Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the estates absent further order of the Court and with respect to the Carve-Out. The earliest date on which a Termination Declaration is delivered by the DIP Lender shall be referred to herein as the "Termination Date."

(b)     *Emergency Hearing*.  Upon the delivery of a Termination Declaration, and at the request of the Debtors, the Creditors' Committee (if any), the DIP Lender and the Prepetition Junior Secured Parties consent to a hearing on an expedited basis to consider whether (i) a Termination Event has occurred and (ii) any other relief is appropriate (including, without limitation, the Debtors' non-consensual use of Cash Collateral).  During the five (5) business days following the date on which a Termination Declaration is delivered (such five (5) business day period, the "Remedies Notice Period"), the Debtors shall continue to have the right to use proceeds of the DIP Facility and Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the estates and to fund the Carve-Out.  At the end of the Remedies Notice Period, unless the Court has entered an order finding that no Termination Event has occurred or is continuing, or otherwise fashioned an appropriate remedy, the Debtors' right to use proceeds of the DIP Facility and Cash Collateral shall immediately cease, unless otherwise provided herein, and the DIP Lender shall have the rights set forth immediately below.

(c)     *Rights and Remedies Following the Remedies Notice Period*.  Following the expiration of the Remedies Notice Period, and in the absence of an order of the Court upon an emergency motion filed by the Debtors (to be heard on no less than five (5) business days' notice)[9]

---

[9]     The DIP Lender and Prepetition Junior Secured Parties shall not object to such shortened notice.

that no Termination Event has occurred or is continuing or otherwise fashioning an appropriate remedy as then determined by the Court (the "Stay Enforcement Order"), the DIP Lender shall be entitled to exercise all rights and remedies in accordance with the DIP Term Sheet, the DIP Documents, this Interim Order and applicable law and shall be permitted to satisfy the all outstanding DIP Obligations and DIP Superpriority Claims based on the priorities set forth in paragraph 9(b) of this Interim Order, subject only to the Carve-Out.  Further, following the expiration of the Remedies Notice Period, and in the absence of a Stay Enforcement Order: (i) the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Lender one-hundred percent (100%) of all collections, remittances and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order (including the priorities set forth in paragraph 9(b) of this Interim Order; (ii) the DIP Lender may compel the Debtors to seek authority to, (A) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which constitute DIP Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365 and any other applicable provisions of the Bankruptcy Code, and (B) assume and assign any lease or executory contract constituting DIP Collateral to DIP Lender's designees in accordance with and subject to Bankruptcy Code section 365; (iii) the DIP Lender may direct the Debtors to (and the Debtors shall comply with such direction to) dispose of or liquidate all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which constitute DIP Collateral) through one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property; (iv) the DIP Lender may, or may direct the Debtors to (and the Debtors shall comply with such

55

direction to), collect accounts receivable, without setoff by any account; and (v) the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lender in the exercise of its rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Lender in a manner consistent with the priorities set forth in paragraph 9(b) of this Interim Order.

(d) *Access to DIP Collateral*. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender under the DIP Term Sheet, the DIP Documents, this Interim Order or applicable law, after the occurrence of a Termination Date and in the absence of a Stay Enforcement Order entered during the Remedies Notice Period, for the purpose of exercising any right or remedy with respect to the DIP Collateral (in accordance with the priorities in paragraph 9(b) of this Interim Order), the DIP Lender (or any of its employees, agents, consultants, contractors or other professionals) (collectively, the "Enforcement Agents") shall have the right (to be exercised at the direction of the DIP Lender) to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the Debtors; (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process); and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, that the Enforcement Agents may only be permitted to do so in accordance with (A) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (B) any prepetition (and, if applicable, postpetition) landlord waivers or consents or (C) further order of this Court on motion and notice appropriate under the circumstances. In addition, the Enforcement Agents shall have the right (to be exercised at the direction of the DIP Lender) to use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the

Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*, that the Enforcement Agents may use such assets solely to the extent permitted by applicable non-bankruptcy law.  Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph 17(d).

(e)     After the Payment in Full of all DIP Obligations, the Prepetition Junior Secured Parties shall: (i) be entitled to issue a Termination Declaration in respect of the Prepetition Junior Secured Obligations in accordance with the procedures set forth in paragraph 17(a); (ii) limit the Debtors' continued use of the Prepetition Junior Collateral (including Cash Collateral) subject to the procedures set forth in paragraph 17(b); (iii) exercise all rights and remedies under the Prepetition Junior Secured Credit Documents in accordance with the procedures set forth in paragraph 17(c); and obtain access the Prepetition Junior Collateral (including Cash Collateral) in accordance with the procedures set forth in paragraph 17(d), in each case, subject to the terms and conditions of the applicable Prepetition Junior Secured Credit Documents.

18.     **Professional Fees**.

(a)     The payment of all DIP Professional Fees and Adequate Protection Fees hereunder shall not be subject to: (i) further application to or approval of the Court; (ii) allowance or review by the Court; or (iii) the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Lender or the Prepetition Junior Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided*, *however*, that any time such professionals seek payment of fees and expenses from the Debtors from and after the Petition Date but prior to the effective date of any chapter 11 plan, solely to the extent

applicable,[10] each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors' counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) (collectively, the "Fee Notice Parties").   Any objections raised by any Fee Notice Party with respect to such invoices must (x) be in writing (y) state with particularity the grounds for such objection and (z) be submitted to the affected professional(s) within ten (10) calendar days after delivery of such invoices to the Fee Notice Parties (such ten (10) day calendar period, the "Fee Objection Period").   If no written objection to payment of the requested DIP Professional Fees or Adequate Protection Fees is received by the applicable professional(s) prior to the expiration of the Fee Objection Period, the Debtors shall promptly pay such invoice(s) (without further order of, or application to, the Court or notice to any other party) within two (2) business days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge or disgorgement.   If within the Fee Objection Period, a Fee Notice Party delivers to the affected professional a written objection to such invoice, the Debtors shall promptly pay the undisputed portion of such invoice, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of the Court.   Any hearing to consider such an

---

[10] For the avoidance of doubt, nothing contained in this paragraph 18 shall prevent the DIP Lender or the Prepetition Junior Secured Parties from seeking payment from the Debtors of professional fees and expenses incurred prior to the Petition Date in accordance with the terms of this Interim Order, the DIP Term Sheet and the DIP Documents.

58

objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(b)     Notwithstanding anything contained in this Interim Order to the contrary, any and all payments, fees, costs, expenses and other amounts paid at any time by any of the Debtors to the DIP Lender or the Prepetition Junior Secured Parties (including such parties' respective professionals), as applicable, pursuant to this Interim Order, the DIP Term Sheet or the DIP Documents, whether incurred prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity.

19.     **Limitation on Use of DIP Proceeds, DIP Collateral and Cash Collateral**.

(a)     Notwithstanding anything to the contrary set forth in this Interim Order, none of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Junior Collateral or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used:  (i) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion,

59

objection, defense or other litigation of any type (A) against the DIP Lender or any of the Prepetition Junior Secured Parties (in each case, in their capacity as such) and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Lender or any of the Prepetition Junior Secured Parties (in each case, in their capacities as such) under this Interim Order, the DIP Term Sheet, the DIP Documents or the Prepetition Credit Documents, as applicable, to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by any Estate Retained Professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of the DIP Lender or any of the Prepetition Junior Secured Parties to recover on the DIP Collateral or the Prepetition Junior Collateral, as applicable, or seeking affirmative relief against the DIP Lender or any of the Prepetition Junior Secured Parties related to the DIP Obligations or the Prepetition Junior Secured Obligations, as applicable, (B) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, Prepetition Junior Secured Liens or Prepetition Junior Secured Obligations or (C) for monetary, injunctive or other affirmative relief against the DIP Lender or any of the Prepetition Junior Secured Parties (in each case, in their capacities as such) that would impair the ability of the DIP Lender or any of the Prepetition Junior Secured Parties to assert or

60

enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Junior Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Junior Secured Parties related to the Prepetition Junior Secured Obligations, or by or on behalf of the DIP Lender related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Liens, DIP Superiority Claims, Adequate Protection Liens, Adequate Protection Claims, Prepetition Junior Secured Liens or Prepetition Junior Secured Obligations; or (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of (A) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens or (B) any of the Adequate Protection Liens, Adequate Protection Claims, Prepetition Junior Secured Liens, Prepetition Junior Secured Obligations or any other rights or interests of any of the Prepetition Junior Secured Parties related to the Prepetition Junior Secured Obligations; *provided* that no more than $50,000 of the proceeds of the DIP Facility, the DIP Collateral or the Prepetition Junior Collateral, including Cash Collateral, in the aggregate, may be used by a Creditors' Committee (if any) solely to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) the foregoing matters with respect to (1) the DIP Liens securing the DIP Obligations in respect of the Rolled DIP Loans (such liens, the "Roll-Up DIP Liens" and the DIP Obligations secured by such liens, the "Rolled DIP Obligations"), (2) the Prepetition Junior Secured Liens or (3) the Prepetition Junior Secured Obligations within the Challenge Period (as defined below) (the "Investigation Budget");

61

*provided*, *further*, that, subject to entry of the Final Order, any and all claims for fees and expenses incurred by a Creditors' Committee (if any) or any other party in interest in violation of any clause of this paragraph 19 (including amounts incurred in excess of the Investigation Budget) shall not be allowed, treated or payable as administrative expense claims for purposes of Bankruptcy Code section 1129(a)(9)(A), and the non-payment of such fees and expenses shall not constitute grounds to deny confirmation of a chapter 11 plan for any of the Debtors.

20.      **Effect of Stipulations on Third Parties**.

(a)      The acknowledgments, stipulations, admissions, agreements, waivers and releases contained herein shall be binding upon the Debtors, their estates and any successor or assigns thereto upon entry of this Interim Order and the Debtors shall be deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)      The acknowledgments, stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall also be binding upon all other parties in interest, including, but not limited to, the Creditors' Committee (if any), any non-statutory committees appointed or formed in these Chapter 11 Cases and any other person or entity seeking to act on behalf of the Debtors' estates, including any chapter 7, chapter 11 trustee or examiner appointed or elected for any of the Debtors in these Chapter 11 Cases or any Successor Cases (a "Trustee"), and each of their respective successors and assigns, in all circumstances and for all purposes, unless: (i) any such party, having obtained requisite standing, timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (A) objecting to or challenging the validity, perfection, priority, scope, extent or enforceability of the Rolled DIP Liens, Rolled DIP Obligations, Prepetition Junior Secured Liens, or the Prepetition Junior Secured Obligations, (B) objecting to or alleging any basis to impair, restrict, deny or

62

otherwise challenge the right of the DIP Lender or the Prepetition Junior Secured Parties to credit bid, in whole or in part, the Rolled DIP Liens, the Rolled DIP Obligations, Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations, as applicable, under Bankruptcy Code section 363(k) or otherwise or (C) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the DIP Lender or the Prepetition Junior Secured Parties in connection with any matter related to the Rolled DIP Loans, the Rolled DIP Liens, the Rolled DIP Obligations, the Prepetition Junior Secured Credit Documents, the Prepetition Junior Secured Collateral, the Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations by the date that is no later than seventy-five (75) calendar days after entry of this Interim Order, subject to further written extension (which writing may be in the form of e-mail by counsel) by the DIP Lender and/or the Prepetition Junior Secured Parties, as applicable (the "Challenge Period"); *provided* that in the event that, prior to the expiration of the Challenge Period, (1) any of the Chapter 11 Cases is converted to a Successor Case or (2) a Trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of ten (10) days solely with respect to such Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (1) and (2); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the party asserting any Challenge sustaining any such Challenge in such duly filed adversary proceeding or contested matter.

(c)        If no such adversary proceeding or contested matter is filed prior to the expiration of the Challenge Period, without further order of this Court: (i) the Rolled DIP Obligations and the Prepetition Junior Secured Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination,

recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Chapter 11 Cases and any Successor Cases, if any; (ii) the Rolled DIP Liens and the Prepetition Junior Secured Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, non-avoidable liens, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (iii) the Rolled DIP Liens, the Rolled DIP Obligations, the DIP Lender, the Prepetition Junior Secured Liens, the Prepetition Junior Secured Obligations and the Prepetition Junior Secured Parties (each in their capacities as such) shall not be subject to any other or further Challenge, and all parties in interest (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period) shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action.

(d)     If an adversary proceeding or contested matter is timely filed by a party that has been granted requisite standing prior to the expiration of the Challenge Period, (i) the stipulations, admissions, agreements, waivers and releases contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these Chapter 11 Cases, including any Trustee, except for the party (or parties) that timely initiated such adversary proceeding or contested matter and, with respect to such party (or parties), solely as to the stipulations, admissions, agreements, waivers and releases that are specifically and expressly challenged in such adversary proceeding or contested matter and (ii) any Challenge not

64

brought in such adversary proceeding or contested matter shall be forever waived; *provided* that, if and to the extent any Challenge to a particular stipulation, admission, agreement, waiver or release is withdrawn, denied or overruled by entry of a final non-appealable order by a court of competent jurisdiction, such stipulation, admission, agreement, waiver and/or release also shall be binding on the Debtors' estates and all parties in interest.  For the avoidance of doubt, no professional fees or expenses of any party shall be funded by the Debtors' estates in connection with any Challenge and any fees incurred in respect thereof shall not be required to be paid from DIP Collateral or Prepetition Junior Collateral (including Cash Collateral) in order for the Debtors to confirm a chapter 11 plan and have such plan go effective or consummate any sale of assets under Bankruptcy Code section 363.

(e)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee (if any), standing or authority to pursue any Challenge or any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenge with respect to the Rolled DIP Liens, the Rolled DIP Obligations, the Prepetition Junior Secured Credit Documents, the Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations.

21.     **Release**.  Subject to the rights and limitations set forth in paragraphs 19 and 20 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors and assigns shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge the DIP Lender, and subject to the entry of the Final Order, each of the Prepetition Junior Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents,

65

representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Junior Secured Liens and the Prepetition Junior Secured Obligations, as applicable, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses; (ii) any and all claims and causes of action arising under the Bankruptcy Code; and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Lender and the Prepetition Junior Secured Parties.

22. **Credit Bidding**.

(a)     Consistent with Bankruptcy Code section 363(k) and applicable law, the DIP Lender (either directly or through one or more acquisition vehicles), shall have the right to credit bid for all or any portion of the DIP Collateral, as applicable, up to the full amount of any DIP Obligations, as part of any sale of Debtors' assets (in whole or in part), including without

66

limitation, sales occurring pursuant to: (i) Bankruptcy Code section 363; (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129; or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725 (each such sale, a "Sale Transaction").  The DIP Lender shall have the absolute right to assign, sell or otherwise dispose of its right to credit bid to any acquisition entity or joint venture formed in connection with such bid.

(b)     The Prepetition Junior Secured Parties' rights to credit bid for all or a portion of the Prepetition Junior Collateral as part of any Sale Transaction are fully preserved, subject in all respects to (i) the Payment in Full of all DIP Obligations and (ii) the terms and conditions of this Interim Order and the applicable Prepetition Junior Secured Credit Documents, including the lien and claim priorities set forth herein and therein.

23.     **No Waiver by Failure to Seek Relief**.  The failure of the Debtors, the DIP Lender or the Prepetition Junior Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Term Sheet, the DIP Documents, the Prepetition Junior Secured Credit Documents, or applicable law shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise.

24.     **Limitation on Charging Expenses**.  Subject to entry of the Final Order and except to the extent of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection or enhancement of realization by the DIP Lender upon the DIP Collateral or, subject to entry of the Final Order, the Prepetition Junior Secured Parties upon the Prepetition Junior Collateral, shall be charged against or recovered from the DIP Collateral or the Prepetition Junior Collateral, whether pursuant to Bankruptcy Code section

67

506(c), any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the DIP Lender or the Prepetition Junior Secured Parties, as applicable, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the DIP Lender or any of the Prepetition Junior Secured Parties.

25.     **No Marshaling; Section 552(b) Waiver**.  Subject to entry of the Final Order, in no event shall the DIP Lender or, the Prepetition Junior Secured Parties, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Obligations, the DIP Collateral, Adequate Protection Obligations, Prepetition Junior Collateral or the Prepetition Junior Secured Obligations, and all proceeds shall be received and applied in accordance with the DIP Term Sheet, the DIP Documents and the Prepetition Junior Secured Credit Documents, as applicable.  Subject to entry of the Final Order, the DIP Lender and each of the Prepetition Junior Secured Parties, shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and in no event shall the "equities of the case" exception in Bankruptcy Code section 552(b) apply to the DIP Lender or the DIP Collateral or, subject to entry of the Final Order, the Prepetition Junior Secured Parties or the Prepetition Junior Collateral.

26.     **Binding Effect; Successors and Assigns**.    The DIP Term Sheet, the DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lender, the Prepetition Junior Secured Parties, the Creditors' Committee (if any), the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or

68

any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the

property of any Debtor's estate) and shall inure to the benefit of the DIP Lender and the Prepetition

Junior Secured Parties; *provided*, that, except to the extent expressly set forth in this Interim Order,

the Prepetition Junior Secured Parties shall have no obligation to permit the use of Cash Collateral

or to extend any financing to any Trustee or similar responsible person appointed for any of the

Debtors' estates.

27.     **Limitation of Liability**.  In determining to make any loan under the DIP Term

Sheet or the DIP Documents, permitting the use of their Cash Collateral or exercising any rights

or remedies as and when permitted pursuant to this Interim Order, the DIP Term Sheet, the DIP

Documents or the Prepetition Junior Secured Credit Documents, the DIP Lender and the

Prepetition Junior Secured Parties (in each case, solely in their capacities as such) shall not be

deemed to be in control of the operations of the Debtors or to be acting as a "responsible person"

or "owner or operator" with respect to the operation or management of the Debtors or their business

(as such terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar

federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors

or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the

Debtors.  Furthermore, nothing in this Interim Order, the DIP Term Sheet, the DIP Documents or

the Prepetition Junior Secured Credit Documents shall in any way be construed or interpreted to

impose or allow the imposition upon the DIP Lender or any of the Prepetition Junior Secured

Parties of any liability for any claims arising from the prepetition or postpetition activities of any

of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

28.    **Proofs of Claim**.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under Bankruptcy Code section 503(b), (i) the Prepetition Junior Secured Parties shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Junior Secured Obligations or the Adequate Protection Obligations and (ii) the DIP Lender shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any DIP Obligations.  The failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority or enforceability of any of the Prepetition Junior Secured Credit Documents, the DIP Documents or of any other indebtedness, liabilities or obligations arising at any time thereunder or under this Interim Order, or prejudice or otherwise adversely affect the Prepetition Junior Secured Parties' or the DIP Lender's rights, remedies, powers or privileges under any of the Prepetition Junior Secured Credit Documents, the DIP Term Sheet, the DIP Documents, this Interim Order or applicable law.  The Prepetition Junior Secured Parties and DIP Lender may (but are not required to) in their discretion file (and amend and/or supplement) applicable proofs of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any successor cases for any claim allowed herein, and any such proof of claim may (but is not required to) be filed in the Debtors' lead Chapter 11 Case *In re Edgio, Inc.,* Case No. 24-[_____] ([__]) as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  The provisions set forth in this paragraph 28 are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

29. **Protection of Lenders' Rights**.

(a)     Except as expressly permitted in this Interim Order, the DIP Term Sheet, the DIP Documents or the Prepetition Junior Secured Credit Documents, in the event any person or entity that holds a lien on or security interest in DIP Collateral (including all Prepetition Collateral) that is junior or otherwise subordinate to the DIP Liens or Prepetition Junior Secured Liens receives any DIP Collateral or proceeds of DIP Collateral, in each case, that is subject to such junior lien, or receives any payment on account of such junior lien or security interest in the DIP Collateral on account of such junior lien (whether in connection with the exercise of any right or remedy (including setoff), any payment or distribution from the Debtors, mistake or otherwise) prior to the Payment in Full of all DIP Obligations and Prepetition Junior Secured Obligations, as applicable, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral or Prepetition Junior Collateral in trust for the benefit of the DIP Lender or the Prepetition Junior Secured Parties, as applicable, and shall immediately turn over all such proceeds to the DIP Lender, or the Prepetition Junior Secured Parties, as applicable, in the same form as received, with any necessary endorsements, for application in accordance with this Interim Order, the DIP Term Sheet, the DIP Documents or the Prepetition Junior Secured Credit Documents.

(b)     Other than with respect to the Carve-Out and Prepetition Permitted Liens, and as otherwise expressly provided in this Interim Order, the DIP Term Sheet, the DIP Documents or the Prepetition Junior Secured Credit Documents, no claim or lien having a priority senior to or *pari passu* with those granted to the DIP Lender or any of the Prepetition Junior Secured Parties by this Interim Order shall be granted or permitted while any of the DIP Obligations or the Prepetition Junior Secured Obligations, respectively, remains outstanding.  Except as expressly

71

provided in this Interim Order, the DIP Term Sheet, the DIP Documents or the Prepetition Junior Secured Credit Documents, each of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Junior Secured Liens or the Prepetition Junior Secured Obligations: (i) shall not be made junior or subordinated to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under Bankruptcy Code section 364(d) or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise, (C) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (D) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Bankruptcy Code sections 506(c), 510, 549, 550 or 551.

(c)     In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the DIP Lender or Prepetition Junior Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the DIP Lender and the Prepetition Junior Secured Parties shall be entitled to the protections afforded in Bankruptcy Code sections 363(m) and 364(e), as applicable, with respect to all uses of the DIP Collateral (including all Cash Collateral and all Prepetition Junior Collateral), all DIP Obligations and all Adequate Protection Obligations.

72

(d)        Subject to the Carve-Out and Prepetition Permitted Liens, unless and until all DIP Obligations and Prepetition Junior Secured Obligations are Paid in Full and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Term Sheet or the DIP Documents, and with the prior written consent of the DIP Lender, (A) any modification, stay, vacatur or amendment of this Interim Order, (B) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims and the Adequate Protection Claims or (C) any other order allowing the use of DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral (including all Prepetition Collateral) with priority equal or superior to the DIP Liens, the Adequate Protection Liens; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Term Sheet, the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Term Sheet or the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases without the consent of the DIP Lender; (vi) an order appointing a Trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(e)        Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time: (i) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and any

73

other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order, the DIP Term Sheet and the DIP Documents until such time as all DIP Obligations and Adequate Protection Obligations are Paid in Full; and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) above.

(f)     Except as expressly provided in this Interim Order, the DIP Term Sheet and the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of the DIP Lender and the Prepetition Junior Secured Parties granted by the provisions of this Interim Order, the DIP Term Sheet and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving any Sale Transaction involving any DIP Collateral (including any Prepetition Junior Collateral), except to the extent that such order provides for the attachment of DIP Liens, Adequate Protection Liens or Prepetition Junior Secured Liens, as applicable, to the proceeds of such Sale Transaction); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order, the DIP Term Sheet and the DIP Documents shall continue in these Chapter 11 Cases and any Successor Cases.

30.     **<u>Reservation of Rights of DIP Lender and Prepetition Junior Secured Parties</u>**. Except as otherwise expressly set forth in this Interim Order, the entry of this Interim Order is

without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, as applicable: (i) any of the rights of any of the Prepetition Junior Secured Parties to seek any other or supplemental relief in respect of the Debtors including the Prepetition Junior Secured Parties' right to seek additional adequate protection; (ii) any of the rights of the DIP Lender or the Prepetition Junior Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lender or any of the Prepetition Junior Secured Parties to (A) request modification of the automatic stay of Bankruptcy Code section 362, (B) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases or (C) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (iii) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender or any of the Prepetition Junior Secured Parties. Any delay in or failure of the DIP Lender and/or the Prepetition Junior Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Lender's or the Prepetition Junior Secured Parties' rights and remedies under this Interim Order, the DIP Term Sheet, the DIP Documents, the Prepetition Junior Secured Credit Documents or applicable law, as applicable.

31.    **No Third-Party Rights**.  Except as explicitly provided for in this Interim Order, any rights and obligations granted in this Interim Order inure solely for the benefit of the DIP Lender and the Prepetition Junior Secured Parties, and no third party shall have any rights hereunder.

32.     **Necessary Action**.  The Debtors are authorized to take any and all actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms of this Interim Order and the transactions contemplated hereby.

33.     **Effectiveness**.  Subject to the terms hereof, this Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

34.     **Final Hearing**.  The Final Hearing shall be held on _____, 2024, at ___.m. **(prevailing Eastern Time)**; *provided* that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment if the DIP Lender so consents. The Debtors shall provide notice of the Final Hearing and the proposed Final Order in accordance with the Local Rules to all parties having been given notice of the Hearing and to any other party entitled to notice pursuant to Local Rule 9013-(m) and Bankruptcy Rule 2002.  Any objections or responses to entry of the Final Order shall be filed and served upon: (i) proposed counsel to the Debtors, (a) Milbank LLP, 55 Hudson Yards, New York, NY 10001, Attn: Dennis F. Dunne (DDunne@Milbank.com), Tyson M. Lomazow (TLomazow@Milbank.com), Lauren C. Doyle (LDoyle@Milbank.com), and Benjamin M. Schak (BSchak@Milbank.com)), and (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins (collins@rlf.com), Russell C. Silberglied (silberglied@rlf.com) and Brendan J. Schlauch (schlauch@rlf.com); (ii) counsel to the DIP Lender, (A) Akin, One Bryant

76

Park, New York, NY 10036, Attn:  Michael S. Stamer (mstamer@akingump.com), Meredith Lahaie (mlahaie@akingump.com) and Joseph Szydlo (jszydlo@akingump.com) and (B) Pashman Stein Walder Hayden P.C., 824 North Market Street, Suite 800, Wilmington, DE 19801, Attn: David B. Stratton (dstratton@pashmanstein.com); (iii) counsel to the Creditors' Committee (if any); and (v) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn:  Richard Schepacarter (richard.schepacarter@usdoj.gov), in each case, so as to be received no later than **_____, 2024, at 5:00 p.m. (prevailing Eastern Time)**.  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

35.     **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

36.     **Retention of Jurisdiction**.  The Court shall retain jurisdiction to resolve any and all disputes arising under or related to the provisions of this Interim Order, and to enforce all of the conditions of this Interim Order.

**<u>Exhibit A</u>**

**Initial Budget**

**Edgio - Weekly Cash Flow DIP Budget - Debtor**  
*Amounts in $000s USD*

Sep. 6 Filing Scenario

| Status Week Week Ended | Fcst 1 9/13 | Fcst 2 9/20 | Fcst 3 9/27 | Fcst 4 10/4 | Fcst 5 10/11 | Fcst 6 10/18 | Fcst 7 10/25 | Fcst 8 11/1 | Fcst 9 11/8 | Fcst 10 11/15 | Fcst 11 11/22 | Fcst 12 11/29 | Fcst 13 12/6 | Fcst 14 12/13 | Fcst 15 12/20 | Fcst 16 12/27 | Fcst 13 Weeks 12/6 | Total 16 Weeks 12/27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $1,396 | $1,870 | $5,731 | $4,267 | $9,725 | $5,321 | $6,176 | $6,608 | $10,766 | $3,207 | $3,412 | $1,989 | $1,989 | $1,989 | $1,839 | $1,839 | $62,456 | $68,122 |
| **Recurring Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Personnel Expenses | (3,694) | (294) | (4,239) | (290) | – | (3,509) | (655) | (3,591) | – | (2,572) | (203) | (2,519) | (120) | (589) | (41) | (1,285) | (21,686) | (23,601) |
| Pre-Petition Debtor AP Disbursements | – | (3,900) | (750) | (750) | (750) | (750) | (500) | (250) | (250) | – | – | – | – | – | – | – | (7,900) | (7,900) |
| Post-Petition Debtor AP Disbursements | – | (546) | (1,264) | (4,649) | (4,863) | (2,062) | (2,191) | (3,705) | (4,385) | (2,507) | (497) | (497) | – | (497) | (497) | – | (27,665) | (28,660) |
| Rent | – | – | – | (4) | – | – | – | (4) | – | – | – | – | (4) | – | – | – | (11) | (11) |
| Insurance | – | – | – | (27) | – | – | – | (266) | – | – | – | (27) | – | – | – | (27) | (319) | (346) |
| Taxes | – | – | (62) | – | – | – | – | – | – | – | – | – | – | – | – | – | (62) | (62) |
| Intercompany Transfers | – | – | – | – | – | – | (3,000) | – | – | (1,500) | – | – | – | – | – | – | (4,500) | (4,500) |
| **Total Operating Disbursements** | (3,694) | (4,741) | (6,315) | (5,719) | (5,613) | (6,322) | (6,347) | (7,815) | (6,135) | (5,078) | (700) | (3,043) | (621) | (1,086) | (538) | (1,312) | (62,143) | (65,080) |
| **Net CF before Financing & Non-Recurring** | ($2,298) | ($2,870) | ($584) | ($1,452) | $4,112 | ($1,000) | ($171) | ($1,207) | $4,631 | ($1,871) | $2,712 | ($1,054) | $1,367 | $902 | $1,300 | $527 | $314 | $3,042 |
| **Financing & Non-Recurring Disbursements** | | | | | | | | | | | | | | | | | | |
| DIP Fees & Interest | – | (125) | – | – | (240) | – | – | – | (248) | – | – | – | – | (255) | – | (125) | (613) | (994) |
| Professional Fees | – | – | – | – | – | (5,750) | – | – | – | (5,220) | – | – | – | (5,875) | – | (250) | (10,970) | (17,095) |
| Board Fees | – | – | (70) | – | – | – | (70) | – | – | – | (70) | – | – | – | – | (70) | (210) | (280) |
| DIP Draw / (Repayment) | 9,375 | – | – | – | – | – | 3,125 | – | – | – | – | – | – | – | – | – | 12,500 | 12,500 |
| KERP | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (1,800) | – | (1,800) |
| Ch. 11 Plan & Exit Costs | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (1,500) | – | (1,500) |
| **Total Financing & Non-Recurring** | $9,375 | ($125) | ($70) | – | ($240) | ($5,750) | $3,055 | – | ($248) | ($5,220) | ($70) | – | – | ($6,130) | – | ($3,745) | $707 | ($9,169) |
| **Net Cash Flow** | $7,077 | ($2,995) | ($654) | ($1,452) | $3,872 | ($6,750) | $2,884 | ($1,207) | $4,383 | ($7,091) | $2,642 | ($1,054) | $1,367 | ($5,228) | $1,300 | ($3,218) | $1,020 | ($6,126) |
| **Liquidity Summary** | | | | | | | | | | | | | | | | | | |
| Opening Debtor Cash Balance | $6,573 | $13,649 | $10,654 | $10,000 | $8,547 | $12,419 | $5,669 | $8,553 | $7,346 | $11,729 | $4,638 | $7,280 | $6,226 | $7,593 | $2,365 | $3,665 | $6,573 | $6,573 |
| Net Cash Flow | 7,077 | (2,995) | (654) | (1,452) | 3,872 | (6,750) | 2,884 | (1,207) | 4,383 | (7,091) | 2,642 | (1,054) | 1,367 | (5,228) | 1,300 | (3,218) | 1,020 | (6,126) |
| **Ending Debtor Cash Balance** | $13,649 | $10,654 | $10,000 | $8,547 | $12,419 | $5,669 | $8,553 | $7,346 | $11,729 | $4,638 | $7,280 | $6,226 | $7,593 | $2,365 | $3,665 | $446 | $7,593 | $446 |

CONFIDENTIAL - DRAFT & SUBJECT TO MATERIAL CHANGE

**<u>Exhibit B</u>**

**DIP Term Sheet**

CONFIDENTIAL
SUBJECT TO FRE 408

**EDGIO, INC.**
**Senior Secured Superpriority**
**Debtor in Possession Credit Facility Term Sheet**

This Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**DIP Term Sheet**") describes the principal terms and conditions of the senior secured superpriority debtor in possession term loan facility (the "**DIP Facility**") to be provided by the DIP Lender (as defined below) to Edgio, Inc., a Delaware corporation ("**Edgio**" or the "**Borrower**"), in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on September 9, 2024 (the "**Petition Date**"). This DIP Term Sheet and the DIP Commitment Letter to which this DIP Term Sheet is attached (the "**DIP Commitment Letter**"), upon the execution hereof and thereof, shall constitute legal, valid and binding obligations of each party hereto, and shall be enforceable against each party hereto and thereto in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws (as defined in the Prepetition Priority Term Loan Credit Agreement (as defined below)) and by general principles of equity. This DIP Term Sheet shall be superseded by the DIP Documents (as defined below), if any, containing more detailed terms, conditions, covenants, representations and warranties and other provisions.

This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities.

| | |
|---|---|
| **BORROWER:** | Edgio, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code. |
| **GUARANTORS:** | Each subsidiary of the Borrower that guaranteed, purported to guarantee, or was required to guarantee, any Prepetition Secured Debt Facility (as defined below). |
| **DIP LENDER:** | Lynrock Lake Master Fund LP (the "**DIP Lender**"), in its capacity as holder of the Interim New Money DIP Loans, the Rolled DIP Loans, and the Final New Money DIP Loans (each as defined below). |
| **DIP FACILITY:** | The DIP Lender agrees to make funded senior secured superpriority debtor in possession loans to the Borrower in a total aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $15,625,000 (the "**DIP Commitments**") on the terms and conditions herein and as set forth on <u>Annex A</u> hereto. The DIP Facility shall also include, as further set forth below, a "roll-up" of (i) all Prepetition Priority Term Loan Obligations and (ii) all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement. |
| **AVAILABILITY PERIOD:** | The DIP Facility shall be available from the Interim Closing Date (as defined below) to the Maturity Date (as defined below), unless terminated earlier pursuant to the terms hereof or the DIP Orders (as |

defined below).  The Borrower may request draws under the DIP Facility on the dates set forth below by delivering a notice of borrowing to the DIP Lender (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower:

(i)    Interim DIP Loans:  On the Interim Closing Date, the DIP Lender shall make available DIP Loans (as defined below) in an aggregate principal amount no less than $45,955,067 consisting of (a) a new money term loan in the aggregate principal amount not to exceed $11,718,750 (which, after accounting for the Original Issue Discount (as defined and described below), will provide $9,375,000 in net funding to the Debtors) (the "**Interim New Money DIP Loan**"), which shall be funded as a single borrowing on the date upon which each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to the Interim DIP Loans" have been satisfied or waived (in writing) by the DIP Lender and (b) a roll up of (1) all outstanding Prepetition Priority Term Loan Obligations and (2) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement, in each case, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Interim Rolled DIP Loans**", and together with the Interim New Money DIP Loan, the "**Interim DIP Loans**"), which shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan; and

(ii)    Final DIP Loan: On the Final Closing Date (as defined below), the DIP Lender shall make available DIP Loans in an aggregate principal amount no less than $73,352,483 consisting of (a) a new money term loan in an aggregate principal amount not to exceed $3,906,250 (which, after accounting for the Original Issue Discount, will provide $3,125,000 in net funding to the Debtors) (the "**Final New Money DIP Loan,**" together with the Interim New Money DIP Loans, the "**New Money DIP Loans**"), which shall be funded as a single borrowing strictly in accordance with the then-in-effect Approved DIP Budget (as defined below) (after giving effect to the Permitted Variances (as defined below)), subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to Final DIP Loan" (or, in the event the DIP Documents have been executed and delivered to the DIP Lender in advance of the Final DIP Loan draw, subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent to funding of the Final DIP Loan set forth in the applicable DIP Documents) and (b) a roll up of all remaining outstanding principal amounts and all accrued and unpaid interest (including interest attributable to principal under the Prepetition Junior Term

| | |
|---|---|
| | Loan Credit Agreement that constituted the Interim Rolled DIP Loans) under the Prepetition Junior Term Loan Credit Agreement, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Final Rolled DIP Loans**", and together with the Final New Money DIP Loan, the "**Final DIP Loan**" and, together with the Interim DIP Loans, the "**DIP Loans**"), which shall be deemed to occur immediately upon entry of the Final DIP Order.<br><br>The DIP Lender shall fund the New Money DIP Loans by wire transfer of immediately available funds no later than 5:00 P.M. (Eastern Time), one (1) Business Day after receipt of a Notice of Borrowing to the account of the Borrower.  Upon the funding of the Interim New Money DIP Loan to the Borrower, all Prepetition Priority Term Loan Obligations and $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Interim Rolled DIP Loans.  Upon the entry of the Final DIP Order, all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Final Rolled DIP Loans. |
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which each of the "Conditions Precedent to the Interim DIP Loans" as set forth below (including, without limitation, entry of an order (in form and substance acceptable to the DIP Lender) approving on an interim basis, the DIP Facility, the DIP Commitment Letter and the DIP Term Sheet (the "**Interim DIP Order**")) shall have been satisfied or waived (in writing) by the DIP Lender in accordance with this DIP Term Sheet.<br><br>"**Final Closing Date**" means the date on which each of the conditions precedent to the Final DIP Loan, as set forth in this DIP Term Sheet (or, to the extent the DIP Documents have been executed and delivered to the DIP Lender, the DIP Credit Agreement) (including, without limitation entry of an order (in form and substance acceptable to the DIP Lender) approving on a final basis, the DIP Facility, the DIP Commitment Letter, the DIP Term Sheet and, as applicable, the DIP Documents, (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**")) shall have been satisfied or waived (in writing) by the DIP Lender in accordance with this DIP Term Sheet and any applicable DIP Documents (each of the Interim Closing Date and the Final Closing Date, a "**Closing Date**").<br><br>As used herein, "**Business Day**" shall mean, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City. |
| **DIP DOCUMENTS:** | As of the Interim Closing Date, the DIP Commitment Letter and this DIP Term Sheet shall be the definitive documentation for the DIP |

| | |
|---|---|
| | Facility. Subsequently, the DIP Lender (in its sole discretion) may require that the DIP Facility be documented by a new senior secured superpriority debtor in possession term loan credit agreement (the "**DIP Credit Agreement**"), and other definitive financing documentation, including, without limitation, guarantees and security documents, such documentation shall be satisfactory in form and substance to the DIP Lender (the "**DIP Documents**"), which shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the Borrower and the DIP Lender shall agree; *provided* that (i) the DIP Documents shall be substantially based in form on the Prepetition Priority Term Loan Credit Agreement and the other "Loan Documents" (as defined in the Prepetition Priority Term Loan Credit Agreement) (modified as necessary to reflect the commencement of the Chapter 11 Cases), (ii) the provisions of the DIP Credit Agreement shall, upon execution, supersede the provisions of the DIP Commitment Letter and this DIP Term Sheet, in each case, to the extent the DIP Credit Agreement has comparable provisions with comparable coverage, (iii) unless and until the DIP Documents are executed, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final Order, as applicable, shall govern the DIP Facility; (iv) unless and until long-form DIP Documents are executed, except as otherwise expressly set forth in the applicable DIP Orders, any provisions not addressed in this DIP Term Sheet shall be governed in a manner consistent with the corresponding provisions of the Prepetition Priority Term Loan Credit Documents (as defined below), as applicable, and (v) the provisions of the DIP Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, the Final DIP Order. |
| **CASH COLLATERAL:** | Subject to the terms and conditions of the applicable DIP Orders, the DIP Lender shall consent to the use of its "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the applicable DIP Orders, the DIP Commitment Letter, the DIP Term Sheet and, upon their execution, the DIP Documents. |
| **USE OF PROCEEDS:** | Subject to Bankruptcy Court approval, the Debtors shall use the proceeds of the DIP Facility and Cash Collateral strictly in accordance with this DIP Term Sheet, the DIP Documents, the DIP Orders and the Approved DIP Budget (after giving effect to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases, (c) costs and expenses related to the DIP Facility and (d) any other purposes specifically set forth in the Approved DIP Budget. |
| | No Cash Collateral or proceeds of the DIP Facility may be used by the Debtors or any other entity to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims |

| | |
|---|---|
| | granted under or in connection with, the DIP Facility; *provided* that any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**") may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action in respect of the Rolled DIP Loans (the "**Investigation Budget**").<br><br>No cash collateral or proceeds of the DIP Facility in excess of the amount in any Approved DIP Budget may be distributed to, or used for the benefit of, any non-Debtor Affiliates or subsidiaries of the Debtors, or applied toward (directly or indirectly) their administration without the prior written approval of the DIP Lender. |
| **APPROVED DIP BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | The Debtors shall prepare and deliver to the DIP Lender and its advisors (a) a weekly updated 13-week rolling operating budget and cash flow forecast, in form consistent with the forecast delivered under the Prepetition Priority Term Loan Credit Agreement, of the Debtors for the period covered thereby (the "**Cash Flow Forecast**"), (b) a cash balance report as of the immediately preceding Friday, (c) accounts payable and accounts receivable balance reports as of the immediately preceding Friday, (d) accounts payable and accounts receivable aging reports as of the immediately preceding Friday, and (e) a revenue and Consolidated EBITDA forecast for the remainder of Fiscal Year 2024 (collectively, the "**Approved DIP Budget**"), which shall be approved by the DIP Lender in its sole discretion.<br><br>Commencing at 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week that is four weeks following the week in which the Petition Date occurs, and continuing at 5:30 P.M. (Eastern Time) on the Tuesday of every fourth week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), or at any other interim time as reasonably requested by the Borrower, the Debtors shall deliver to the DIP Lender and its advisors an updated and supplemented forecast (in the case of the Cash Flow Forecast, for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered) and reports of the information contained in the previous Approved DIP Budget (a "**Proposed Budget**"), and, if such Proposed Budget is in form and substance acceptable to the DIP Lender, in its sole discretion, it shall become the "Approved DIP Budget" for purposes of this DIP Term Sheet, the DIP Documents and the DIP Orders.   Until any Proposed Budget, amendment, supplement or modification has been approved by the DIP Lender, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.<br><br>By no later than 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week following the week in which the Petition Date occurs, and no later than 5:30 P.M. (Eastern Time) on each Tuesday of each calendar week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), the Debtors shall |

|  | deliver to the DIP Lender and its advisors a variance report (each, a "**Weekly Variance Report**"), setting forth, in reasonable detail, (a) in the case of the Cash Flow Forecast, the "receipts" and "disbursements" of the Debtors on a weekly, rolling four-week basis and cumulative basis (relative to the initial Approved DIP Budget) and any variances between the actual amounts and those set forth in the initial Approved DIP Budget and the then-in-effect Approved DIP Budget, and including detail by line-item as to whether a given material (greater than 5% or $20,000) variance is permanent or timing-based and commentary in respect thereof and (b) in the case of other reports, variances comparing such reports with (i) the applicable reports in the most recently delivered Approved DIP Budget and (ii) the initial Approved DIP Budget. Each Tuesday (or, if any Tuesday is not a Business Day, the next Business Day thereafter) of each calendar week, beginning with the calendar week that is one week following the week in which the Petition Date occurs, shall be referred to as a "**Cash Flow Variance Testing Date**." |
|  | The Debtors shall comply with the following (collectively, the "**Permitted Variances**"): |
|  | As of any Cash Flow Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 90% (on a cumulative basis taking into account the variance for any prior Testing Period (as defined below) during the then-in-effect Approved DIP Budget period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget, and (ii) the aggregate disbursements (excluding professional fees and expenses incurred by the DIP Professionals (as defined in the Interim DIP Order) and/or professionals retained by the Debtors, but including professional fees and expenses incurred by professionals retained by the Creditors' Committee) to exceed 110% (on a cumulative basis taking into account the variance for any prior Testing Period during the then-in-effect Approved DIP Budget period) of the estimated disbursements provided in the then-in-effect Approved DIP Budget. The two-week period ending on the Friday prior to each Cash Flow Variance Testing Date shall be referred to as a "**Testing Period**". |
|  | Additional variances, if any, from the Approved DIP Budget, and any proposed amendment, supplement or modification to the Approved DIP Budget, shall be subject to the written approval of the DIP Lender, in its sole discretion. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Lender in writing). |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with this DIP Term Sheet, the DIP Documents and/or the DIP Orders (collectively, the "**DIP Obligations**"), in all cases subject to (a) the "Carve Out" (as defined |

below) and (b) the Prepetition Permitted Liens (as defined below), shall be pursuant to:

(i) section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status against each of the Debtors (the "**DIP Superpriority Claims**") which DIP Superpriority Claims shall have priority over any and all administrative expenses and claims of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code;

(ii) section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority senior security interest in and lien upon all DIP Collateral (as defined below) that, as of the Petition Date, is unencumbered and not subject to any liens;

(iii) section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected junior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is subject to a Prepetition Permitted Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any such Prepetition Permitted Lien; and

(iv) section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority priming security interest in and lien upon all DIP Collateral that is subject to a Prepetition Secured Debt Lien (as defined below), which security interest and lien shall be junior and subordinate only to the Carve-Out and any Prepetition Permitted Liens (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**"); *provided*, that the DIP Liens shall not attach to any claims or causes of avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (collectively, "**Avoidance Actions**"); *provided, further*, that, subject to entry of the Final DIP Order, the DIP Liens shall attach to all proceeds of Avoidance Actions ("**Avoidance Action Proceeds**").

The DIP Liens shall not be made *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject, in each case, only to the Carve Out and Prepetition Permitted Liens.

| | As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Priority Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Priority Term Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code). |
|---|---|
| **PREPETITION PRIORITY TERM LOAN FACILITY:** | As of the Petition Date, the Debtors owe no less than $9,236,316.75 in principal amount of senior term loans, including accrued and unpaid interest thereon, *plus* premiums, costs, fees, expenses and other obligations (the "**Prepetition Priority Term Loan Obligations**") under that certain Priority Credit Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Priority Term Loan Credit Agreement**" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Priority Term Loan Credit Documents**"), by and among the Borrower and Lynrock, as lender, (the "**Prepetition Priority Term Loan Lender**"). The Prepetition Priority Term Loan Obligations are secured by a continuing security interest and lien on (the "**Prepetition Priority Term Loan Lien**") the "Collateral" (as defined in the Prepetition Priority Term Loan Credit Agreement) (the "**Prepetition Priority Term Loan Collateral**"), which are senior to all of Prepetition Secured Debt Liens with respect to the Collateral, subject to the terms of the Priority Lien Intercreditor Agreement.[1] |
| **PREPETITION JUNIOR TERM LOAN FACILITY:** | As of the Petition Date, the Debtors owe no less than $94,446,233.40 in principal amount of junior term loans, including accrued and unpaid interest thereon, *plus* premiums (including any Prepayment Premium or Make-Whole Amount (each as defined in the Prepetition Junior Term Loan Credit Agreement)), costs, fees, expenses and other obligations (the "**Prepetition Junior Term Loan Obligations**") under that certain Credit Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Term Loan Credit Agreement**" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Junior Term Loan Credit Documents**"), by and among the Borrower and Lynrock, as lender, (the "**Prepetition Junior Term Loan Lender**"). |

---

[1]   The "**Priority Lien Intercreditor Agreement**" means that certain Priority Lien Intercreditor Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date), by and among the Borrower, certain subsidiaries of the Borrower party thereto, the Prepetition Priority Term Loan Lender, the Prepetition Junior Notes Trustee and the Prepetition Junior Term Loan Lender.

| | |
|---|---|
| | The Prepetition Junior Term Loan Obligations are secured by a continuing security interest in and lien on (the "**Prepetition Junior Term Loan Lien**") the "Collateral" (as defined in the Prepetition Junior Term Loan Credit Agreement) (the "**Prepetition Junior Term Loan Collateral**"), which are (i) junior and subordinate to the Prepetition Priority Term Loan Lien with respect to the Collateral and (ii) *pari passu* with the Prepetition Junior Notes Lien with respect to the Collateral, in each case, subject to the terms of the Priority Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement.[2] |
| **PREPETITION JUNIOR NOTES** | As of the Petition Date, the Debtors owe no less than $140,971,311.36 in principal amount of convertible junior secured notes, including accrued and unpaid interest thereon, *plus* all other premiums (including any Applicable Premium (as defined in the Prepetition Junior Notes Indenture)), costs, fees, expenses and other obligations (the "**Prepetition Junior Notes Obligations**" and, together with the Prepetition Priority Term Loan Obligations and Prepetition Junior Term Loan Obligations, the "**Prepetition Secured Obligations**") under that certain Indenture, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Notes Indenture**," together with the Prepetition Priority Term Loan Credit Agreement and the Prepetition Junior Term Loan Credit Agreement, the "**Prepetition Secured Debt Facilities**," and, the Prepetition Junior Notes Indenture, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Junior Term Loan Credit Documents**"), by and among the Borrower and U.S. Bank Trust Company, National Association, as trustee and collateral agent (in such capacities, the "**Prepetition Junior Notes Agent**," together with Lynrock, as noteholder under the Prepetition Junior Notes Indenture (the "**Prepetition Junior Noteholder**"), the "**Prepetition Junior Notes Parties**" and, the Prepetition Junior Notes Parties, together with the Prepetition Priority Term Loan Lender and the Prepetition Junior Term Loan Lender, the "**Prepetition Secured Parties**"). The Prepetition Junior Notes Obligations are secured by a continuing security interest in and lien on (the "**Prepetition Junior Notes Lien**" and, together with the Prepetition Priority Term Loan Lien and the Prepetition Junior Term Loan Lien, the "**Prepetition Secured Debt Liens**") the "Collateral" (as defined in the Prepetition Junior Notes Indenture) (the "**Prepetition Junior Notes Collateral**" and, together with the Prepetition Priority Term Loan Collateral and the Prepetition Junior Term Loan Collateral, the "**Prepetition Collateral**"), which are (i) junior and subordinate to the Prepetition |

---

[2] The "**Junior Lien Intercreditor Agreement**" means that certain First Lien Pari Passu Intercreditor Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date), by and among the Borrower, certain subsidiaries of the Borrower party thereto, the Prepetition Junior Notes Trustee and the Prepetition Junior Term Loan Lender.

| | |
|---|---|
| | Priority Term Loan Lien with respect to the Collateral and (ii) *pari passu* with the Prepetition Junior Term Loan Lien with respect to the Collateral, in each case, subject to the terms of the Priority Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement. |
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES** | As adequate protection for the diminution in value of their interests in the Prepetition Collateral resulting from (a) subordination of their respective interests in the Prepetition Collateral, (b) the use of cash collateral during the Chapter 11 Cases, (c) the use, sale, lease or other disposition of any Prepetition Collateral, (d) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code and/or (e) any other reason for which adequate protection may be granted under the Bankruptcy Code (the "**Diminution in Value**"), the Prepetition Junior Term Loan Lender and the Prepetition Junior Notes Parties shall, to the extent of any Diminution in Value, during the pendency of the Chapter 11 Cases: |
| | (i)      be granted (a) additional and replacement liens on, except as set forth herein, all property of the Debtors' estates that constitutes DIP Collateral (the "**Adequate Protection Liens**"), which shall be junior and subordinate only to the Carve-Out, the Prepetition Permitted Liens and the DIP Liens, and (b) superpriority administrative expense claims against each of the Debtors pursuant to section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), which claims shall be junior and subordinate only to the Carve Out and the DIP Superpriority Claims; |
| | (ii)      receive payments in cash on a current basis of all reasonable and documented fees, costs and expenses of professionals retained by the Prepetition Junior Term Loan Lender, the Prepetition Junior Noteholder and the Prepetition Junior Notes Agent, which professionals shall include, but may not be limited to, (a) Akin Gump Strauss Hauer & Feld LLP, as lead restructuring counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (b) Pashman Stein Walder Hayden P.C., as Delaware local counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the Prepetition Secured Parties in lieu of the professionals set forth in clauses (a) or (b) (the "**Adequate Protection Fees**"); and |
| | (iii)      accrue interest on all outstanding Prepetition Junior Term Loan Obligations and Prepetition Junior Notes Obligations that have not been exchanged into Rolled DIP Loans. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever |

located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including (i) all Prepetition Collateral (including Cash Collateral); (ii) all intercompany claims; (iii) all money, cash and cash equivalents; (iv) all funds in any deposit accounts (excluding cash deposits that secure any outstanding letters of credit), securities accounts, commodities accounts, or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (v) all accounts and other receivables (including those generated by intercompany transactions); (vi) all contracts and contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, furniture, machinery, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds; (xii) all franchise rights; (xiii) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (xiv) all general intangibles, tax or other refunds or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights; (xix) all commercial tort claims; (xx) subject to the entry of the Final DIP Order, all Avoidance Action Proceeds (but not Avoidance Actions themselves); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials, and records); (xxii) all proceeds, whether by settlement, judgment or otherwise, arising from or relating to any litigation, arbitration, administrative proceeding or other legal action (other than Avoidance Actions) in which the Borrower or any of the Guarantors is or may become a party, including, but not limited to, all monetary awards, settlements, compensation, damages, penalties or any other form of payment or relief that the Borrower or any Guarantor receives or is entitled to receive as a result of such legal actions, including, but not limited to, any proceeds or other payments related to claims asserted against any legal professionals (collectively, "**Litigation Proceeds**"); (xxiii) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiv) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided* that the DIP Collateral shall not include any "Excluded Assets" described in the definition thereof in the Prepetition Priority Term Loan Documents. All of the DIP Liens described herein with respect to the DIP Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing

| | |
|---|---|
| | statements or other agreements. Notwithstanding the foregoing, the Debtors shall take any and all actions that may be necessary or desirable, or that the DIP Lender may reasonably request, to maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **CARVE-OUT** | As defined and set forth in the DIP Orders. |
| **DIP FEES:** | The Debtors shall pay to the DIP Lender a fee equal to 5.0% of the funded amount of the Interim New Money DIP Loan (the "**Interim Exit Premium**"), earned upon the Interim Closing Date and 5.0% of the funded amount of the Final DIP Loan (the "**Final Exit Premium**" and together with the Interim Exit Premium, the "**Exit Premium**" and the Exit Premium, together with the Original Issue Discount, the "**DIP Fees**"), earned upon the Final Closing Date, and, in each case, payable in cash on the Maturity Date (as defined below) (or upon the date of any mandatory prepayment of the applicable New Money DIP Loans), to the extent earlier than the Maturity Date, whether as a result of acceleration or otherwise); *provided*, that payment of the Exit Premium shall be waived if the DIP Lender or an affiliate of the DIP Lender acquires substantially all equity or assets of the Debtors, whether through a sale process or a chapter 11 plan. |
| **ORIGINAL ISSUE DISCOUNT:** | The New Money DIP Loans shall be made at a discount of 20% (the "**Original Issue Discount**") of the DIP Commitments. Notwithstanding the foregoing, the Debtors shall repay to the DIP Lender the full principal amount of the New Money DIP Loans borrowed by the Borrower in accordance with the terms of this DIP Term Sheet and the DIP Documents, without setoff, deduction, offset or counterclaim, it being understood and agreed that the Original Issue Discount with respect to each New Money DIP Loan shall be deemed fully-earned on the Closing Date in respect of such New Money DIP Loan, shall be due and payable upon the funding of such New Money DIP Loan and shall be non-refundable when paid. The parties agree that the Original Issue Discount shall be treated for U.S. tax purposes as adjustments to purchase price and as original issue discount and all parties agree to report such amounts accordingly. <br><br> The Original Issue Discount shall be net-funded from the proceeds of any DIP Loans borrowed concurrently with the payment thereof. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate per annum equal to 19.5%. <br><br> Interest with respect to any DIP Loan shall be paid as follows (i)(a) 2.5% *per annum* shall be paid in cash and (b) 17.0% *per annum* shall be payable in kind and not in cash with such interest amount being automatically added to, and made part of, the outstanding principal |

| | |
|---|---|
| | amount of DIP Leans, in each case on the last Business Day of each month and (ii) all accrued and unpaid interest shall be paid in cash on the Maturity Date.<br><br>All interest and fees under this DIP Term Sheet or the DIP Documents shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is repaid unless otherwise provided in a chapter 11 plan or order of the Bankruptcy Court approving the sale (or sales) of all or substantially all of the Debtors' assets, in each case, that is in form and substance acceptable to the DIP Lender, in its sole discretion. |
| **DEFAULT RATE:** | Automatically following the occurrence and during the continuance of an Event of Default (as defined below) (after giving effect to any applicable grace periods), all principal, interest and all other amounts in respect of the DIP Obligations shall bear interest at a rate equal to 6.00% *per annum* in excess of the interest rate set forth under "Interest Rate" above and such default interest shall be payable solely in cash. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"):<br><br>  (i)  the date that is 6 months after the Petition Date (the "**Interim Maturity Date**"); *provided*, that the Interim Maturity Date may be extended with the prior written consent of the DIP Lender, in its sole discretion, for up to two (2) additional 30-day periods as necessary to obtain receipt of all regulatory approvals required for consummation of a sale of assets;<br><br>  (ii)  the date of consummation of any sale or disposition of (a) all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures) or (b) one or more Segments (as defined in the Bidding Procedures) to the extent that, as of the date such Segment(s) is/are sold, no other Qualified Bids (as defined in the Bidding Procedures) for a substantial portion of the Debtors' remaining Assets have been submitted to the Debtors (the "**Sale Maturity Date**"); *provided*, that the Sale Maturity Date may be extended by the DIP Lender, in its sole discretion;<br><br>  (iii)  the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and |

| | |
|---|---|
| | (iv)   the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an Event of Default (as defined below). |
| **OPTIONAL PREPAYMENTS:** | The DIP Loans may be permanently prepaid by the Borrower at any time, subject to the payment of the Exit Premium; *provided*, that the Borrower shall not be permitted to prepay any DIP Loans to the extent that, following such optional prepayment, less than $6,000,000 in aggregate principal amount of DIP Loans would remain outstanding. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | Subject to the Carve-Out, the Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Premium) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows:<br><br>(i)   100% of the net cash proceeds of any sale or disposition of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, subject to the prior deposit of proceeds into escrow solely to fund (i) the KEIP Payment, (ii) the Expense Reimbursement (as defined in the Bidding Procedures) and (iii) the payment of any applicable fees payable to TD Cowen pursuant to that certain engagement letter among them and the Borrower dated February 27, 2024, as amended on September 8, 2024 (the "**Cowen Engagement Letter**" and such payments described in clauses (i) through this clause (iii), the "**Mandatory Pre-Prepayments**"), in each case to be applied solely to such uses only when due and only in the amounts required to be paid;<br><br>(ii)   100% of the net cash proceeds of any other sale or other disposition by the Borrower or the Guarantors or their subsidiaries of any assets, subject to exceptions consistent with the Prepetition Priority Term Loan Credit Agreement, and subject to the prior deposit of proceeds into escrow solely to fund the Mandatory Pre-Prepayments to be applied solely to the Mandatory Pre-Prepayments only when due and only in the amounts required to be paid;<br><br>(iii)   100% of the net cash proceeds of extraordinary receipts by the Borrower or the Guarantors or their subsidiaries (including any Litigation Proceeds, tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions);<br><br>(iv)   100% of the net cash proceeds received from the incurrence or issuance of indebtedness by the Borrower or the Guarantors or their subsidiaries not expressly permitted |

to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below; and

(v)     100% of the net cash proceeds received from the sale or issuance of equity securities by the Borrower or the Guarantors or their subsidiaries.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the Borrower or any Guarantor will be applied in the following order of priority (subject to other intercreditor arrangements to be agreed, any other payments required pursuant to the DIP Orders and solely in the case of clause (i) through (ii) above of this section titled "Mandatory Prepayments", the prior deposit of proceeds into escrow solely to fund the Mandatory Pre-Prepayments to be applied solely to the Mandatory Pre-Prepayments only when due and only in the amounts required to be paid):

(a)     first, to pay all documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, all reasonable and documented fees and expenses of all DIP Professionals (as defined in the Interim DIP Order) in accordance with the procedures set forth in the Interim DIP Order);

(b)     second, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lender in respect of the New Money DIP Loans;

(c)     third, to repay any principal amounts outstanding in respect of the New Money DIP Loans;

(d)     fourth, to pay the Exit Premium to the DIP Lender in connection with the funded portion of the New Money DIP Loans;

(e)     fifth, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lender in respect of the Rolled DIP Loans;

(f)     sixth, to repay any principal amounts outstanding in respect of the Rolled DIP Loans; and

(g)     seventh, to pay all other amounts owing to the DIP Lender.

For purposes of this DIP Term Sheet:

"**KEIP**" means a key employee incentive program to be developed by the Compensation Committee of the Debtors based on the recommendations of its independent compensation consultant, which shall be acceptable to the DIP Lender, acting in good faith, with such consent not to be unreasonably withheld or delayed; provided, that in all events, the KEIP shall provide that (a) any KEIP Payment (as defined below) shall be subject to a general release and waiver of claims requirement (including with respect to the DIP Lender and its affiliates) and (b) any KEIP Payment shall be paid to eligible employees no earlier than the consummation of the sale or disposition (in one or more series of transactions or dispositions) of all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures); *provided*, however, that, to the extent there is a sale or disposition of any of the Debtors' Assets to a Stalking Horse Bidder (as defined in the Bidding Procedures) or an affiliate of a Stalking Horse Bidder (a "**Stalking Horse Sale**"), any KEIP Payment will be subject to clawback during the 90-calendar-day transition services period following consummation of such Stalking Horse Sale.

"**KEIP Payment**" means the aggregate amount that becomes payable pursuant to the terms of the KEIP upon one or more Third-Party Sales, in an aggregate amount not to exceed 2.1% of the net cash proceeds of such Third Party Sale that would otherwise be payable to the DIP Lender (which for the avoidance of doubt shall exclude any escrow or holdback amounts unless, until and at such time as they are payable to the DIP Lender) pursuant to the section above "Mandatory Prepayments" or to any Prepetition Secured Party pursuant to the mandatory prepayment provisions of the Prepetition Secured Debt Facilities, which amount shall be inclusive of any employer-side payroll, social security, and similar taxes that become payable in connection with amounts to be paid under the KEIP.

"**KERP**" means a key employee retention program for the benefit of certain non-insider employees of Debtors, on substantially the same terms and conditions set forth in the form of retention agreement agreed to among the Debtors, the DIP Lender and certain eligible employees of the Debtors prior to the Petition Date (the "***Prepetition KERP***"); *provided*, that any KERP Payment will be paid to eligible employees no earlier than the later of (a) the consummation of a sale or disposition of all or substantially all of the Debtors' Assets to a party other than the Stalking Horse Bidder or an affiliate of the Stalking Horse Bidder, and (b) a Stalking Horse Sale; *provided, however*, that, to the extent a Stalking Horse Sale is consummated, any KERP Payment will be subject to clawback for the 90-calendar-day transition services period following consummation of such Stalking Horse Sale.

"**KERP Payment**" means the aggregate amount that could become payable pursuant to the terms of the KERP, which shall not exceed the aggregate amount set forth in the Approved DIP Budget, and

| | |
|---|---|
| | which amount (a) shall be inclusive of any employer-side payroll, social security or similar taxes that become payable in connection with amounts to be paid under the KERP and (b) shall be reduced by any amounts previously paid to eligible employees under the Prepetition KERP and the employer-side payroll, social security or similar taxes that were payable in connection with such amounts.<br><br>"**Third Party Sale**" means any sale or disposition of (a) all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures), (b) one or more Segments (as defined in the Bidding Procedures) or (c) any individual Assets within a Segment, in each case, to an acquirer that is not the DIP Lender or an affiliate of the DIP Lender.<br><br>Notwithstanding the foregoing or anything to the contrary herein or in the DIP Documents or DIP Orders, each of the parties hereto, on behalf of itself and its respective affiliates, hereby acknowledges and agrees that distributions in respect of the DIP Obligations related to the Rolled DIP Loans shall be allocated first to the principal amount of such Rolled DIP Loans (as determined for income tax purposes) and then, to the extent that the consideration exceeds the principal amount of such Rolled DIP Loans, to any accrued but unpaid interest on such Rolled DIP Loans (collectively, "**Intended Tax Treatment**"). Except as required by a final "determination" within the meaning of Section 1313(a) of the Code, or any corresponding or similar outcome under state, local or non-U.S. tax law, the parties hereto will, and will cause each of their respective affiliates to, (x) report, act and file all tax returns in all respects and for all purposes consistent with such Intended Tax Treatment and (y) not take any position for tax purposes (whether in audits, tax returns or otherwise) that is inconsistent with such Intended Tax Treatment. |
| **CONDITIONS PRECEDENT TO THE INTERIM DIP LOANS:** | The obligations of the DIP Lender to make the Interim DIP Loan on the Interim Closing Date will be subject to satisfaction or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with the related draw request:<br><br>(i)    the Debtors shall have timely delivered to the DIP Lender and its advisors the initial Approved DIP Budget or any update thereto then required to be delivered in accordance with this DIP Term Sheet;<br><br>(ii)    the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) on the date of entry of the Interim DIP Order (or such later time as the DIP Lender may agree to).<br><br>(iii)    the Borrower shall have delivered to the DIP Lender a closing certificate duly executed by the chief executive officer, president or chief financial officer (or other |

responsible officer with equivalent duties) of the Borrower, appropriately completed, by which such officer shall certify to the DIP Lender that the conditions precedent to the Interim DIP Loan set forth in clauses (vii) and (viii) hereof to be made on the Interim Closing Date have been satisfied;

(iv)   the Interim DIP Order shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Interim DIP Order;

(v)   all of the "first day" motions, orders and related pleadings filed by the Debtors in the Chapter 11 Cases shall have been delivered in advance to counsel to the DIP Lender and the relief granted thereunder shall be acceptable to the DIP Lender;

(vi)   the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition Priority Term Loan Credit Agreement remains in place);

(vii)   no default or Event of Default under the DIP Commitment Letter or this DIP Term Sheet (or under the DIP Documents, as the case may be) or a Termination Event under, and as defined in, the Interim DIP Order shall have occurred and be continuing on the Interim Closing Date or shall exist after giving effect to the Interim DIP Loan to be made on the Interim Closing Date;

(viii)   all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects on the Interim Closing Date (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

18

(ix)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform could not reasonably be expected to cause a Material Adverse Change;

(x)    receipt by the DIP Lender of a certificate, in form and substance reasonably satisfactory to the DIP Lender, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) of each Debtor on behalf of such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (1) the certificate of incorporation of such Debtor, certified as of a recent date by the applicable secretary of state and (2) the by-laws of such Debtor then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) thereof authorized to execute the DIP Commitment Letter and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(xi)    to the extent invoiced at least one (1) Business Day prior to the Interim Closing Date, substantially concurrently with the Interim Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Prepetition Secured Parties and the DIP Lender relating to the Chapter 11 Cases, the DIP Facility and the Prepetition Secured Debt Facilities (including, without limitation,

19

reasonable fees and expenses of their counsel and external advisors allocated to the Chapter 11 Cases, including, without limitation, all reasonable and documented fees and out-of-pocket expenses of (a) Akin Gump Strauss Hauer & Feld, LLP), (b) Pashman Stein Walder Hayden P.C., (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the DIP Lender in lieu of the professionals set forth in clause (a) or (b) (collectively, the "**DIP Professionals**") or the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order. Modifications of the Interim DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent (email being sufficient) of the DIP Lender;

(xii) the Debtors are in compliance in all respects with the section below entitled "Milestones"; and

(xiii) the DIP Lender shall have received, at least three (3) Business Days prior to the Interim Closing Date (or such shorter period as DIP Lender may agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001), as subsequently amended and reauthorized), in each case, requested at least seven (7) Business Days prior to the Interim Closing Date.

For the purposes of this DIP Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, any event, circumstance or condition that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on (i) the business, assets, properties, liabilities (contingent or otherwise), financial condition or results of operations of the Debtors, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases, (ii) the ability of the Debtors to perform their obligations under this DIP Term Sheet or any other DIP Document to which they are a party, (iii) the validity or enforceability against any Debtor of this DIP Term Sheet or any other DIP Document to which it is a party or (iv) the rights and remedies of the DIP Lender hereunder or thereunder.

| | |
|---|---|
| **CONDITIONS PRECEDENT TO THE FINAL DIP LOAN:** | The obligations of the DIP Lender to make the Final DIP Loan on the Final Closing Date shall be subject to satisfaction, or written waiver, by the DIP Lender, of each of the conditions precedent described above in the section of this DIP Term Sheet (or, to the extent the DIP Documents have been executed and delivered to the DIP Lender, the DIP Credit Agreement) titled "Conditions Precedent |

to the Interim DIP Loans" and each of the following conditions precedent in connection with the related draw request:

    (i)    the Debtors shall have timely delivered to the DIP Lender the Approved DIP Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet;

    (ii)    the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) three (3) Business Days prior to the requested funding date for such Final DIP Loan (or such later time as the DIP Lender may agree to);

    (iii)    the Final DIP Order shall have been entered by the Bankruptcy Court (after notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Final DIP Order;

    (iv)    no default or Event of Default under the DIP Facility or a Termination Event under the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist after giving effect to the Final DIP Loan to be made on the Final Closing Date;

    (v)    all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects as of the Final Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects, and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date);

    (vi)    subject to Bankruptcy Court approval, (a) the Debtors shall have the corporate power and authority to make, deliver and perform their obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet, the DIP Documents (as applicable) and the Final DIP Order except for consents,

<table>
<tr>
<td></td>
<td>

authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(vii)  to the extent invoiced at least one (1) Business Day prior to the applicable Final Closing Date, substantially concurrently with such Final Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or postpetition) of the DIP Lender and the Prepetition Secured Parties relating to the Chapter 11 Cases, the DIP Facility (including, without limitation, reasonable fees and expenses of the DIP Professionals and any professionals retained by the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) in accordance with the terms of the Final DIP Order;

(viii)  at least forty-one (41) days shall have passed since the Petition Date;

(ix)  if required by the DIP Lender, and to the extent not previously executed, receipt by the DIP Lender of duly executed and delivered copies of the DIP Documents (including, without limitation, senior secured superpriority debtor in possession term loan credit agreement), in each case on the terms set forth in this DIP Term Sheet or otherwise on terms reasonably acceptable to the DIP Lender; and

(x)  the Debtors are in compliance in all respects with the section below entitled "Milestones."

Modifications of the Final DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent of the DIP Lender, in its sole discretion (e-mail being sufficient (including as communicated by counsel in writing)).

</td>
</tr>
<tr>
<td>

**REPRESENTATIONS AND WARRANTIES:**

</td>
<td>

The same representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) as set forth in the Priority Term Loan Credit Agreement (it being understood that references to "Material Adverse Effect" therein shall be deemed to refer to "Material Adverse Change" as defined herein), which shall be deemed made by the Debtors for the benefit of the DIP Lender in respect of the DIP Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein, and the following additional representations and warranties.

(i)  the Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable

</td>
</tr>
</table>

|  |  |
|---|---|
|  | law and proper notice of the bankruptcy proceedings will be given; |
|  | (ii) the Interim DIP Order or the Final DIP Order, as applicable, is in full force and effect and has not been reversed, vacated, stayed, modified or amended in any manner adverse to the DIP Lender without the prior written consent of the DIP Lender; and |
|  | (iii) each Approved DIP Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower delivered to the DIP Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projection. |
| **FINANCIAL COVENANTS:** | Financial covenants shall include: |
|  | (i) Minimum Qualified Cash (as defined in the Prepetition Priority Term Loan Credit Agreement) of (x) until November 1, 2024, $5,000,000 and (y) after November 1, 2024, $3,000,000, tested on Tuesday of each week, as of the close of business on the immediately preceding Friday (the "**Minimum Qualified Cash Covenant**"; <u>provided that</u>, for the avoidance of doubt, for purposes of the DIP Facility, the Minimum Qualified Cash Covenant herein shall be deemed to replace the Minimum Qualified Cash covenant set forth in Section 7.20 of the Priority Term Loan Credit Agreement); and |
|  | (ii) variances against the then-in-effect Approved DIP Budget, tested in accordance with the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports". |
| **AFFIRMATIVE COVENANTS:** | The same affirmative covenants as set forth in the Priority Term Loan Credit Agreement and the following additional covenants of the Debtors, so long as any obligations remain outstanding under the DIP Facility or the DIP Orders: |
|  | (i) timely deliver, or cause to be timely delivered, to the DIP Lender the Approved DIP Budget and the Weekly Variance Reports, all in accordance with the provisions set forth in the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports" and otherwise in the applicable DIP Orders; |
|  | (ii) cooperate, consult with, and provide to the DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP |

Lender, and permit representatives and independent contractors on behalf of the DIP Lender, collectively, to visit and inspect any of the Debtors' properties, to examine their corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their affairs, finances and accounts with their directors, officers, and independent public accountants (so long as the Debtors have a reasonable opportunity to participate in such meeting), all at the expense of the Borrower; and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that any and all information for which confidentiality is owed to third parties pursuant to written agreements entered into not in contemplation of this exception, information subject to attorney-client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (ii);

(iii)   comply with the Approved DIP Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the applicable DIP Orders;

(iv)   [reserved];

(v)   take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or requested by the DIP Lender to carry out the provisions of this DIP Term Sheet, the DIP Documents and the applicable DIP Orders;

(vi)   except to the extent contemplated by the Approved DIP Budget or otherwise consented to by the DIP Lender in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights, licenses and privileges, and comply with all material contractual obligations of the Debtors;

(vii)   provide drafts of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases to counsel to the DIP Lender at least three (3) Business Days in advance of such filing;

(viii)   maintain their cash management system in a manner reasonably acceptable to the DIP Lender (which shall be

| | |
|---|---|
| | deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as set forth under any cash management orders entered by the Bankruptcy Court); |
| | (ix)  cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every calendar week at reasonable times during normal business hours to discuss the Approved DIP Budget, the Weekly Variance Report, the Chapter 11 Cases, and the financial condition, performance and business affairs of the Debtors; |
| | (x)  at the request of the DIP Lender, take all steps reasonably necessary to appoint a Chief Restructuring Officer (a "**CRO**") acceptable to the DIP Lender (including, but not limited to, seeking entry of an order of the Bankruptcy Court approving the retention and employment of such CRO), which CRO shall have such duties, responsibilities, and authority as are customary for such position and shall be appointed on terms and conditions, including compensation, acceptable to the DIP Lender; and |
| | (xi)  promptly upon receipt by the Debtors of any material adverse written communications from any governmental authority, the Borrower will provide a copy of same to the DIP Lender. |
| **NEGATIVE COVENANTS:** | The same negative covenants as set forth in the Priority Term Loan Credit Agreement and, in addition, prohibitions on the Debtors to, without the express, prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following: |
| | (i)  other than liens required or permitted by this DIP Term Sheet, the DIP Documents and the applicable DIP Orders, seek to or create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out and (b) Prepetition Permitted Liens existing as of the Petition Date; |
| | (ii)  convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of the Debtors' property, business or assets, whether now owned or hereafter acquired, other than (a) dispositions permitted under the Prepetition Priority Term Loan Credit Agreement and (b) asset sales |

25

approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender;

(iii)     create, incur, assume or permit to exist any indebtedness, other than (a) the DIP Obligations and (b) indebtedness permitted pursuant to the DIP Documents and the applicable DIP Orders;

(iv)     amend, modify or compromise any material term or material amount owed under a material real property lease or material contract without the prior written consent of the DIP Lender;

(v)     incur or make any Restricted Payment ((i) as defined in the Prepetition Priority Term Loan Credit Agreement including, for the avoidance of doubt, the proviso contained in such definition and (ii) including, but not limited to, payments relating to any D&O tail policy, investment or loan without the prior written consent of the DIP Lender, unless in accordance with the Approved DIP Budget, after giving effect to the Permitted Variances;

(vi)     create or acquire any ownership interest in any subsidiaries (whether direct or indirect);

(vii)     create or permit to exist any other claim which is *pari passu* with or senior to the claims of the DIP Lender under the DIP Facility, except for the Carve Out and except as set forth in this DIP Term Sheet and the applicable DIP Orders;

(viii)     modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code without the prior written consent of the DIP Lender;

(ix)     [reserved];

(x)     pay prepetition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders and (b) payments authorized by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender;

(xi)     engage in any activities that would result in the Borrower or any Guarantor becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; and

| | |
|---|---|
| | (xii)    enter into, implement, waive, supplement or amend any retention bonus, transaction bonus or similar arrangement(s) with any current or former directors, officers, or employees of the Debtors, to which any of the Debtors is a party to, sponsors, administers or has any liability with respect to, without the prior written consent of the DIP Lender, except (i) with respect to the KEIP and the KEIP Payment thereunder, or (ii) with respect to the KERP and KERP Payment thereunder. |
| **MILESTONES:** | Milestones in respect of the Chapter 11 Cases under the DIP Facility are listed below (as any such time and date may be extended with the written consent of the DIP Lender (which consent may be confirmed via e-mail by counsel on behalf of the DIP Lender)), in each case, subject to Bankruptcy Court availability:<br><br>(i)    no later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of the Interim DIP Order;<br><br>(ii)    no later than one (1) calendar day after the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of an order, in form and substance acceptable to the DIP Lender, among other things, (a) approving procedures (the "**Bidding Procedures**") to be used and bid protections to be provided in connection with the sale (or sales) of all or substantially all of the Debtors' assets (the "**Sale Transaction**"), (b) establishing certain dates and deadlines related thereto and scheduling an auction (if any) (the "**Auction**") and the hearing on approval of the Sale Transaction and (c) approving the utilization of a form of asset purchase agreement to be used in connection with the Sale Transaction (the "**Bidding Procedures Order**");<br><br>(iii)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;<br><br>(iv)    no later than twenty-four (24) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;<br><br>(v)    no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;<br><br>(vi)    no later than October 15, 2024, the Bid Deadline (as defined in the Bidding Procedures) shall have occurred, |

|  | unless such date has been extended in accordance with the terms of the Bidding Procedures; |
|---|---|
|  | (vii) no later than November 13, 2024, the Auction (if necessary) shall have occurred; |
|  | (viii) no later than November 25, 2024, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "**Sale Approval Order**"), in form and substance acceptable to the DIP Lender; and |
|  | (ix) no later than December 6, 2024, the Sale Transaction shall be consummated (the "**Sale Closing Milestone**") (or the Outside Date shall have been extended as provided in the Stalking Horse Agreement (each as defined in the Bidding Procedures)). |
| **EVENTS OF DEFAULT:** | Each of the following shall constitute an "**Event of Default**": |
|  | (i) the entry of an interim or final order with respect the DIP Facility, granting approval of the DIP Commitment Letter and the DIP Term Sheet or the DIP Documents (as applicable) in form or substance that is not acceptable to the DIP Lender in its sole discretion; |
|  | (ii) except as set forth in clause (xxiii) below, failure by the Debtors to be in compliance with provisions of this DIP Term Sheet or any DIP Document (subject to applicable grace periods as set forth in any DIP Document or any DIP Order, including a one (1) Business Day grace period for delivery of the Approved DIP Budgets, cash flow forecasts and Weekly Variance Reports; |
|  | (iii) any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order; |
|  | (iv) any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for entry of a final order of the Bankruptcy Court charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender; |
|  | (v) failure of any Milestone set forth in this DIP Term Sheet to be satisfied by the specified deadline therefor (in each case, as then in effect after giving effect to any extensions, waivers or amendments thereto made in accordance with the requirements of this DIP Term Sheet); |

(vi)    failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;

(vii)    the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens or DIP Superpriority Claims, excluding (a) the Carve-Out, (b) liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender or (c) as provided in the "first day" motions with the prior written consent of the DIP Lender;

(viii)    the Debtors (or any of their direct or indirect non-Debtor affiliates) commence (or fail to contest the commencement by a third party of) any action (other than an action permitted by the DIP Orders) against the DIP Lender, the Prepetition Secured Parties or any of its agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Document or under any DIP Order in favor of the DIP Lender or the Prepetition Secured Parties;

(ix)    the entry of an order by the Bankruptcy Court in favor of the Creditors' Committee (if any), any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against the DIP Lender or the Prepetition Secured Parties, (b) sustaining an objection to claims of the DIP Lender or the Prepetition Secured Parties or (c) avoiding any liens held by the DIP Lender or the Prepetition Secured Parties; *provided*, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Rolled DIP Loans or the Prepetition Secured Obligations in accordance with the terms of the applicable DIP Orders;

(x)    (a) the Debtors file any pleading in any court (or fail to contest any pleading filed by a third party in any court) seeking entry of an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Document or any DIP Order, or the disallowance of any DIP Obligations, in whole or in part,

29

or (b) any provision of this DIP Term Sheet, any other DIP Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding;

(xi)     without the prior written consent of the DIP Lender, the failure by the Debtors to be in compliance with provisions of the Bidding Procedures Order (subject to any applicable grace periods as set forth in the Bidding Procedures Order);

(xii)    without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations;

(xiii)   to the extent that any DIP Obligations remain outstanding, the filing of a chapter 11 plan that is not reasonably acceptable to the DIP Lender;

(xiv)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner or responsible officer with enlarged powers (beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor;

(xv)     the granting of (or the Debtors' failure to contest) any motion filed by a creditor or other party in interest seeking relief from the automatic stay in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value in excess of $100,000;

(xvi)    termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of the satisfaction in full of the DIP Obligations;

(xvii)   the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code;

(xviii)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(xix)    a dismissal of any of the Chapter 11 Cases;

(xx)     without the prior written consent of the DIP Lender, a request by the Debtors to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay

| | |
|---|---|
| | in full in cash all obligations under the DIP Facility upon consummation thereof; |
| | (xxi) [reserved]; |
| | (xxii) the filing of any motion seeking approval of a sale of any DIP Collateral (other than any sale permitted under "Negative Covenants"); |
| | (xxiii) failure to pay (A) principal in full when due, including without limitation, on the Maturity Date, or (B) interest or other DIP Obligations in full within three (3) Business Days after the same becomes due; or |
| | (xxiv) the entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking the appointment or election of a trustee, responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business. |
| **REMEDIES UPON EVENT OF DEFAULT:** | As set forth in the applicable DIP Orders. |
| **OTHER BANKRUPTCY MATTERS:** | All reasonable and documented prepetition and postpetition professional fees, costs and expenses of the Prepetition Secured Parties and the DIP Lender relating to the Chapter 11 Cases, the DIP Facility or the Prepetition Secured Debt Facilities, any sale (or sales) of the Debtors' assets or businesses or the negotiation, solicitation and implementation of a chapter 11 plan (including, without limitation, (i) the preparation of documentation (including any amendments, modifications or waivers) in respect thereof, (ii) the administration thereof and (iii) in connection with the enforcement or protection of rights in connection with the DIP Facility or the documentation in respect thereof) (including, without limitation, prepetition and postpetition fees and disbursements of the DIP Professionals and the Adequate Protection Fees) subject to the terms of the applicable DIP Orders, shall be payable by the Borrower, following receipt of a summary invoice and without the requirement for Bankruptcy Court approval. A copy of each summary invoice for fees, costs and expenses of the DIP Lender and the Prepetition Secured Parties shall be provided by the DIP Lender and the Prepetition Secured Parties to the U.S. Trustee and counsel to the Creditors' Committee (if any). <br><br> The Borrower shall indemnify the DIP Lender in accordance with indemnity provisions customary for transactions of this type and otherwise generally consistent with those set forth in the Prepetition Priority Term Loan Credit Agreement.  Section 10.5 of the |

| | |
|---|---|
| | Prepetition Priority Term Loan Credit Agreement is hereby incorporated by reference herein, *mutatis mutandis*. |
| | The DIP Orders shall contain releases and exculpations for the DIP Lender and the Prepetition Secured Parties, in form and substance satisfactory to the DIP Lender and the Prepetition Secured Parties, including, without limitation, releases from any avoidance actions under chapter 5 of the Bankruptcy Code or any analogous federal, state of foreign laws. |
| | Subject to the entry of the Interim DIP Order, the DIP Lender shall have the unconditional right to credit bid ("**Credit Bid**") the outstanding DIP Obligations (and any other applicable obligations) in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any chapter 11 plan or otherwise. |
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this DIP Term Sheet and any applicable DIP Order, such DIP Order shall govern. |
| **AMENDMENT AND WAIVER:** | Except as otherwise expressly provided herein or therein, no provision of this DIP Term Sheet, any other DIP Document or any DIP Order may be amended other than by an instrument in writing signed by (i) the DIP Lender and (ii) the Debtors. |
| **ASSIGNMENTS:** | The DIP Lender may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the Borrower, which shall not be unreasonably withheld (it being understood that it shall be reasonable to withhold consent to an assignment to a competitor of the Debtors); *provided*, that no consent of the Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to a DIP Lender or an affiliate of a DIP Lender or the Prepetition Secured Parties. The parties to each assignment shall execute and deliver to the DIP Lender an assignment agreement in form and substance acceptable to the DIP Lender (an "**Assignment Agreement**"). Subject to receipt and recording thereof by DIP Lender, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of the DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder. |
| **WAIVERS AND PROTECTIONS:** | The Final DIP Order shall include in respect of (i) the DIP Obligations and Prepetition Secured Obligations, (ii) the DIP Collateral, including, but not limited to, all Prepetition Collateral, (iii) the DIP Lender and the Prepetition Secured Parties, as applicable, (a) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (b) a waiver of the ability to |

| | |
|---|---|
| | surcharge the DIP Collateral or Prepetition Collateral, including under section 506(c) of the Bankruptcy Code, and (c) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, including, but not limited to, all Prepetition Collateral.<br><br>In addition, the DIP Orders shall include stipulations in respect of the validity of the Prepetition Secured Debt Liens and the Prepetition Secured Obligations, subject to an investigation period of not less than seventy-five (75) calendar days following the entry of the Interim DIP Order. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet.  The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury. |
| **PATRIOT ACT:** | The DIP Lender hereby notifies the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub.  L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the DIP Lender to identify the Borrower in accordance with the Act. |
| **NOTICES:** | (a) All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, upon confirmation of delivery, addressed as follows in the case of the Borrower and the DIP Lender, or to such other address as may be hereafter notified by the respective parties hereto:<br><br>Borrower:　　Edgio, Inc.<br>11811 N. Tatum Blvd., Suite 3031, Phoenix, Arizona 85028<br>Richard Diegnan, Chief Legal Officer<br>Email: rdiegnan@edg.io<br>with a copy to (which shall not constitute notice under this DIP Term Sheet or any DIP Documents):<br><br>Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn: Tyson Lomazow, Lauren C. Doyle, Maya Grant<br>Email: tlomazow@milbank.com<br>　　　　ldoyle@milbank.com |

|  | mgrant@milbank.com |
|---|---|
|  | DIP Lender: |
|  | Lender: Lynrock Lake Master Fund LP<br>Attention: Cynthia Paul; Michael Manley; Operations<br>Email: cp@lynrocklake.com<br>mike@lynrocklake.com<br>ops@lynrocklake.com |
|  | with a copy to (which shall not constitute notice under this DIP Term Sheet or any DIP Documents):<br><br>Akin Gump Strauss Hauer & Feld LLP<br>Attention: Michael Stamer, Meredith Lahaie, Catherine Goodall<br>Email: mstamer@akingump.com<br>mlahaie@akingump.com<br>cgoodall@akingump.com |
|  | (b) Notices and other communications to the DIP Lender hereunder may be delivered or furnished by electronic communications (including email) pursuant to procedures approved by the DIP Lender. The DIP Lender or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided*, that approval of such procedures may be limited to particular notices or communications. Unless the DIP Lender otherwise prescribes, notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment); *provided*, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.<br><br>(c) Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto. |
| **COUNSEL TO DIP LENDER:** | (a) Lead restructuring counsel: Akin Gump Strauss Hauer & Feld LLP<br><br>(b) Delaware local counsel: Pashman Stein Walder Hayden P.C. |

### Annex A

**DIP Commitments**

| DIP Lender | DIP Commitment |
|---|---|
| Lynrock Lake Master Fund LP | $15,625,000 |
| **Total** | **$15,625,000** |

**Exhibit C**

**Milestones**

**Milestones**

Pursuant to Paragraph 16 of the Interim Order, the following Milestones shall apply to the DIP Facility unless waived in writing by the DIP Lender (which may be by e-mail from counsel to the DIP Lender) to counsel to the Debtors; *provided*, that such Milestones shall be subject to Bankruptcy Rule 9006 and adjustment for the Bankruptcy Court's availability where applicable. Capitalized terms used but not defined in this <u>Exhibit C</u> shall have the meanings ascribed to such terms in the Interim Order.

| Date | Event |
| --- | --- |
| No later than one (1) calendar day after the Petition Date | The Debtors shall have filed a motion in the Bankruptcy Court seeking entry of an order, in form and substance acceptable to the DIP Lender, among other things, (a) approving procedures (the "<u>Bidding Procedures</u>") to be used and bid protections to be provided in connection with the sale (or sales) of all or substantially all of the Debtors' assets (the "<u>Sale Transaction</u>"), (b) establishing certain dates and deadlines related thereto and scheduling an auction (if any) (the "<u>Auction</u>") and the hearing on approval of the Sale Transaction and (c) approving the utilization of a form of asset purchase agreement to be used in connection with the Sale Transaction (the "<u>Bidding Procedures Order</u>"); |
| No later than three (3) business days after the Petition Date | The Court shall have entered the Interim Order. |
| No later than twenty-four (24) calendar days after the Petition Date | The Court shall have entered the Bidding Procedures Order. |
| No later than thirty (30) calendar days after the Petition Date | The Court shall have entered the Final Order. |
| October 15, 2024 | The Bid Deadline (as defined in the Bidding Procedures) shall have occurred, unless such date has been extended in accordance with the terms of the Bidding Procedures. |
| November 13, 2024 | The Auction shall have occurred (if necessary). |
| November 25, 2024 | The Court shall have entered an order approving the Sale Transaction, in form and substance acceptable to the DIP Lender. |
| December 6, 2024 | The Sale Transaction shall be consummated (or the Outside Date extended as provided in the Stalking Horse Agreement (each as defined in the Bidding Procedures)). |

**Exhibit B to DIP Motion**

**DIP Commitment Letter**

September 9, 2024

Edgio, Inc.
11811 N. Tatum Blvd., Suite 3031, Phoenix, Arizona 85028
Richard Diegnan, Chief Legal Officer
Email: rdiegnan@edg.io

<u>Senior Secured Superpriority Debtor in Possession Credit Facility</u>

<u>Commitment Letter</u>

Ladies and Gentlemen:

Edgio, Inc., a Delaware corporation ("<u>you</u>" or "<u>Edgio</u>") and its undersigned subsidiaries (collectively with Edgio, the "<u>Debtors</u>" and each, an "<u>Debtor</u>") have requested that the undersigned commitment party ("<u>us</u>", "<u>we</u>" or the "<u>Commitment Party</u>") to the term sheet attached hereto as <u>Exhibit A</u> (including all schedules, annexes and exhibits hereto, as may be amended, restated, supplemented or otherwise modified from time to time, the "<u>DIP Term Sheet</u>") agree to provide, under section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "<u>Bankruptcy Code</u>"), a multiple draw senior secured superpriority debtor in possession term loan facility (the "<u>DIP Facility</u>") in an aggregate funded principal amount of $15,625,000, consisting of (i) $11,718,750 of Interim New Money DIP Loans (together with the Interim Rolled DIP Loans in the amount set forth in the DIP Term Sheet and which shall be deemed incurred upon the occurrence of the Interim Closing Date), which shall be available to be funded on the Interim Closing Date subject to entry of the Interim DIP Order and (ii) $3,906,250 of Final New Money DIP Loans (together with the Final Rolled DIP Loans in the amount set forth in the DIP Term Sheet and which shall be deemed incurred upon the occurrence of the Final Closing Date), which shall be available to be funded on the Final Closing Date subject to entry of the Final DIP Order.  The availability of the DIP Facility will be conditioned on and subject solely to the conditions set forth in <u>Section 5</u> below.  Capitalized terms used but not defined herein are used with the meanings assigned to the DIP Term Sheet.

1.    **Commitment**

In connection with the foregoing, the Commitment Party is pleased to advise you of its commitments to provide the Interim New Money DIP Loans and the Final DIP Loans (the "<u>DIP Commitments</u>") upon the terms and subject to solely the conditions set forth in this letter agreement and the DIP Term Sheet (this "<u>Commitment Letter</u>" and together with the DIP Term Sheet, the "<u>DIP Commitment Letter and Term Sheet</u>").

2.    **[Reserved]**

3.    **Information**

You hereby represent that (a) all written factual information, other than (i) the Projections (as defined below) and (ii) information of a general economic or industry specific nature (such written information other than as described in the immediately preceding clauses (i) and (ii), the "<u>Information</u>"),

that has been or will be made available to us by you or on behalf of you or any of your representatives in connection herewith is or will be, when taken as a whole, complete and correct in all material respects and does not or will not, when furnished and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto) and (b) the financial projections and other projections, budgets, estimates and other forward-looking information (collectively, the "Projections") that have been or will be made available to us by you or on behalf of you or any of your representatives in connection herewith have been or will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time the related Projections are made available to us; it being understood that (x) the Projections are merely a prediction as to future events and are not to be viewed as facts, (y) the Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, and (z) no assurance can be given that any particular Projection will be realized and that actual results during the period or periods covered by any the Projections may differ significantly from the projected results and such differences may be material. You agree that if, at any time prior to the effectiveness of the DIP Facility, you become aware that any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances; *provided* that any such supplemental Information and Projections shall be treated as confidential in accordance with this Commitment Letter.

In providing this Commitment Letter and arranging the DIP Facility, the Commitment Party is relying on the accuracy of the Information furnished to it by or on behalf of you by your representatives without independent verification thereof.

4.      **Fees**

As consideration for the commitments and agreements of the Commitment Party, the Debtors jointly and severally agree to pay or cause to be paid to the DIP Lender the nonrefundable premiums and fees described in the DIP Term Sheet, including the sections of the DIP Term Sheet titled "DIP FEES" and "ORIGINAL ISSUE DISCOUNT" (collectively, the "DIP Fees") at the times, on the terms and subject to the conditions set forth in the DIP Commitment Letter and Term Sheet.

The Debtors acknowledge and agree that the DIP Fees shall be fully earned, nonrefundable, and non-avoidable upon the occurrence of such events or such applicable dates as described with respect thereto in the DIP Term Sheet, and shall be paid by the Debtors, free and clear of any withholding or deduction for any applicable taxes, on the applicable dates as set forth in the DIP Term Sheet.  The DIP Fees are being earned as consideration for the DIP Lender's DIP Commitment and not with respect to any other services being provided.

5.      **Conditions**

The DIP Lender's commitments and agreements hereunder are subject only to the conditions set forth under the sections of the DIP Term Sheet titled (i)"Conditions Precedent to the Interim DIP Loans" and (ii) "Conditions Precedent to the Final DIP Loan".

The DIP Lender acknowledges that the obligations of the Debtors hereunder are subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

6.      **Indemnification and Expenses**

You agree to indemnify, hold harmless and defend the Commitment Party (including in connection with its capacity as a lender under the DIP Commitment Letter and Term Sheet) and its affiliates and their respective directors, officers, employees, attorneys, advisors, consultants, agents and other representatives (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, expenses and liabilities, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with the DIP Commitment Letter and Term Sheet, the DIP Facility, the use of the proceeds thereof or any claim, litigation, investigation or proceeding (a "<u>Proceeding</u>") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each Indemnified Person within ten (10) Business Days after written demand (together with reasonable backup documentation) for any reasonable and documented out-of-pocket legal expenses (limited to one counsel for all Indemnified Persons taken as a whole and, if reasonably necessary, a single regulatory counsel for all Indemnified Persons taken as a whole and a single local counsel for all Indemnified Persons taken as a whole in each relevant material jurisdiction (which may be a single local counsel acting in multiple jurisdictions) and, solely in the case of any actual or perceived conflict of interest between Indemnified Persons where the Indemnified Persons affected by such conflict inform you of such conflict, one additional regulatory counsel and/or local counsel in each relevant material jurisdiction to each group of affected Indemnified Persons similarly situated, taken as a whole) or other reasonable and documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing, but subject to the limitations in the next sentence; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they (x) are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of, or a material breach of this Commitment Letter by, such Indemnified Person or its control affiliates, directors, officers or employees (collectively, the "<u>Related Parties</u>") or (y) arise solely from any dispute among Indemnified Persons or any Related Parties, other than any claims arising out of any act or omission on the part of you or any of your affiliates. Notwithstanding the foregoing, each Indemnified Person shall be obligated to refund and return promptly any and all amounts paid under the indemnification provisions of this Commitment Letter to such Indemnified Person and/or its Related Party for any such losses, claims, damages, liabilities or expenses to the extent such Indemnified Person and its Related Parties are not entitled to payment of such amounts in accordance with the terms hereof as finally determined by a final, non-appealable judgment of a court of competent jurisdiction.

In addition, whether or not the Interim Closing Date occurs, all reasonable and documented prepetition and post-petition professional fees, costs and expenses of the Prepetition Priority Term Loan Lender, the Prepetition Junior Term Loan Lender, the Prepetition Junior Notes Agent and the Commitment Party (including in connection with its capacity as a lender under the DIP Facility) relating to the Chapter 11 Cases, the DIP Facility or the Prepetition Secured Debt Facilities (including, without limitation, (i) the preparation of documentation (including any amendments, modifications or waivers) in respect thereof, (ii) the administration thereof and (iii) in connection with the enforcement or protection of rights in connection with the DIP Facility or the documentation in respect thereof) (including, without limitation, prepetition and post-petition fees and disbursements of counsel and advisors allocated to the Chapter 11 Cases, including, but not limited to, the fees, costs and expenses of Akin Gump Strauss Hauer & Feld, LLP) subject to the DIP Orders , shall be payable by the Debtors in accordance with the process set forth in the Interim DIP Order or Final DIP Order, as applicable.

You will not be liable for any settlement of any Proceeding effected without your prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), but, if settled with your written consent or if there is a final judgment in any such Proceedings, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and

expenses by reason of such settlement or judgment in accordance with the indemnification provisions of this Commitment Letter.

It is further agreed that the DIP Lender shall only have liability to you (as opposed to any other person) in respect of its commitment. None of the Indemnified Persons or the Debtors or their respective directors, officers, employees, advisors, and agents shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP Facility or the transactions contemplated hereby or thereby; *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this <u>Section 6</u>.

7.      **Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities**

You acknowledge that the Commitment Party (or an affiliate) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of, or claims against, you, your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. You also acknowledge that the Commitment Party and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Party has advised or is advising you on other matters, (b) the Commitment Party, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Party, and you waive, to the fullest extent permitted by law, any claims you may have against the Commitment Party for breach of duty or alleged breach of any fiduciary duty on the part of the Commitment Party and agree that that Commitment Party will not have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including equity holders, employees or creditors, in each case, in respect of any of the transactions contemplated by this Commitment Letter, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, and you are responsible for making your own independent judgment with respect to the transactions contemplated by this Commitment Letter and the process leading thereto, (d) you have been advised that the Commitment Party and its affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that the Commitment Party and its affiliates have no obligation to disclose such interests and transactions to you and your affiliates, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) the Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, or any of your affiliates and (g) neither the Commitment Party nor any of its affiliates has any obligation or duty (including any implied duty) to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by the Commitment Party, you or any such affiliate.

You acknowledge for United States securities law purposes that the DIP Lender may establish an information blocking device or "<u>Information Barrier</u>" between, on the one hand, its directors, officers, employees, agents, affiliates (as such term is used in Rule 12b-2 under the Exchange Act) and, on the other hand, its affiliates and its and their attorneys, accountants, financial or other advisors, members, equity holders, partners, directors and employees who, pursuant to such Information Barrier policy, are permitted

4

to receive confidential information or otherwise participate in discussions concerning the transactions contemplated hereby, and those of the DIP Lender's, and its affiliates', other employees.

Additionally, you acknowledge and agree that the Commitment Party is not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated by this Commitment Letter, and the Commitment Party shall not have any responsibility or liability to you with respect thereto. Any review by the Commitment Party of the transactions contemplated by this Commitment Letter or other matters relating thereto will be performed solely for the benefit of the Commitment Party, and shall not be on behalf of you or any of your affiliates.

You acknowledge that the Commitment Party may be (or may be affiliated with) a full service financial firm and as such from time to time may, and its affiliates may, (a) effect transactions for its own or its affiliates' account or the account of customers, and hold long positions in debt or equity securities, loans or other securities and financial instruments of companies that may be the subject of the transactions contemplated hereunder or with which you or your subsidiaries may have commercial or other relationships or (b) provide debt financing, equity capital, investment banking, financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling to other companies or similar services in respect of which you or your subsidiaries may have conflicting interests. The Debtors hereby waive and release, to the fullest extent permitted by law, any claims each of them has or will or may have hereunder with respect to any conflict of interest arising from such transactions, activities, investments or holdings, or arising from the failure of the Commitment Party or any of its affiliates or customers to bring such transactions, activities, investments or holdings to their attention.

8.    **Confidentiality**

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to you and your respective officers, directors, employees, members, partners, stockholders, attorneys, accountants, independent auditors, professionals, experts, agents and advisors (collectively, "Representatives"), in each case on a confidential and need-to-know basis, (b) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law or regulation or compulsory legal process (in which case, you agree to inform the Commitment Party promptly thereof prior to such disclosure to the extent timely practicable and not prohibited by law, rule, regulation or other legal process), (c) upon the request or demand of any regulatory authority having jurisdiction over you, (d) upon notice to the Commitment Party, in connection with any public filing requirement you are legally obligated to satisfy, in form and substance acceptable to the Commitment Party, (e) in a Bankruptcy Court filing in order to implement the transactions contemplated hereunder, (f) to the United States Trustee, the official committee of unsecured creditors or any other statutory committee formed in the Chapter 11 Cases and each of their legal counsel, independent auditors, professionals and other experts or agents who are informed of the confidential nature of such information and agree to be bound by confidentiality and use restrictions substantially similar to those set forth in this Section 8, (g) to the extent any such information becomes publicly available other than by reason of disclosure by you, your affiliates or your or their representatives in breach of this Commitment Letter, and (h) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to Edgio, in each case, who agree to be bound by confidentiality and use restrictions.

The Commitment Party shall use all nonpublic information provided to it by you or on behalf of you by any of your representatives hereunder solely in connection with the DIP Facility or the restructuring transactions described herein  and subject to the Chapter 11 Cases and shall treat confidentially all such

information; *provided* that nothing herein shall prevent the Commitment Party from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case the Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent timely practicable and not prohibited by law, rule, regulation or other legal process), (ii) upon the request or demand of any regulatory authority having jurisdiction over the Commitment Party or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure by the Commitment Party, its affiliates or its Representatives in breach of this Commitment Letter, (iv) to the Commitment Party's affiliates, and to its and such affiliates' respective Representatives who need to know such information in connection with the transactions contemplated by the Commitment Letter and are informed of the confidential nature of such information and instructed to keep such information of this type confidential, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by the Commitment Party from a third party that is not, to the Commitment Party's actual knowledge, subject to confidentiality obligations owed to you, (vii) to the extent that such information is independently developed by the Commitment Party or its affiliates or (viii) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to Edgio, in each case, who agree to be bound by confidentiality and use restrictions substantially similar to those set forth in this Section 8.  The provisions of this paragraph shall automatically terminate and be superseded by the confidentiality provisions to the extent covered in the definitive documentation for the DIP Facility upon the funding thereunder and effectiveness thereof, and the provisions of this Section 8 shall in any event automatically terminate one year following the date of this Commitment Letter.  Notwithstanding any other provision herein, this Commitment Letter does not limit the disclosure of any tax strategies.

9.  **Miscellaneous**

This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the Indemnified Persons, and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons to the extent expressly set forth herein.  The Commitment Party may assign its DIP Commitment (in whole or in part) to (i) its affiliates and affiliated investment funds, (ii) any investment funds, accounts, vehicles, or other entities that are managed, advised or sub-advised by the Commitment Party, its affiliates or the same person as the Commitment Party or its affiliates, and (iii) any other person you agree to in writing in your sole discretion. The Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby, and to satisfy its obligations hereunder through, or assign its rights and obligations hereunder to, one or more of its affiliates, separate funds and/or accounts within their control or investment funds under its affiliates' management and/or advisement (collectively, "DIP Lender Affiliates"); and to allocate, in whole or in part, to its affiliates certain fees payable to the Commitment Party in such manner as the Commitment Party and its affiliates may agree in their sole discretion; *provided* that the Commitment Party will be liable for the actions or inactions of any such person whose services are so employed, and no delegation or assignment to a DIP Lender Affiliate shall relieve the Commitment Party from its obligations hereunder to the extent that any DIP Lender Affiliate fails to satisfy the DIP Commitments hereunder at the time required.

This DIP Commitment Letter and Term Sheet may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This DIP Commitment Letter and Term Sheet set forth the entire

understanding of the parties with respect to the DIP Facility, and replace and supersede all prior agreements and understandings (written or oral) related to the subject matter hereof. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and the Bankruptcy Code, to the extent applicable.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York (or if such court does not have jurisdiction, any state court or Federal court located in the Borough of Manhattan), any appellate court from any thereof, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of the Chapter 11 Cases may be heard and determined in the Bankruptcy Court and any other Federal court having jurisdiction over the Chapter 11 Cases from time to time, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. Notwithstanding the foregoing consent to jurisdiction in United States District Court for the Southern District of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Commitment Letter or the performance of services hereunder or thereunder.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Debtors, which information includes names, addresses, tax identification numbers and other information that will allow the Commitment Party to identify the Debtors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and any lender under this DIP Commitment Letter and Term Sheet.

The indemnification, expense reimbursement, jurisdiction, confidentiality, governing law, sharing of information, no agency or fiduciary duty, waiver of jury trial, service of process and venue provisions contained herein shall remain in full force and effect regardless of whether the DIP Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the DIP Commitments.

The parties hereto hereby agree that this DIP Commitment Letter and Term Sheet is a legal, valid, binding and enforceable agreement with respect to the subject matter herein, except as such enforceability may be limited by Debtor Relief Laws (as defined in the Prepetition Secured Debt Facilities) and by general principles of equity; it being acknowledged and agreed that the funding of the DIP Facility is subject solely to the conditions specified in Section 5 herein.

To the extent the DIP Lender requires the DIP Facility to be evidenced by DIP Documents, each of the Commitment Party and you will use their commercially reasonable efforts to promptly prepare, negotiate and finalize the DIP Documents as contemplated by the DIP Term Sheet.

If the DIP Commitment Letter and Term Sheet correctly sets forth our agreement, please indicate your acceptance of the terms of the DIP Commitment Letter and Term Sheet by returning to us executed

counterparts of the DIP Commitment Letter and Term Sheet no later than 11:59 p.m. New York City time, on September 11, 2024. This offer will automatically expire if we have not received such executed counterparts in accordance with the preceding sentence.  In addition, the commitment and agreements of the Commitment Party hereunder shall expire (the date of such expiration, the "Termination Date") automatically if the Bankruptcy Court has not entered the Interim DIP Order within six (6) calendar days after the Petition Date.

[Remainder of this page intentionally left blank]

Very truly yours,

**LYNROCK LAKE MASTER FUND LP, as the Commitment Party**

By: Lynrock Lake Partners LLC, its general partner

By: _____

Name: Cynthia Paul

Title: Member

[Signature Page to DIP Commitment Letter]

Accepted and agreed to as of the date first above written:

**EDGIO, INC.**

By: _____
Name: Richard Diegnan
Title:   Chief Legal Officer


**EDGIO INTERNATIONAL, INC.**
**EDGECAST INC.**
**LIMELIGHT ACQUISITIONCO, INC.**
**LIMELIGHT MIDCO, INC.**
**LIMELIGHT NETWORKS VPS, INC.**
**MOJO MERGER SUB, LLC**

By: _____
Name: Richard Diegnan
Title:   Authorized Officer

## **EXHIBIT A**

DIP TERM SHEET

See attached.

CONFIDENTIAL
SUBJECT TO FRE 408

**EDGIO, INC.**
**Senior Secured Superpriority**
**Debtor in Possession Credit Facility Term Sheet**

This Senior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**DIP Term Sheet**") describes the principal terms and conditions of the senior secured superpriority debtor in possession term loan facility (the "**DIP Facility**") to be provided by the DIP Lender (as defined below) to Edgio, Inc., a Delaware corporation ("**Edgio**" or the "**Borrower**"), in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on September 9, 2024 (the "**Petition Date**"). This DIP Term Sheet and the DIP Commitment Letter to which this DIP Term Sheet is attached (the "**DIP Commitment Letter**"), upon the execution hereof and thereof, shall constitute legal, valid and binding obligations of each party hereto, and shall be enforceable against each party hereto and thereto in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws (as defined in the Prepetition Priority Term Loan Credit Agreement (as defined below)) and by general principles of equity. This DIP Term Sheet shall be superseded by the DIP Documents (as defined below), if any, containing more detailed terms, conditions, covenants, representations and warranties and other provisions.

This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities.

| | |
|---|---|
| **BORROWER:** | Edgio, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code. |
| **GUARANTORS:** | Each subsidiary of the Borrower that guaranteed, purported to guarantee, or was required to guarantee, any Prepetition Secured Debt Facility (as defined below). |
| **DIP LENDER:** | Lynrock Lake Master Fund LP (the "**DIP Lender**"), in its capacity as holder of the Interim New Money DIP Loans, the Rolled DIP Loans, and the Final New Money DIP Loans (each as defined below). |
| **DIP FACILITY:** | The DIP Lender agrees to make funded senior secured superpriority debtor in possession loans to the Borrower in a total aggregate principal amount not to exceed at any time outstanding aggregate principal commitments of $15,625,000 (the "**DIP Commitments**") on the terms and conditions herein and as set forth on <u>Annex A</u> hereto. The DIP Facility shall also include, as further set forth below, a "roll-up" of (i) all Prepetition Priority Term Loan Obligations and (ii) all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement. |
| **AVAILABILITY PERIOD:** | The DIP Facility shall be available from the Interim Closing Date (as defined below) to the Maturity Date (as defined below), unless terminated earlier pursuant to the terms hereof or the DIP Orders (as |

defined below). The Borrower may request draws under the DIP Facility on the dates set forth below by delivering a notice of borrowing to the DIP Lender (the "**Notice of Borrowing**"), duly executed by an authorized officer of the Borrower:

(i)    <u>Interim DIP Loans</u>: On the Interim Closing Date, the DIP Lender shall make available DIP Loans (as defined below) in an aggregate principal amount no less than $45,955,067 consisting of (a) a new money term loan in the aggregate principal amount not to exceed $11,718,750 (which, after accounting for the Original Issue Discount (as defined and described below), will provide $9,375,000 in net funding to the Debtors) (the "**Interim New Money DIP Loan**"), which shall be funded as a single borrowing on the date upon which each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to the Interim DIP Loans" have been satisfied or waived (in writing) by the DIP Lender and (b) a roll up of (1) all outstanding Prepetition Priority Term Loan Obligations and (2) $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement, in each case, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Interim Rolled DIP Loans**", and together with the Interim New Money DIP Loan, the "**Interim DIP Loans**"), which shall be deemed to occur immediately upon funding of the Interim New Money DIP Loan; and

(ii)    <u>Final DIP Loan</u>: On the Final Closing Date (as defined below), the DIP Lender shall make available DIP Loans in an aggregate principal amount no less than $73,352,483 consisting of (a) a new money term loan in an aggregate principal amount not to exceed $3,906,250 (which, after accounting for the Original Issue Discount, will provide $3,125,000 in net funding to the Debtors) (the "**Final New Money DIP Loan**," together with the Interim New Money DIP Loans, the "**New Money DIP Loans**"), which shall be funded as a single borrowing strictly in accordance with the then-in-effect Approved DIP Budget (as defined below) (after giving effect to the Permitted Variances (as defined below)), subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent described under the section of this DIP Term Sheet entitled "Conditions Precedent to Final DIP Loan" (or, in the event the DIP Documents have been executed and delivered to the DIP Lender in advance of the Final DIP Loan draw, subject to the satisfaction or waiver (in writing) by the DIP Lender of each of the conditions precedent to funding of the Final DIP Loan set forth in the applicable DIP Documents) and (b) a roll up of all remaining outstanding principal amounts and all accrued and unpaid interest (including interest attributable to principal under the Prepetition Junior Term

<table>
<tr><td></td><td>Loan Credit Agreement that constituted the Interim Rolled DIP Loans) under the Prepetition Junior Term Loan Credit Agreement, on a cashless, dollar-for-dollar basis, into DIP Loans (the "**Final Rolled DIP Loans**", and together with the Final New Money DIP Loan, the "**Final DIP Loan**" and, together with the Interim DIP Loans, the "**DIP Loans**"), which shall be deemed to occur immediately upon entry of the Final DIP Order.<br><br>The DIP Lender shall fund the New Money DIP Loans by wire transfer of immediately available funds no later than 5:00 P.M. (Eastern Time), one (1) Business Day after receipt of a Notice of Borrowing to the account of the Borrower. Upon the funding of the Interim New Money DIP Loan to the Borrower, all Prepetition Priority Term Loan Obligations and $25,000,000 of the outstanding principal amount under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Interim Rolled DIP Loans. Upon the entry of the Final DIP Order, all outstanding principal amounts and all accrued and unpaid interest under the Prepetition Junior Term Loan Credit Agreement shall be immediately converted into Final Rolled DIP Loans.</td></tr>
<tr><td>**CLOSING DATES:**</td><td>"**Interim Closing Date**" means the date on which each of the "Conditions Precedent to the Interim DIP Loans" as set forth below (including, without limitation, entry of an order (in form and substance acceptable to the DIP Lender) approving on an interim basis, the DIP Facility, the DIP Commitment Letter and the DIP Term Sheet (the "**Interim DIP Order**")) shall have been satisfied or waived (in writing) by the DIP Lender in accordance with this DIP Term Sheet.<br><br>"**Final Closing Date**" means the date on which each of the conditions precedent to the Final DIP Loan, as set forth in this DIP Term Sheet (or, to the extent the DIP Documents have been executed and delivered to the DIP Lender, the DIP Credit Agreement) (including, without limitation entry of an order (in form and substance acceptable to the DIP Lender) approving on a final basis, the DIP Facility, the DIP Commitment Letter, the DIP Term Sheet and, as applicable, the DIP Documents, (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**")) shall have been satisfied or waived (in writing) by the DIP Lender in accordance with this DIP Term Sheet and any applicable DIP Documents (each of the Interim Closing Date and the Final Closing Date, a "**Closing Date**").<br><br>As used herein, "**Business Day**" shall mean, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City.</td></tr>
<tr><td>**DIP DOCUMENTS:**</td><td>As of the Interim Closing Date, the DIP Commitment Letter and this DIP Term Sheet shall be the definitive documentation for the DIP</td></tr>
</table>

| | |
|---|---|
| | Facility. Subsequently, the DIP Lender (in its sole discretion) may require that the DIP Facility be documented by a new senior secured superpriority debtor in possession term loan credit agreement (the "**DIP Credit Agreement**"), and other definitive financing documentation, including, without limitation, guarantees and security documents, such documentation shall be satisfactory in form and substance to the DIP Lender (the "**DIP Documents**"), which shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the Borrower and the DIP Lender shall agree; *provided* that (i) the DIP Documents shall be substantially based in form on the Prepetition Priority Term Loan Credit Agreement and the other "Loan Documents" (as defined in the Prepetition Priority Term Loan Credit Agreement) (modified as necessary to reflect the commencement of the Chapter 11 Cases), (ii) the provisions of the DIP Credit Agreement shall, upon execution, supersede the provisions of the DIP Commitment Letter and this DIP Term Sheet, in each case, to the extent the DIP Credit Agreement has comparable provisions with comparable coverage, (iii) unless and until the DIP Documents are executed, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final Order, as applicable, shall govern the DIP Facility; (iv) unless and until long-form DIP Documents are executed, except as otherwise expressly set forth in the applicable DIP Orders, any provisions not addressed in this DIP Term Sheet shall be governed in a manner consistent with the corresponding provisions of the Prepetition Priority Term Loan Credit Documents (as defined below), as applicable, and (v) the provisions of the DIP Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, the Final DIP Order. |
| **CASH COLLATERAL:** | Subject to the terms and conditions of the applicable DIP Orders, the DIP Lender shall consent to the use of its "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the applicable DIP Orders, the DIP Commitment Letter, the DIP Term Sheet and, upon their execution, the DIP Documents. |
| **USE OF PROCEEDS:** | Subject to Bankruptcy Court approval, the Debtors shall use the proceeds of the DIP Facility and Cash Collateral strictly in accordance with this DIP Term Sheet, the DIP Documents, the DIP Orders and the Approved DIP Budget (after giving effect to the Permitted Variances), for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases, (c) costs and expenses related to the DIP Facility and (d) any other purposes specifically set forth in the Approved DIP Budget. <br><br> No Cash Collateral or proceeds of the DIP Facility may be used by the Debtors or any other entity to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims |

| | |
|---|---|
| | granted under or in connection with, the DIP Facility; *provided* that any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Creditors' Committee**") may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action in respect of the Rolled DIP Loans (the "**Investigation Budget**").<br><br>No cash collateral or proceeds of the DIP Facility in excess of the amount in any Approved DIP Budget may be distributed to, or used for the benefit of, any non-Debtor Affiliates or subsidiaries of the Debtors, or applied toward (directly or indirectly) their administration without the prior written approval of the DIP Lender. |
| **APPROVED DIP BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | The Debtors shall prepare and deliver to the DIP Lender and its advisors (a) a weekly updated 13-week rolling operating budget and cash flow forecast, in form consistent with the forecast delivered under the Prepetition Priority Term Loan Credit Agreement, of the Debtors for the period covered thereby (the "**Cash Flow Forecast**"), (b) a cash balance report as of the immediately preceding Friday, (c) accounts payable and accounts receivable balance reports as of the immediately preceding Friday, (d) accounts payable and accounts receivable aging reports as of the immediately preceding Friday, and (e) a revenue and Consolidated EBITDA forecast for the remainder of Fiscal Year 2024 (collectively, the "**Approved DIP Budget**"), which shall be approved by the DIP Lender in its sole discretion.<br><br>Commencing at 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week that is four weeks following the week in which the Petition Date occurs, and continuing at 5:30 P.M. (Eastern Time) on the Tuesday of every fourth week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), or at any other interim time as reasonably requested by the Borrower, the Debtors shall deliver to the DIP Lender and its advisors an updated and supplemented forecast (in the case of the Cash Flow Forecast, for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered) and reports of the information contained in the previous Approved DIP Budget (a "**Proposed Budget**"), and, if such Proposed Budget is in form and substance acceptable to the DIP Lender, in its sole discretion, it shall become the "Approved DIP Budget" for purposes of this DIP Term Sheet, the DIP Documents and the DIP Orders.   Until any Proposed Budget, amendment, supplement or modification has been approved by the DIP Lender, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.<br><br>By no later than 5:30 P.M. (Eastern Time) on the Tuesday of the calendar week following the week in which the Petition Date occurs, and no later than 5:30 P.M. (Eastern Time) on each Tuesday of each calendar week thereafter (or, in each case, if any Tuesday is not a Business Day, the next Business Day thereafter), the Debtors shall |

deliver to the DIP Lender and its advisors a variance report (each, a "**Weekly Variance Report**"), setting forth, in reasonable detail, (a) in the case of the Cash Flow Forecast, the "receipts" and "disbursements" of the Debtors on a weekly, rolling four-week basis and cumulative basis (relative to the initial Approved DIP Budget) and any variances between the actual amounts and those set forth in the initial Approved DIP Budget and the then-in-effect Approved DIP Budget, and including detail by line-item as to whether a given material (greater than 5% or $20,000) variance is permanent or timing-based and commentary in respect thereof and (b) in the case of other reports, variances comparing such reports with (i) the applicable reports in the most recently delivered Approved DIP Budget and (ii) the initial Approved DIP Budget. Each Tuesday (or, if any Tuesday is not a Business Day, the next Business Day thereafter) of each calendar week, beginning with the calendar week that is one week following the week in which the Petition Date occurs, shall be referred to as a "**Cash Flow Variance Testing Date**."

The Debtors shall comply with the following (collectively, the "**Permitted Variances**"):

As of any Cash Flow Variance Testing Date, the Debtors shall not allow: (i) the aggregate receipts of the Debtors to be less than 90% (on a cumulative basis taking into account the variance for any prior Testing Period (as defined below) during the then-in-effect Approved DIP Budget period) of the estimated receipts for such items in the then-in-effect Approved DIP Budget, and (ii) the aggregate disbursements (excluding professional fees and expenses incurred by the DIP Professionals (as defined in the Interim DIP Order) and/or professionals retained by the Debtors, but including professional fees and expenses incurred by professionals retained by the Creditors' Committee) to exceed 110% (on a cumulative basis taking into account the variance for any prior Testing Period during the then-in-effect Approved DIP Budget period) of the estimated disbursements provided in the then-in-effect Approved DIP Budget. The two-week period ending on the Friday prior to each Cash Flow Variance Testing Date shall be referred to as a "**Testing Period**".

Additional variances, if any, from the Approved DIP Budget, and any proposed amendment, supplement or modification to the Approved DIP Budget, shall be subject to the written approval of the DIP Lender, in its sole discretion. For the avoidance of doubt, any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Lender in writing).

| | |
|---|---|
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lender under or in connection with this DIP Term Sheet, the DIP Documents and/or the DIP Orders (collectively, the "**DIP Obligations**"), in all cases subject to (a) the "Carve Out" (as defined |

below) and (b) the Prepetition Permitted Liens (as defined below), shall be pursuant to:

(i) section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status against each of the Debtors (the "**DIP Superpriority Claims**") which DIP Superpriority Claims shall have priority over any and all administrative expenses and claims of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code;

(ii) section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority senior security interest in and lien upon all DIP Collateral (as defined below) that, as of the Petition Date, is unencumbered and not subject to any liens;

(iii) section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected junior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is subject to a Prepetition Permitted Lien, which security interest and lien shall be junior and subordinate only to the Carve-Out and any such Prepetition Permitted Lien; and

(iv) section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority priming security interest in and lien upon all DIP Collateral that is subject to a Prepetition Secured Debt Lien (as defined below), which security interest and lien shall be junior and subordinate only to the Carve-Out and any Prepetition Permitted Liens (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**"); *provided*, that the DIP Liens shall not attach to any claims or causes of avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (collectively, "**Avoidance Actions**"); *provided, further*, that, subject to entry of the Final DIP Order, the DIP Liens shall attach to all proceeds of Avoidance Actions ("**Avoidance Action Proceeds**").

The DIP Liens shall not be made *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject, in each case, only to the Carve Out and Prepetition Permitted Liens.

| | |
|---|---|
| | As used herein, "**Prepetition Permitted Liens**" shall mean certain liens senior by operation of law and otherwise permitted by the Prepetition Priority Term Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Priority Term Loan Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code). |
| **PREPETITION PRIORITY TERM LOAN FACILITY:** | As of the Petition Date, the Debtors owe no less than $9,236,316.75 in principal amount of senior term loans, including accrued and unpaid interest thereon, *plus* premiums, costs, fees, expenses and other obligations (the "**Prepetition Priority Term Loan Obligations**") under that certain Priority Credit Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Priority Term Loan Credit Agreement**" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Priority Term Loan Credit Documents**"), by and among the Borrower and Lynrock, as lender, (the "**Prepetition Priority Term Loan Lender**"). The Prepetition Priority Term Loan Obligations are secured by a continuing security interest in and lien on (the "**Prepetition Priority Term Loan Lien**") the "Collateral" (as defined in the Prepetition Priority Term Loan Credit Agreement) (the "**Prepetition Priority Term Loan Collateral**"), which are senior to all of Prepetition Secured Debt Liens with respect to the Collateral, subject to the terms of the Priority Lien Intercreditor Agreement.[1] |
| **PREPETITION JUNIOR TERM LOAN FACILITY:** | As of the Petition Date, the Debtors owe no less than $94,446,233.40 in principal amount of junior term loans, including accrued and unpaid interest thereon, *plus* premiums (including any Prepayment Premium or Make-Whole Amount (each as defined in the Prepetition Junior Term Loan Credit Agreement)), costs, fees, expenses and other obligations (the "**Prepetition Junior Term Loan Obligations**") under that certain Credit Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Term Loan Credit Agreement**" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Junior Term Loan Credit Documents**"), by and among the Borrower and Lynrock, as lender, (the "**Prepetition Junior Term Loan Lender**"). |

---

[1] The "**Priority Lien Intercreditor Agreement**" means that certain Priority Lien Intercreditor Agreement, dated as of August 23, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date), by and among the Borrower, certain subsidiaries of the Borrower party thereto, the Prepetition Priority Term Loan Lender, the Prepetition Junior Notes Trustee and the Prepetition Junior Term Loan Lender.

| | |
|---|---|
| | The Prepetition Junior Term Loan Obligations are secured by a continuing security interest in and lien on (the "**Prepetition Junior Term Loan Lien**") the "Collateral" (as defined in the Prepetition Junior Term Loan Credit Agreement) (the "**Prepetition Junior Term Loan Collateral**"), which are (i) junior and subordinate to the Prepetition Priority Term Loan Lien with respect to the Collateral and (ii) *pari passu* with the Prepetition Junior Notes Lien with respect to the Collateral, in each case, subject to the terms of the Priority Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement.[2] |
| **PREPETITION JUNIOR NOTES** | As of the Petition Date, the Debtors owe no less than $140,971,311.36 in principal amount of convertible junior secured notes, including accrued and unpaid interest thereon, *plus* all other premiums (including any Applicable Premium (as defined in the Prepetition Junior Notes Indenture)), costs, fees, expenses and other obligations (the "**Prepetition Junior Notes Obligations**" and, together with the Prepetition Priority Term Loan Obligations and Prepetition Junior Term Loan Obligations, the "**Prepetition Secured Obligations**") under that certain Indenture, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Notes Indenture**," together with the Prepetition Priority Term Loan Credit Agreement and the Prepetition Junior Term Loan Credit Agreement, the "**Prepetition Secured Debt Facilities**," and, the Prepetition Junior Notes Indenture, together with all related security agreements, collateral agreements, pledge agreements, control agreements, guarantees and other documents, the "**Prepetition Junior Term Loan Credit Documents**"), by and among the Borrower and U.S. Bank Trust Company, National Association, as trustee and collateral agent (in such capacities, the "**Prepetition Junior Notes Agent**," together with Lynrock, as noteholder under the Prepetition Junior Notes Indenture (the "**Prepetition Junior Noteholder**"), the "**Prepetition Junior Notes Parties**" and, the Prepetition Junior Notes Parties, together with the Prepetition Priority Term Loan Lender and the Prepetition Junior Term Loan Lender, the "**Prepetition Secured Parties**"). The Prepetition Junior Notes Obligations are secured by a continuing security interest in and lien on (the "**Prepetition Junior Notes Lien**" and, together with the Prepetition Priority Term Loan Lien and the Prepetition Junior Term Loan Lien, the "**Prepetition Secured Debt Liens**") the "Collateral" (as defined in the Prepetition Junior Notes Indenture) (the "**Prepetition Junior Notes Collateral**" and, together with the Prepetition Priority Term Loan Collateral and the Prepetition Junior Term Loan Collateral, the "**Prepetition Collateral**"), which are (i) junior and subordinate to the Prepetition |

---

[2] The "**Junior Lien Intercreditor Agreement**" means that certain First Lien Pari Passu Intercreditor Agreement, dated as of November 14, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date), by and among the Borrower, certain subsidiaries of the Borrower party thereto, the Prepetition Junior Notes Trustee and the Prepetition Junior Term Loan Lender.

| | |
|---|---|
| | Priority Term Loan Lien with respect to the Collateral and (ii) *pari passu* with the Prepetition Junior Term Loan Lien with respect to the Collateral, in each case, subject to the terms of the Priority Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement. |
| **ADEQUATE PROTECTION FOR PREPETITION SECURED PARTIES** | As adequate protection for the diminution in value of their interests in the Prepetition Collateral resulting from (a) subordination of their respective interests in the Prepetition Collateral, (b) the use of cash collateral during the Chapter 11 Cases, (c) the use, sale, lease or other disposition of any Prepetition Collateral, (d) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code and/or (e) any other reason for which adequate protection may be granted under the Bankruptcy Code (the "**Diminution in Value**"), the Prepetition Junior Term Loan Lender and the Prepetition Junior Notes Parties shall, to the extent of any Diminution in Value, during the pendency of the Chapter 11 Cases: |
| | (i) be granted (a) additional and replacement liens on, except as set forth herein, all property of the Debtors' estates that constitutes DIP Collateral (the "**Adequate Protection Liens**"), which shall be junior and subordinate only to the Carve-Out, the Prepetition Permitted Liens and the DIP Liens, and (b) superpriority administrative expense claims against each of the Debtors pursuant to section 507(b) of the Bankruptcy Code (the "**Adequate Protection Claims**"), which claims shall be junior and subordinate only to the Carve Out and the DIP Superpriority Claims; |
| | (ii) receive payments in cash on a current basis of all reasonable and documented fees, costs and expenses of professionals retained by the Prepetition Junior Term Loan Lender, the Prepetition Junior Noteholder and the Prepetition Junior Notes Agent, which professionals shall include, but may not be limited to, (a) Akin Gump Strauss Hauer & Feld LLP, as lead restructuring counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (b) Pashman Stein Walder Hayden P.C., as Delaware local counsel to the Prepetition Junior Term Loan Lender and Prepetition Junior Noteholder, (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the Prepetition Secured Parties in lieu of the professionals set forth in clauses (a) or (b) (the "**Adequate Protection Fees**"); and |
| | (iii) accrue interest on all outstanding Prepetition Junior Term Loan Obligations and Prepetition Junior Notes Obligations that have not been exchanged into Rolled DIP Loans. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever |

located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including (i) all Prepetition Collateral (including Cash Collateral); (ii) all intercompany claims; (iii) all money, cash and cash equivalents; (iv) all funds in any deposit accounts (excluding cash deposits that secure any outstanding letters of credit), securities accounts, commodities accounts, or other accounts (together with and all money, cash and cash equivalents, instruments and other property deposited therein or credited thereto from time to time); (v) all accounts and other receivables (including those generated by intercompany transactions); (vi) all contracts and contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, furniture, machinery, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds; (xii) all franchise rights; (xiii) all patents, tradenames, trademarks, copyrights, licenses and all other intellectual property; (xiv) all general intangibles, tax or other refunds or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights; (xix) all commercial tort claims; (xx) subject to the entry of the Final DIP Order, all Avoidance Action Proceeds (but not Avoidance Actions themselves); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials, and records); (xxii) all proceeds, whether by settlement, judgment or otherwise, arising from or relating to any litigation, arbitration, administrative proceeding or other legal action (other than Avoidance Actions) in which the Borrower or any of the Guarantors is or may become a party, including, but not limited to, all monetary awards, settlements, compensation, damages, penalties or any other form of payment or relief that the Borrower or any Guarantor receives or is entitled to receive as a result of such legal actions, including, but not limited to, any proceeds or other payments related to claims asserted against any legal professionals (collectively, "**Litigation Proceeds**"); (xxiii) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiv) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided* that the DIP Collateral shall not include any "Excluded Assets" described in the definition thereof in the Prepetition Priority Term Loan Documents. All of the DIP Liens described herein with respect to the DIP Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing

| | |
|---|---|
| | statements or other agreements.  Notwithstanding the foregoing, the Debtors shall take any and all actions that may be necessary or desirable, or that the DIP Lender may reasonably request, to maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **CARVE-OUT** | As defined and set forth in the DIP Orders. |
| **DIP FEES:** | The Debtors shall pay to the DIP Lender a fee equal to 5.0% of the funded amount of the Interim New Money DIP Loan (the "**Interim Exit Premium**"), earned upon the Interim Closing Date and 5.0% of the funded amount of the Final DIP Loan (the "**Final Exit Premium**" and together with the Interim Exit Premium, the "**Exit Premium**" and the Exit Premium, together with the Original Issue Discount, the "**DIP Fees**"), earned upon the Final Closing Date, and, in each case, payable in cash on the Maturity Date (as defined below) (or upon the date of any mandatory prepayment of the applicable New Money DIP Loans), to the extent earlier than the Maturity Date, whether as a result of acceleration or otherwise); *provided*, that payment of the Exit Premium shall be waived if the DIP Lender or an affiliate of the DIP Lender acquires substantially all equity or assets of the Debtors, whether through a sale process or a chapter 11 plan. |
| **ORIGINAL ISSUE DISCOUNT:** | The New Money DIP Loans shall be made at a discount of 20% (the "**Original Issue Discount**") of the DIP Commitments. Notwithstanding the foregoing, the Debtors shall repay to the DIP Lender the full principal amount of the New Money DIP Loans borrowed by the Borrower in accordance with the terms of this DIP Term Sheet and the DIP Documents, without setoff, deduction, offset or counterclaim, it being understood and agreed that the Original Issue Discount with respect to each New Money DIP Loan shall be deemed fully-earned on the Closing Date in respect of such New Money DIP Loan, shall be due and payable upon the funding of such New Money DIP Loan and shall be non-refundable when paid.  The parties agree that the Original Issue Discount shall be treated for U.S. tax purposes as adjustments to purchase price and as original issue discount and all parties agree to report such amounts accordingly.

The Original Issue Discount shall be net-funded from the proceeds of any DIP Loans borrowed concurrently with the payment thereof. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate per annum equal to 19.5%.

Interest with respect to any DIP Loan shall be paid as follows (i)(a) 2.5% *per annum* shall be paid in cash and (b) 17.0% *per annum* shall be payable in kind and not in cash with such interest amount being automatically added to, and made part of, the outstanding principal |

| | |
|---|---|
| | amount of DIP Leans, in each case on the last Business Day of each month and (ii) all accrued and unpaid interest shall be paid in cash on the Maturity Date. |
| | All interest and fees under this DIP Term Sheet or the DIP Documents shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is repaid unless otherwise provided in a chapter 11 plan or order of the Bankruptcy Court approving the sale (or sales) of all or substantially all of the Debtors' assets, in each case, that is in form and substance acceptable to the DIP Lender, in its sole discretion. |
| **DEFAULT RATE:** | Automatically following the occurrence and during the continuance of an Event of Default (as defined below) (after giving effect to any applicable grace periods), all principal, interest and all other amounts in respect of the DIP Obligations shall bear interest at a rate equal to 6.00% *per annum* in excess of the interest rate set forth under "Interest Rate" above and such default interest shall be payable solely in cash. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
| | (i)  the date that is 6 months after the Petition Date (the "**Interim Maturity Date**"); *provided*, that the Interim Maturity Date may be extended with the prior written consent of the DIP Lender, in its sole discretion, for up to two (2) additional 30-day periods as necessary to obtain receipt of all regulatory approvals required for consummation of a sale of assets; |
| | (ii)  the date of consummation of any sale or disposition of (a) all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures) or (b) one or more Segments (as defined in the Bidding Procedures) to the extent that, as of the date such Segment(s) is/are sold, no other Qualified Bids (as defined in the Bidding Procedures) for a substantial portion of the Debtors' remaining Assets have been submitted to the Debtors (the "**Sale Maturity Date**"); *provided*, that the Sale Maturity Date may be extended by the DIP Lender, in its sole discretion; |
| | (iii)  the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and |

| | |
|---|---|
| | (iv) the date of acceleration of all or any portion of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an Event of Default (as defined below). |
| **OPTIONAL PREPAYMENTS:** | The DIP Loans may be permanently prepaid by the Borrower at any time, subject to the payment of the Exit Premium; *provided*, that the Borrower shall not be permitted to prepay any DIP Loans to the extent that, following such optional prepayment, less than $6,000,000 in aggregate principal amount of DIP Loans would remain outstanding. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | Subject to the Carve-Out, the Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Premium) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows:<br><br>(i) 100% of the net cash proceeds of any sale or disposition of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, subject to the prior deposit of proceeds into escrow solely to fund (i) the KEIP Payment, (ii) the Expense Reimbursement (as defined in the Bidding Procedures) and (iii) the payment of any applicable fees payable to TD Cowen pursuant to that certain engagement letter among them and the Borrower dated February 27, 2024, as amended on September 8, 2024 (the "**Cowen Engagement Letter**" and such payments described in clauses (i) through this clause (iii), the "**Mandatory Pre-Prepayments**"), in each case to be applied solely to such uses only when due and only in the amounts required to be paid;<br><br>(ii) 100% of the net cash proceeds of any other sale or other disposition by the Borrower or the Guarantors or their subsidiaries of any assets, subject to exceptions consistent with the Prepetition Priority Term Loan Credit Agreement, and subject to the prior deposit of proceeds into escrow solely to fund the Mandatory Pre-Prepayments to be applied solely to the Mandatory Pre-Prepayments only when due and only in the amounts required to be paid;<br><br>(iii) 100% of the net cash proceeds of extraordinary receipts by the Borrower or the Guarantors or their subsidiaries (including any Litigation Proceeds, tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions);<br><br>(iv) 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by the Borrower or the Guarantors or their subsidiaries not expressly permitted |

to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below; and

(v)     100% of the net cash proceeds received from the sale or issuance of equity securities by the Borrower or the Guarantors or their subsidiaries.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the Borrower or any Guarantor will be applied in the following order of priority (subject to other intercreditor arrangements to be agreed, any other payments required pursuant to the DIP Orders and solely in the case of clause (i) through (ii) above of this section titled "Mandatory Prepayments", the prior deposit of proceeds into escrow solely to fund the Mandatory Pre-Prepayments to be applied solely to the Mandatory Pre-Prepayments only when due and only in the amounts required to be paid):

(a)     first, to pay all documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, all reasonable and documented fees and expenses of all DIP Professionals (as defined in the Interim DIP Order) in accordance with the procedures set forth in the Interim DIP Order);

(b)     second, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lender in respect of the New Money DIP Loans;

(c)     third, to repay any principal amounts outstanding in respect of the New Money DIP Loans;

(d)     fourth, to pay the Exit Premium to the DIP Lender in connection with the funded portion of the New Money DIP Loans;

(e)     fifth, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lender in respect of the Rolled DIP Loans;

(f)     sixth, to repay any principal amounts outstanding in respect of the Rolled DIP Loans; and

(g)     seventh, to pay all other amounts owing to the DIP Lender.

For purposes of this DIP Term Sheet:

"**KEIP**" means a key employee incentive program to be developed by the Compensation Committee of the Debtors based on the recommendations of its independent compensation consultant, which shall be acceptable to the DIP Lender, acting in good faith, with such consent not to be unreasonably withheld or delayed; provided, that in all events, the KEIP shall provide that (a) any KEIP Payment (as defined below) shall be subject to a general release and waiver of claims requirement (including with respect to the DIP Lender and its affiliates) and (b) any KEIP Payment shall be paid to eligible employees no earlier than the consummation of the sale or disposition (in one or more series of transactions or dispositions) of all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures); *provided*, however, that, to the extent there is a sale or disposition of any of the Debtors' Assets to a Stalking Horse Bidder (as defined in the Bidding Procedures) or an affiliate of a Stalking Horse Bidder (a "**Stalking Horse Sale**"), any KEIP Payment will be subject to clawback during the 90-calendar-day transition services period following consummation of such Stalking Horse Sale.

"**KEIP Payment**" means the aggregate amount that becomes payable pursuant to the terms of the KEIP upon one or more Third-Party Sales, in an aggregate amount not to exceed 2.1% of the net cash proceeds of such Third Party Sale that would otherwise be payable to the DIP Lender (which for the avoidance of doubt shall exclude any escrow or holdback amounts unless, until and at such time as they are payable to the DIP Lender) pursuant to the section above "Mandatory Prepayments" or to any Prepetition Secured Party pursuant to the mandatory prepayment provisions of the Prepetition Secured Debt Facilities, which amount shall be inclusive of any employer-side payroll, social security, and similar taxes that become payable in connection with amounts to be paid under the KEIP.

"**KERP**" means a key employee retention program for the benefit of certain non-insider employees of Debtors, on substantially the same terms and conditions set forth in the form of retention agreement agreed to among the Debtors, the DIP Lender and certain eligible employees of the Debtors prior to the Petition Date (the "***Prepetition KERP***"); *provided*, that any KERP Payment will be paid to eligible employees no earlier than the later of (a) the consummation of a sale or disposition of all or substantially all of the Debtors' Assets to a party other than the Stalking Horse Bidder or an affiliate of the Stalking Horse Bidder, and (b) a Stalking Horse Sale; *provided*, *however*, that, to the extent a Stalking Horse Sale is consummated, any KERP Payment will be subject to clawback for the 90-calendar-day transition services period following consummation of such Stalking Horse Sale.

 "**KERP Payment**" means the aggregate amount that could become payable pursuant to the terms of the KERP, which shall not exceed the aggregate amount set forth in the Approved DIP Budget, and

| | |
|---|---|
| | which amount (a) shall be inclusive of any employer-side payroll, social security or similar taxes that become payable in connection with amounts to be paid under the KERP and (b) shall be reduced by any amounts previously paid to eligible employees under the Prepetition KERP and the employer-side payroll, social security or similar taxes that were payable in connection with such amounts.<br><br>"**Third Party Sale**" means any sale or disposition of (a) all or substantially all of the Debtors' Assets (as defined in the Bidding Procedures), (b) one or more Segments (as defined in the Bidding Procedures) or (c) any individual Assets within a Segment, in each case, to an acquirer that is not the DIP Lender or an affiliate of the DIP Lender.<br><br>Notwithstanding the foregoing or anything to the contrary herein or in the DIP Documents or DIP Orders, each of the parties hereto, on behalf of itself and its respective affiliates, hereby acknowledges and agrees that distributions in respect of the DIP Obligations related to the Rolled DIP Loans shall be allocated first to the principal amount of such Rolled DIP Loans (as determined for income tax purposes) and then, to the extent that the consideration exceeds the principal amount of such Rolled DIP Loans, to any accrued but unpaid interest on such Rolled DIP Loans (collectively, "**Intended Tax Treatment**").  Except as required by a final "determination" within the meaning of Section 1313(a) of the Code, or any corresponding or similar outcome under state, local or non-U.S. tax law, the parties hereto will, and will cause each of their respective affiliates to, (x) report, act and file all tax returns in all respects and for all purposes consistent with such Intended Tax Treatment and (y) not take any position for tax purposes (whether in audits, tax returns or otherwise) that is inconsistent with such Intended Tax Treatment. |
| **CONDITIONS PRECEDENT TO THE INTERIM DIP LOANS:** | The obligations of the DIP Lender to make the Interim DIP Loan on the Interim Closing Date will be subject to satisfaction or written waiver, by the DIP Lender, of each of the following conditions precedent in connection with the related draw request:<br><br>(i)    the Debtors shall have timely delivered to the DIP Lender and its advisors the initial Approved DIP Budget or any update thereto then required to be delivered in accordance with this DIP Term Sheet;<br><br>(ii)    the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) on the date of entry of the Interim DIP Order (or such later time as the DIP Lender may agree to).<br><br>(iii)    the Borrower shall have delivered to the DIP Lender a closing certificate duly executed by the chief executive officer, president or chief financial officer (or other |

responsible officer with equivalent duties) of the Borrower, appropriately completed, by which such officer shall certify to the DIP Lender that the conditions precedent to the Interim DIP Loan set forth in clauses (vii) and (viii) hereof to be made on the Interim Closing Date have been satisfied;

(iv)     the Interim DIP Order shall have been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Interim DIP Order;

(v)      all of the "first day" motions, orders and related pleadings filed by the Debtors in the Chapter 11 Cases shall have been delivered in advance to counsel to the DIP Lender and the relief granted thereunder shall be acceptable to the DIP Lender;

(vi)     the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition Priority Term Loan Credit Agreement remains in place);

(vii)    no default or Event of Default under the DIP Commitment Letter or this DIP Term Sheet (or under the DIP Documents, as the case may be) or a Termination Event under, and as defined in, the Interim DIP Order shall have occurred and be continuing on the Interim Closing Date or shall exist after giving effect to the Interim DIP Loan to be made on the Interim Closing Date;

(viii)   all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects on the Interim Closing Date (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(ix) subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform could not reasonably be expected to cause a Material Adverse Change;

(x) receipt by the DIP Lender of a certificate, in form and substance reasonably satisfactory to the DIP Lender, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) of each Debtor on behalf of such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (1) the certificate of incorporation of such Debtor, certified as of a recent date by the applicable secretary of state and (2) the by-laws of such Debtor then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller (or other responsible officer with equivalent duties) thereof authorized to execute the DIP Commitment Letter and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(xi) to the extent invoiced at least one (1) Business Day prior to the Interim Closing Date, substantially concurrently with the Interim Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Prepetition Secured Parties and the DIP Lender relating to the Chapter 11 Cases, the DIP Facility and the Prepetition Secured Debt Facilities (including, without limitation,

reasonable fees and expenses of their counsel and external advisors allocated to the Chapter 11 Cases, including, without limitation, all reasonable and documented fees and out-of-pocket expenses of (a) Akin Gump Strauss Hauer & Feld, LLP), (b) Pashman Stein Walder Hayden P.C., (c) KPMG LLP, as tax and auditing consultant, and (d) any other attorneys retained by the DIP Lender in lieu of the professionals set forth in clause (a) or (b) (collectively, the "**DIP Professionals**") or the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order. Modifications of the Interim DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent (email being sufficient) of the DIP Lender;

(xii)    the Debtors are in compliance in all respects with the section below entitled "Milestones"; and

(xiii)    the DIP Lender shall have received, at least three (3) Business Days prior to the Interim Closing Date (or such shorter period as DIP Lender may agree) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act (Title III of Pub. L. 107 56 signed into law October 26, 2001), as subsequently amended and reauthorized), in each case, requested at least seven (7) Business Days prior to the Interim Closing Date.

For the purposes of this DIP Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, any event, circumstance or condition that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on (i) the business, assets, properties, liabilities (contingent or otherwise), financial condition or results of operations of the Debtors, other than any material adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases, (ii) the ability of the Debtors to perform their obligations under this DIP Term Sheet or any other DIP Document to which they are a party, (iii) the validity or enforceability against any Debtor of this DIP Term Sheet or any other DIP Document to which it is a party or (iv) the rights and remedies of the DIP Lender hereunder or thereunder.

| | |
|---|---|
| **CONDITIONS PRECEDENT TO THE FINAL DIP LOAN:** | The obligations of the DIP Lender to make the Final DIP Loan on the Final Closing Date shall be subject to satisfaction, or written waiver, by the DIP Lender, of each of the conditions precedent described above in the section of this DIP Term Sheet (or, to the extent the DIP Documents have been executed and delivered to the DIP Lender, the DIP Credit Agreement) titled "Conditions Precedent |

to the Interim DIP Loans" and each of the following conditions precedent in connection with the related draw request:

(i)    the Debtors shall have timely delivered to the DIP Lender the Approved DIP Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet;

(ii)    the Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with such draw request no later than 11:00 A.M. (Eastern Time) three (3) Business Days prior to the requested funding date for such Final DIP Loan (or such later time as the DIP Lender may agree to);

(iii)    the Final DIP Order shall have been entered by the Bankruptcy Court (after notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in any manner without the consent of the DIP Lender, and the Debtors shall be in compliance in all respects with the Final DIP Order;

(iv)    no default or Event of Default under the DIP Facility or a Termination Event under the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist after giving effect to the Final DIP Loan to be made on the Final Closing Date;

(v)    all representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) of the Debtors hereunder (or under the DIP Documents, as the case may be) shall be true and correct in all material respects as of the Final Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects, and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date);

(vi)    subject to Bankruptcy Court approval, (a) the Debtors shall have the corporate power and authority to make, deliver and perform their obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this DIP Term Sheet, the DIP Documents (as applicable) and the Final DIP Order except for consents,

<table>
<tr><td></td><td>

authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(vii)  to the extent invoiced at least one (1) Business Day prior to the applicable Final Closing Date, substantially concurrently with such Final Closing Date, all reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or postpetition) of the DIP Lender and the Prepetition Secured Parties relating to the Chapter 11 Cases, the DIP Facility (including, without limitation, reasonable fees and expenses of the DIP Professionals and any professionals retained by the Prepetition Secured Parties) shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) in accordance with the terms of the Final DIP Order;

(viii)  at least forty-one (41) days shall have passed since the Petition Date;

(ix)  if required by the DIP Lender, and to the extent not previously executed, receipt by the DIP Lender of duly executed and delivered copies of the DIP Documents (including, without limitation, senior secured superpriority debtor in possession term loan credit agreement), in each case on the terms set forth in this DIP Term Sheet or otherwise on terms reasonably acceptable to the DIP Lender; and

(x)  the Debtors are in compliance in all respects with the section below entitled "Milestones."

Modifications of the Final DIP Order, other than as directed by the Bankruptcy Court, shall require the prior written consent of the DIP Lender, in its sole discretion (e-mail being sufficient (including as communicated by counsel in writing)).

</td></tr>
<tr><td>

**REPRESENTATIONS AND WARRANTIES:**

</td><td>

The same representations and warranties (other than those that cannot be correctly made due to the existence of the Chapter 11 Cases) as set forth in the Priority Term Loan Credit Agreement (it being understood that references to "Material Adverse Effect" therein shall be deemed to refer to "Material Adverse Change" as defined herein), which shall be deemed made by the Debtors for the benefit of the DIP Lender in respect of the DIP Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein, and the following additional representations and warranties.

(i)  the Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with applicable

</td></tr>
</table>

|  | law and proper notice of the bankruptcy proceedings will be given; |
|  | (ii) the Interim DIP Order or the Final DIP Order, as applicable, is in full force and effect and has not been reversed, vacated, stayed, modified or amended in any manner adverse to the DIP Lender without the prior written consent of the DIP Lender; and |
|  | (iii) each Approved DIP Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower delivered to the DIP Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projection. |
| **FINANCIAL COVENANTS:** | Financial covenants shall include: |
|  | (i) Minimum Qualified Cash (as defined in the Prepetition Priority Term Loan Credit Agreement) of (x) until November 1, 2024, $5,000,000 and (y) after November 1, 2024, $3,000,000, tested on Tuesday of each week, as of the close of business on the immediately preceding Friday (the "**Minimum Qualified Cash Covenant**"; <u>provided that</u>, for the avoidance of doubt, for purposes of the DIP Facility, the Minimum Qualified Cash Covenant herein shall be deemed to replace the Minimum Qualified Cash covenant set forth in Section 7.20 of the Priority Term Loan Credit Agreement); and |
|  | (ii) variances against the then-in-effect Approved DIP Budget, tested in accordance with the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports". |
| **AFFIRMATIVE COVENANTS:** | The same affirmative covenants as set forth in the Priority Term Loan Credit Agreement and the following additional covenants of the Debtors, so long as any obligations remain outstanding under the DIP Facility or the DIP Orders: |
|  | (i) timely deliver, or cause to be timely delivered, to the DIP Lender the Approved DIP Budget and the Weekly Variance Reports, all in accordance with the provisions set forth in the section above entitled "Approved DIP Budget; Approved Cash Flow Projection; Variance Reports" and otherwise in the applicable DIP Orders; |
|  | (ii) cooperate, consult with, and provide to the DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP |

Lender, and permit representatives and independent contractors on behalf of the DIP Lender, collectively, to visit and inspect any of the Debtors' properties, to examine their corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their affairs, finances and accounts with their directors, officers, and independent public accountants (so long as the Debtors have a reasonable opportunity to participate in such meeting), all at the expense of the Borrower; and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that any and all information for which confidentiality is owed to third parties pursuant to written agreements entered into not in contemplation of this exception, information subject to attorney-client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (ii);

(iii)    comply with the Approved DIP Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the applicable DIP Orders;

(iv)    [reserved];

(v)    take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or requested by the DIP Lender to carry out the provisions of this DIP Term Sheet, the DIP Documents and the applicable DIP Orders;

(vi)    except to the extent contemplated by the Approved DIP Budget or otherwise consented to by the DIP Lender in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights, licenses and privileges, and comply with all material contractual obligations of the Debtors;

(vii)    provide drafts of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases to counsel to the DIP Lender at least three (3) Business Days in advance of such filing;

(viii)    maintain their cash management system in a manner reasonably acceptable to the DIP Lender (which shall be

| | |
|---|---|
| | deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as set forth under any cash management orders entered by the Bankruptcy Court); |
| | (ix)  cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every calendar week at reasonable times during normal business hours to discuss the Approved DIP Budget, the Weekly Variance Report, the Chapter 11 Cases, and the financial condition, performance and business affairs of the Debtors; |
| | (x)  at the request of the DIP Lender, take all steps reasonably necessary to appoint a Chief Restructuring Officer (a "**CRO**") acceptable to the DIP Lender (including, but not limited to, seeking entry of an order of the Bankruptcy Court approving the retention and employment of such CRO), which CRO shall have such duties, responsibilities, and authority as are customary for such position and shall be appointed on terms and conditions, including compensation, acceptable to the DIP Lender; and |
| | (xi)  promptly upon receipt by the Debtors of any material adverse written communications from any governmental authority, the Borrower will provide a copy of same to the DIP Lender. |
| **NEGATIVE COVENANTS:** | The same negative covenants as set forth in the Priority Term Loan Credit Agreement and, in addition, prohibitions on the Debtors to, without the express, prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following: |
| | (i)  other than liens required or permitted by this DIP Term Sheet, the DIP Documents and the applicable DIP Orders, seek to or create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out and (b) Prepetition Permitted Liens existing as of the Petition Date; |
| | (ii)  convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of the Debtors' property, business or assets, whether now owned or hereafter acquired, other than (a) dispositions permitted under the Prepetition Priority Term Loan Credit Agreement and (b) asset sales |

|  | | approved by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender; |
|---|---|---|
|  | (iii) | create, incur, assume or permit to exist any indebtedness, other than (a) the DIP Obligations and (b) indebtedness permitted pursuant to the DIP Documents and the applicable DIP Orders; |
|  | (iv) | amend, modify or compromise any material term or material amount owed under a material real property lease or material contract without the prior written consent of the DIP Lender; |
|  | (v) | incur or make any Restricted Payment ((i) as defined in the Prepetition Priority Term Loan Credit Agreement including, for the avoidance of doubt, the proviso contained in such definition and (ii) including, but not limited to, payments relating to any D&O tail policy, investment or loan without the prior written consent of the DIP Lender, unless in accordance with the Approved DIP Budget, after giving effect to the Permitted Variances; |
|  | (vi) | create or acquire any ownership interest in any subsidiaries (whether direct or indirect); |
|  | (vii) | create or permit to exist any other claim which is *pari passu* with or senior to the claims of the DIP Lender under the DIP Facility, except for the Carve Out and except as set forth in this DIP Term Sheet and the applicable DIP Orders; |
|  | (viii) | modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code without the prior written consent of the DIP Lender; |
|  | (ix) | [reserved]; |
|  | (x) | pay prepetition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders and (b) payments authorized by an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Lender; |
|  | (xi) | engage in any activities that would result in the Borrower or any Guarantor becoming an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940; and |

| | |
|---|---|
| | (xii)     enter into, implement, waive, supplement or amend any retention bonus, transaction bonus or similar arrangement(s) with any current or former directors, officers, or employees of the Debtors, to which any of the Debtors is a party to, sponsors, administers or has any liability with respect to, without the prior written consent of the DIP Lender, except (i) with respect to the KEIP and the KEIP Payment thereunder, or (ii) with respect to the KERP and KERP Payment thereunder. |
| **MILESTONES:** | Milestones in respect of the Chapter 11 Cases under the DIP Facility are listed below (as any such time and date may be extended with the written consent of the DIP Lender (which consent may be confirmed via e-mail by counsel on behalf of the DIP Lender)), in each case, subject to Bankruptcy Court availability: |

(i)     no later than one (1) calendar day following the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of the Interim DIP Order;

(ii)     no later than one (1) calendar day after the Petition Date, the Debtors shall have filed a motion in the Bankruptcy Court seeking entry of an order, in form and substance acceptable to the DIP Lender, among other things, (a) approving procedures (the "**Bidding Procedures**") to be used and bid protections to be provided in connection with the sale (or sales) of all or substantially all of the Debtors' assets (the "**Sale Transaction**"), (b) establishing certain dates and deadlines related thereto and scheduling an auction (if any) (the "**Auction**") and the hearing on approval of the Sale Transaction and (c) approving the utilization of a form of asset purchase agreement to be used in connection with the Sale Transaction (the "**Bidding Procedures Order**");

(iii)     no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(iv)     no later than twenty-four (24) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(v)     no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(vi)     no later than October 15, 2024, the Bid Deadline (as defined in the Bidding Procedures) shall have occurred,

| | |
|---|---|
| | unless such date has been extended in accordance with the terms of the Bidding Procedures; |
| | (vii)    no later than November 13, 2024, the Auction (if necessary) shall have occurred; |
| | (viii)    no later than November 25, 2024, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "**Sale Approval Order**"), in form and substance acceptable to the DIP Lender; and |
| | (ix)    no later than December 6, 2024, the Sale Transaction shall be consummated (the "**Sale Closing Milestone**") (or the Outside Date shall have been extended as provided in the Stalking Horse Agreement (each as defined in the Bidding Procedures)). |
| **EVENTS OF DEFAULT:** | Each of the following shall constitute an "**Event of Default**": |
| | (i)    the entry of an interim or final order with respect the DIP Facility, granting approval of the DIP Commitment Letter and the DIP Term Sheet or the DIP Documents (as applicable) in form or substance that is not acceptable to the DIP Lender in its sole discretion; |
| | (ii)    except as set forth in clause (xxiii) below, failure by the Debtors to be in compliance with provisions of this DIP Term Sheet or any DIP Document (subject to applicable grace periods as set forth in any DIP Document or any DIP Order, including a one (1) Business Day grace period for delivery of the Approved DIP Budgets, cash flow forecasts and Weekly Variance Reports; |
| | (iii)    any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order; |
| | (iv)    any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party) for entry of a final order of the Bankruptcy Court charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender; |
| | (v)    failure of any Milestone set forth in this DIP Term Sheet to be satisfied by the specified deadline therefor (in each case, as then in effect after giving effect to any extensions, waivers or amendments thereto made in accordance with the requirements of this DIP Term Sheet); |

(vi)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;

(vii)   the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens or DIP Superpriority Claims, excluding (a) the Carve-Out, (b) liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender or (c) as provided in the "first day" motions with the prior written consent of the DIP Lender;

(viii)   the Debtors (or any of their direct or indirect non-Debtor affiliates) commence (or fail to contest the commencement by a third party of) any action (other than an action permitted by the DIP Orders) against the DIP Lender, the Prepetition Secured Parties or any of its agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Document or under any DIP Order in favor of the DIP Lender or the Prepetition Secured Parties;

(ix)   the entry of an order by the Bankruptcy Court in favor of the Creditors' Committee (if any), any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against the DIP Lender or the Prepetition Secured Parties, (b) sustaining an objection to claims of the DIP Lender or the Prepetition Secured Parties or (c) avoiding any liens held by the DIP Lender or the Prepetition Secured Parties; *provided*, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Rolled DIP Loans or the Prepetition Secured Obligations in accordance with the terms of the applicable DIP Orders;

(x)   (a) the Debtors file any pleading in any court (or fail to contest any pleading filed by a third party in any court) seeking entry of an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Document or any DIP Order, or the disallowance of any DIP Obligations, in whole or in part,

or (b) any provision of this DIP Term Sheet, any other DIP Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding;

(xi) without the prior written consent of the DIP Lender, the failure by the Debtors to be in compliance with provisions of the Bidding Procedures Order (subject to any applicable grace periods as set forth in the Bidding Procedures Order);

(xii) without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations;

(xiii) to the extent that any DIP Obligations remain outstanding, the filing of a chapter 11 plan that is not reasonably acceptable to the DIP Lender;

(xiv) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner or responsible officer with enlarged powers (beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor;

(xv) the granting of (or the Debtors' failure to contest) any motion filed by a creditor or other party in interest seeking relief from the automatic stay in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value in excess of $100,000;

(xvi) termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of the satisfaction in full of the DIP Obligations;

(xvii) the conversion of any Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code;

(xviii) the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(xix) a dismissal of any of the Chapter 11 Cases;

(xx) without the prior written consent of the DIP Lender, a request by the Debtors to use cash collateral or to obtain financing under section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay

<table>
<tr><td></td><td>in full in cash all obligations under the DIP Facility upon consummation thereof;<br><br>(xxi) [reserved];<br><br>(xxii) the filing of any motion seeking approval of a sale of any DIP Collateral (other than any sale permitted under "Negative Covenants");<br><br>(xxiii) failure to pay (A) principal in full when due, including without limitation, on the Maturity Date, or (B) interest or other DIP Obligations in full within three (3) Business Days after the same becomes due; or<br><br>(xxiv) the entry of an order by the Bankruptcy Court approving (a) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (b) a motion seeking the appointment or election of a trustee, responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business.</td></tr>
<tr><td><strong>REMEDIES UPON EVENT OF DEFAULT:</strong></td><td>As set forth in the applicable DIP Orders.</td></tr>
<tr><td><strong>OTHER BANKRUPTCY MATTERS:</strong></td><td>All reasonable and documented prepetition and postpetition professional fees, costs and expenses of the Prepetition Secured Parties and the DIP Lender relating to the Chapter 11 Cases, the DIP Facility or the Prepetition Secured Debt Facilities, any sale (or sales) of the Debtors' assets or businesses or the negotiation, solicitation and implementation of a chapter 11 plan (including, without limitation, (i) the preparation of documentation (including any amendments, modifications or waivers) in respect thereof, (ii) the administration thereof and (iii) in connection with the enforcement or protection of rights in connection with the DIP Facility or the documentation in respect thereof) (including, without limitation, prepetition and postpetition fees and disbursements of the DIP Professionals and the Adequate Protection Fees) subject to the terms of the applicable DIP Orders, shall be payable by the Borrower, following receipt of a summary invoice and without the requirement for Bankruptcy Court approval.  A copy of each summary invoice for fees, costs and expenses of the DIP Lender and the Prepetition Secured Parties shall be provided by the DIP Lender and the Prepetition Secured Parties to the U.S. Trustee and counsel to the Creditors' Committee (if any).<br><br>The Borrower shall indemnify the DIP Lender in accordance with indemnity provisions customary for transactions of this type and otherwise generally consistent with those set forth in the Prepetition Priority Term Loan Credit Agreement.  Section 10.5 of the</td></tr>
</table>

<table>
<tr><td></td><td>Prepetition Priority Term Loan Credit Agreement is hereby incorporated by reference herein, <em>mutatis mutandis</em>.<br><br>The DIP Orders shall contain releases and exculpations for the DIP Lender and the Prepetition Secured Parties, in form and substance satisfactory to the DIP Lender and the Prepetition Secured Parties, including, without limitation, releases from any avoidance actions under chapter 5 of the Bankruptcy Code or any analogous federal, state of foreign laws.<br><br>Subject to the entry of the Interim DIP Order, the DIP Lender shall have the unconditional right to credit bid ("**Credit Bid**") the outstanding DIP Obligations (and any other applicable obligations) in connection with any non-ordinary course sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, any chapter 11 plan or otherwise.</td></tr>
<tr><td>**DIP ORDERS GOVERN:**</td><td>To the extent of any conflict or inconsistency between this DIP Term Sheet and any applicable DIP Order, such DIP Order shall govern.</td></tr>
<tr><td>**AMENDMENT AND WAIVER:**</td><td>Except as otherwise expressly provided herein or therein, no provision of this DIP Term Sheet, any other DIP Document or any DIP Order may be amended other than by an instrument in writing signed by (i) the DIP Lender and (ii) the Debtors.</td></tr>
<tr><td>**ASSIGNMENTS:**</td><td>The DIP Lender may assign all or any part of the DIP Loans or the DIP Commitments from time to time with the consent of the Borrower, which shall not be unreasonably withheld (it being understood that it shall be reasonable to withhold consent to an assignment to a competitor of the Debtors); <em>provided</em>, that no consent of the Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to a DIP Lender or an affiliate of a DIP Lender or the Prepetition Secured Parties.  The parties to each assignment shall execute and deliver to the DIP Lender an assignment agreement in form and substance acceptable to the DIP Lender (an "**Assignment Agreement**").  Subject to receipt and recording thereof by DIP Lender, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of the DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder.</td></tr>
<tr><td>**WAIVERS AND PROTECTIONS:**</td><td>The Final DIP Order shall include in respect of (i) the DIP Obligations and Prepetition Secured Obligations, (ii) the DIP Collateral, including, but not limited to, all Prepetition Collateral, (iii) the DIP Lender and the Prepetition Secured Parties, as applicable, (a) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, (b) a waiver of the ability to</td></tr>
</table>

<table>
<tr><td></td><td>surcharge the DIP Collateral or Prepetition Collateral, including under section 506(c) of the Bankruptcy Code, and (c) a waiver of the equitable doctrine of "marshaling" with respect to the DIP Collateral, including, but not limited to, all Prepetition Collateral.

In addition, the DIP Orders shall include stipulations in respect of the validity of the Prepetition Secured Debt Liens and the Prepetition Secured Obligations, subject to an investigation period of not less than seventy-five (75) calendar days following the entry of the Interim DIP Order.</td></tr>
<tr><td>**GOVERNING LAW AND JURISDICTION:**</td><td>The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors submit to the exclusive jurisdiction of the Bankruptcy Court and waive any right to trial by jury.</td></tr>
<tr><td>**PATRIOT ACT:**</td><td>The DIP Lender hereby notifies the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the DIP Lender to identify the Borrower in accordance with the Act.</td></tr>
<tr><td>**NOTICES:**</td><td>(a)  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, upon confirmation of delivery, addressed as follows in the case of the Borrower and the DIP Lender, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:         Edgio, Inc.
                  11811 N. Tatum Blvd., Suite 3031, Phoenix, Arizona 85028
                  Richard Diegnan, Chief Legal Officer
                  Email: rdiegnan@edg.io
                  with a copy to (which shall not constitute notice under this DIP Term Sheet or any DIP Documents):

                  Milbank LLP
                  55 Hudson Yards
                  New York, NY 10001-2163
                  Attn: Tyson Lomazow, Lauren C. Doyle, Maya Grant
                  Email: tlomazow@milbank.com
                         ldoyle@milbank.com</td></tr>
</table>

|  | mgrant@milbank.com |
| --- | --- |
|  | DIP Lender: |
|  | Lender: Lynrock Lake Master Fund LP<br>Attention: Cynthia Paul; Michael Manley; Operations<br>Email: cp@lynrocklake.com<br>mike@lynrocklake.com<br>ops@lynrocklake.com<br><br>with a copy to (which shall not constitute notice under this DIP Term Sheet or any DIP Documents):<br><br>Akin Gump Strauss Hauer & Feld LLP<br>Attention: Michael Stamer, Meredith Lahaie, Catherine Goodall<br>Email: mstamer@akingump.com<br>mlahaie@akingump.com<br>cgoodall@akingump.com |
|  | (b) Notices and other communications to the DIP Lender hereunder may be delivered or furnished by electronic communications (including email) pursuant to procedures approved by the DIP Lender. The DIP Lender or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided*, that approval of such procedures may be limited to particular notices or communications. Unless the DIP Lender otherwise prescribes, notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment); *provided*, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.<br><br>(c) Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto. |
| **COUNSEL TO DIP LENDER:** | (a) Lead restructuring counsel: Akin Gump Strauss Hauer & Feld LLP<br><br>(b) Delaware local counsel: Pashman Stein Walder Hayden P.C. |

**<u>Annex A</u>**

**DIP Commitments**

| DIP Lender | DIP Commitment |
|---|---|
| Lynrock Lake Master Fund LP | **$15,625,000** |
| **Total** | **$15,625,000** |