**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br>**EDGIO, INC.**, *et al.*,[1]<br>Debtors. | Case No. 24-[•] (   )<br>Chapter 11<br>(Joint Administration Requested) |

**DECLARATION OF
ANN M. MILLER IN
SUPPORT OF THE DEBTORS
MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING
THEM TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III)
MODIFYING THE AUTOMATIC STAY, (IV) GRANTING
ADEQUATE PROTECTION, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF.**

---

[1] The Debtors operate under the trade name Edgio and have previously used the trade names Limelight, Edgecast and Layer0. The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the last four digits of each Debtor's federal tax identification number, are: Edgio, Inc. (7033); Edgecast Inc. (6704); Edgio International, Inc. (3022); Limelight AcquisitionCo, Inc. (6138); Limelight Midco, Inc. (1120); Limelight Networks VPS, Inc. (3438); and Mojo Merger Sub, LLC (0056). The Debtors' service address for purposes of these Chapter 11 Cases is: 11811 N. Tatum Blvd., Ste. 3031, Phoenix, AZ 85028. Additional information about the Chapter 11 Cases is available at https://OmniManagementSolutions.com/Edgio/.

I, Ann M. Miller, declare under penalty of perjury as follows:

1. I am a Managing Director at TD Securities (USA) LLC (an affiliate of Cowen and Company, LLC) ("**TD Cowen**"), an investment banking firm with headquarters at 1 Vanderbilt, New York, NY 10017, and offices in additional locations, including 599 Lexington Avenue, New York, NY 10022, where I am based. TD Cowen is the Debtors' proposed investment banker in these Chapter 11 Cases and I anticipate that the Debtors will, within the first thirty days of these Chapter 11 Cases, file an application to employ and retain TD Cowen.

2. I submit this Declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, (V) Granting Adequate Protection, and (VI) Granting Related Relief* (the "**Motion**"), filed contemporaneously herewith.[2] Through the Motion, the Debtors seek, among other things, approval of the DIP Facility, consisting of (a) a new money term loan in an aggregate principal amount of $15,625,000 (the "**DIP Term Loan**") and (b) the "roll-up" of $103,682,550 in outstanding principal amounts and all accrued and unpaid interest, plus all interest accrued following the Petition Date, under the Priority Term Loan and the 2023 Term Loan (the "**Roll-Up Amount**"), with approximately $34.24 million of such amount being rolled up in connection with the Interim DIP Loan and the remainder to occur in connection with the Final DIP Loan.[3]

3. I am over the age of 18, am authorized to submit this Declaration on the Debtor's behalf.

4. Except as otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge of Debtors' operations and finances gleaned during the course of

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3] The material terms of the DIP Facility are set forth in further detail in the Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Documents.

TD Cowen's engagement with Debtors, (b) my discussions with Debtors' senior management, other members of the TD Cowen team and Debtors' other advisors, and (c) my review of relevant documents and/or my opinion based upon my experience. I am not being specifically compensated for this testimony other than through payments received by TD Cowen, as a proposed professional to be retained by the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

## BACKGROUND AND QUALIFICATIONS

5.       TD Cowen is an investment banking and financial advisory firm that provides its clients with a range of investment banking and advisory services, including raising capital, restructuring advice, and distressed mergers and acquisition advice. TD Cowen's investment banking and financial advisory professionals collectively have decades of experience advising clients, both out-of-court and in chapter 11. TD Cowen has been retained to provide investment banking and financial advisory services in, among other cases: *In re DermTech, Inc., et al.*, Case No. 24-11378 (JTD) (Bankr. D. Del.); *In re Sienna Biopharmaceuticals, Inc.,* Case No. 19-12051 (MFW) (Bankr. D. Del.); *In re PhaseRX, Inc.*, Case No. 16-12577 (MFW) (Bankr. D. Del.); *In re Bind Therapeutics, Inc.*, Case No. 16-11084 (BLS) (Bankr. D. Del.); and *In re Wire Company Holdings, LLC* (d/b/a New York Wire), Case No. 15-12097 (LSS).

6.       I have more than 25 years of experience providing strategic advice to public and private companies and extensive experience in in-court and out-of-court restructurings, debt for equity exchanges, mergers and acquisitions, and capital raising. I rejoined TD Cowen in May 2023, after leading and being an integral team member at several boutique and global investment banks. I hold a Master of Business Administration in Analytical Finance and Economics from the University of Chicago and a Bachelor of Business Administration from the University of Wisconsin, Madison. I also hold the designation of Chartered Financial Analyst.

## THE DIP FINANCING

### I. THE DEBTOR'S NEED FOR LIQUIDITY

7. I understand that information regarding the Debtors' cash needs leading up to the commencement of these Chapter 11 Cases and the need for the relief requested in the Motion is addressed in detail in the *Declaration of Jesse York in Support of the Motion* (the "**Riveron Declaration**") that is being filed contemporaneously with the Motion and this Declaration. I also understand that information regarding the history, events, and facts and circumstances that led to the filing of these Chapter 11 Cases is addressed in detail in the *Declaration of Todd Hinders in Support of Chapter 11 Petitions and First Day Motions of Edgio, Inc. et al.* (the "**First Day Declaration**").

8. I understand that, as described in the Riveron Declaration, the Debtors' management team and their advisors have determined that the Debtors would not be able to fund their operations and the administrative costs of these Chapter 11 Cases, without access to debtor-in-possession financing. Further, I understand that, based on the current expectations and timeline memorialized in the DIP Commitment Letter, procuring the new money financing under the DIP Facility and having access to Cash Collateral provides the Debtors with the best chance to sufficiently fund the Debtors' anticipated sale process and operations as well as administrative costs during these Chapter 11 Cases.

### II. THE DEBTOR'S EFFORTS TO OBTAIN POSTPETITION FINANCING

9. Through working with the Debtors' management and other advisors, I have become well acquainted with Debtors' capital structure, liquidity needs, and business operations. As more fully set forth in the First Day Declaration, following a series of events which led to financial and operational challenges, in February 2024, the Debtors engaged TD Cowen as investment banker to explore strategic alternatives, and in June 2024, engaged restructuring professionals at TD Cowen in connection with the Sale Process.

10. Prior to beginning this marketing process, the Company focused on restructuring its operations and developing a strategy to minimize operating costs, including separating certain segments from the remaining Company to maximize the value of the assets. Additionally, the Company focused its efforts on retaining key personnel and customers and managing the vendor payables, which they believed was key in maximizing the value of the assets in a sale.

11. As further described in the First Day Declaration, TD Cowen launched its marketing process in June 2024. In July 2024, it became apparent that the Company was going to soon hit a liquidity wall, and, given these time constraints, marketing the assets out-of-court was becoming exceedingly difficult. As a result, the Company and its advisors began contingency planning, which included a potential chapter 11 filing.

12. TD Cowen, with assistance of the Debtors and their other advisors, considered potential sources of financing that would provide the liquidity necessary to fund the continued marketing of the assets out-of-court as well as in a chapter 11 filing. Given, among other things, the existing capital structure and the lack of unencumbered assets, the Company was unable to source additional financing from parties outside of its existing capital structure. Accordingly, the Company's advisors focused efforts on engaging with Lynrock Lake. Following weeks of good faith and constructive negotiations, the Company was able to secure required financing first in the form of the Priority Term Loan, which provided the Company with $7.5 million in net cash proceeds and allowed for the orderly commencement of these Chapter 11 Cases and second, subject to Court approval, the proposed post-petition DIP Facility. In light of the terms of the 2023 Term Loan and the 2023 Credit Agreement (together, the "***2023 Financings***") and the Company's deteriorating liquidity position, the rates and terms agreed upon in the 2023 Financings effectively established the Company's cost of capital for purposes of procuring debtor in possession financing.

13. While continuing to negotiate the terms of the DIP Facility with Lynrock Lake, TD Cowen also approached potential lenders to seek alternative proposals to the DIP Facility in the days prior to the Petition Date. In doing so, TD Cowen and the Debtors advisors were conscious of risks to the business associated with chapter 11 rumors. Therefore, TD Cowen solicited

proposals for debtor in possession financing by contacting approximately fifteen well-established and experienced third-party financial institutions and other capital sources. Those parties included lenders that often make loans in distressed and bankruptcy situations and have the capital necessary to provide adequate financing to the Debtors.

14. To this date, the foregoing efforts have not surfaced any actionable financing proposals from any third parties, other than the DIP Facility.

15. Thus, the Debtors and their directors, in consultation with TD Cowen and the Debtors' other advisors, determined that the proposed DIP Facility and the authorization to use Cash Collateral as offered by Lynrock Lake are the best financing options that the Debtors could obtain and that it would be imprudent to attempt to conduct the Chapter 11 Cases without access to the DIP Facility on the proposed terms thereof. Fully unsecured post-petition financing was not available to Debtors. Other potential sources of debtor in possession financing for Debtors, including on a junior secured basis, were also nonexistent.

### III. THE TERMS OF THE PROPOSED DIP FACILITY

16. As noted in the Motion, the proposed DIP Facility includes: $15,625,000 in New Money DIP Commitments (resulting in $12.5 million funded after applying the original issue discount), of which approximately (a) $11,718,750 (resulting in $9.375 million funding after applying the original issue discount) will be made available by the DIP Lender following entry of the Interim Order and (b) $3,906,250 will be made available by the DIP Lender subject to entry of the Final Order (resulting in $3.125 million funding after applying the original issue discount). The DIP Facility also includes a roll-up of up to $103,682,550 in outstanding principal amounts and all accrued and unpaid interest, plus all interest accrued following the Petition Date, under the Priority Term Loan and the 2023 Term Loan, with a roll-up of approximately $34.24 million of such amount occurring in connection with the Interim DIP Loans and the remainder being rolled up in connection with the Final DIP Loan. The DIP Facility matures up to 6 months after the Petition Date and all amounts outstanding under the DIP Facility shall be due and payable in full on the Maturity Date.

17.     The economic terms of the proposed DIP Facility are more fully described in the Motion. Certain of the key terms of the DIP Credit Agreement include: (i) an Exit Premium of 5% due on all New Money DIP Loans; (ii) an Original Issue Discount on the New Money DIP Loans of 20%; and (ii) interest accruing at a rate of 19.5% *per annum*, with 2.5% *per annum* paid in cash and the remainder paid in kind on the DIP Loan. In addition, the obligations are secured by first priority liens on substantially all of the Debtors' assets and guaranteed by each subsidiary of the Borrower that guaranteed, purported to guarantee or was required to guarantee any of the Prepetition Secured Debt Facilities (including each of the Debtors).

18.     In accordance with the DIP Orders and the Approved DIP Budget, proceeds of the DIP Facility will be used to fund (i) working capital needs and general corporate purposes, (ii) bankruptcy related costs and expenses (including professional fees), (iii) costs and expenses related to the DIP Facility, and (iv) any other purposes specifically set forth in the Approved DIP Budget.

### IV.     THE PROPOSED DIP FACILITY IS THE BEST FINANCING OPTION AVAILABLE TO THE DEBTORS

19.     TD Cowen was closely involved in the Debtors' review of the principal economic terms of the proposed DIP Facility and related negotiations. As set forth in the Motion, the intent of the proposed DIP Facility is to fund the Debtors' operations and effectuate the Sale Process by providing them with necessary liquidity to administer these Chapter 11 Cases.

20.     Based on my experience with debtor-in-possession financing transactions and my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facility, taken as a whole, is the best financing option currently available to the Debtors under the facts and circumstances of these Chapter 11 Cases.

21.     Based on the discussions that I observed and participated in, the negotiations with Lynrock Lake were conducted at arm's length over several rounds beginning and continuing until the Petition Date. These negotiations centered around, among other things, the terms and conditions of the DIP Facility, including sizing, milestones and covenants, the maturity thereof, the proposed "roll-up," the interest rate, minimum cash balances, and the fees to be paid in

connection with the DIP Facility. Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the financing solicitation process described herein, these negotiations resulted in the best currently available financing option for the Debtors, taken as a whole, given the facts and circumstances of these Chapter 11 Cases.

22. First, the proposed DIP Facility will provide the Debtors with access to the capital that the Debtors, in consultation with their advisors, believe is necessary to administer these Chapter 11 Cases effectively and efficiently.

23. Second, the proposed DIP Facility was subject to a third-party marketing process as further described above. The "roll-up," fees and rates to be paid under the proposed DIP Facility are integral components of the overall terms of the proposed DIP Facility and were required by the DIP Lender as consideration for the extension of postpetition financing. So, while the Debtors, with the assistance of their advisors, including TD Cowen, solicited other sources of postpetition financing to determine whether the Debtors could obtain such postpetition financing from any other providers on superior terms, the Debtors were unable to obtain other committed DIP alternatives.

24. Additionally, the terms of the roll-up also benefit the Debtors by reducing the current applicable interest rate on the 2023 Term Loan. The 2023 Term Loan bears interest at the rate of 25.5% (including default interest), of which 3.5% is payable in cash. Therefore, if the 2023 Term Loan Obligations were not included in the roll-up the Debtors might be forced to make adequate protection payments during these Chapter 11 Cases at a rate higher than the cash interest payable on the Rolled DIP Loans.

25. Finally, based on my experience with debtor-in-possession financing transactions, my involvement in the marketing and negotiation of the postpetition financing alternatives for the Debtors and in light of the Debtors' previous completed financings and company condition, it is my belief that the principal economic terms proposed under the DIP Facility, (*i.e.*, pricing, fees, interest rate, and roll-up), are generally consistent with the terms one would expect in debtor-in-possession financings under comparable circumstances.

26. Accordingly, it is my view that the proposed DIP Facility offers the best currently available financing option to the Debtors under the facts and circumstances of these Chapter 11 Cases and the product of arm's length negotiations.

## CONCLUSION

27. For all of the reasons set forth herein and, in the Motion, I believe that obtaining post-petition financing in accordance with the terms of the proposed DIP Facility and Debtors' use of Cash Collateral is absolutely essential to Debtors' ability to minimize disruption and avoid immediate and irreparable harm to their estates.

*[Remainder of page intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 9, 2024

*/s/ /Ann M. Miller*

Ann M. Miller